JUDGE HOLWELL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK



**11 CIV 7010**

- - - - - - - - - - - - - - - - - x

FEDERAL HOUSING FINANCE AGENCY,
as Conservator for the FEDERAL HOME
LOAN MORTGAGE CORPORATION,

                Plaintiff,

    – against –

ALLY FINANCIAL INC. f/k/a GMAC, LLC,
GMAC MORTGAGE GROUP, INC.,
RESIDENTIAL CAPITAL LLC f/k/a
RESIDENTIAL CAPITAL CORPORATION,
GMAC-RFC HOLDING COMPANY, LLC
d/b/a GMAC RESIDENTIAL FUNDING
CORPORATION, RESIDENTIAL FUNDING
COMPANY, LLC f/k/a RESIDENTIAL
FUNDING CORPORATION, ALLY
SECURITIES, LLC f/k/a RESIDENTIAL
FUNDING SECURITIES, LLC d/b/a GMAC
RFC SECURITIES and f/k/a RESIDENTIAL
FUNDING SECURITIES CORPORATION,
RESIDENTIAL ASSET MORTGAGE
PRODUCTS, INC., RESIDENTIAL ASSET
SECURITIES CORPORATION,
RESIDENTIAL ACCREDIT LOANS, INC.,
J.P. MORGAN SECURITIES LLC f/k/a
J.P. MORGAN SECURITIES, INC. and as
Successor-in-Interest to BEAR, STEARNS &
CO., INC., CREDIT SUISSE SECURITIES
(USA) LLC f/k/a/ CREDIT SUISSE FIRST
BOSTON LLC, RBS SECURITIES, INC. d/b/a
RBS GREENWICH CAPITAL and f/k/a
GREENWICH CAPITAL MARKETS, INC.,
CITIGROUP GLOBAL MARKETS INC.,
BARCLAYS CAPITAL INC., UBS
SECURITIES LLC, and GOLDMAN, SACHS
& CO.,

               Defendants.

- - - - - - - - - - - - - - - - - x

**RECEIVED**
OCT - 6 2011
U.S.D.C. S.D. N.Y.
CASHIERS

**NOTICE OF REMOVAL**

Action Removed From Supreme
Court, New York County, Index
No. 652441/2011

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1452 and 1441(b), the undersigned defendants (the "Removing Defendants") hereby remove this action to this Court from the Supreme Court of the State of New York, County of New York ("Supreme Court"), where it was pending under Index No. 652441/2011.  As grounds for removal, the Removing Defendants state as follows:

1.     The action's removal is authorized by 28 U.S.C. § 1452 because this action is related to cases under the Bankruptcy Code, Title 11 of the United States Code, and therefore within the jurisdiction supplied by 28 U.S.C. § 1334(b).

2.     The action's removal is also authorized by 28 U.S.C. § 1441(b) because the action arises under the laws of the United States by virtue of the provision of 12 U.S.C. § 1452(f)(2) that all civil actions to which the Federal Home Loan Mortgage Corporation "is a party shall be deemed to arise under the laws of the United States."

3.     This action also falls within the original jurisdiction of this Court pursuant to 28 U.S.C. § 1331 (laws of the United States), 28 U.S.C. § 1345 (federal agency action) and/or § 1349 (federally-owned and chartered corporation).

## I.     Background And Procedural Matters

### A.     The Federal Actions

4.     On July 27, 2011 and September 2, 2011, the Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and in most instances also as Conservator for the Federal National Mortgage Association ("Fannie Mae"), filed in this Court thirteen substantially similar actions (the "Federal Actions") arising out of the alleged purchase by Freddie Mac and Fannie Mae of residential mortgage-backed securities ("RMBS") in the period from

2

2005 to 2007.  Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act"), state Blue Sky Laws, and the common law.

5.     This Court has recognized that the Federal Actions "preliminarily appear to bear substantial similarities and to raise similar issues," and it has directed the submission of a joint report (or separate reports if agreement cannot be reached) on or before October 19, 2011 describing the similarities and differences among the Federal Actions and proposing means for the most efficient and convenient handling of these substantially similar actions.  *See* Order, *FHFA as Conservator etc. v. HSBC N. Am. Holdings, Inc. et al.*, No. 11 Civ. 6189 (LAK) (S.D.N.Y. Sept. 16, 2011) (DE 4).

**B.     This Action And The Other State-Court Actions**

6.     On September 2, 2011, FHFA filed this action in Supreme Court. Here, as in the Federal Actions, FHFA asserts common-law claims, Securities Act claims, and state Blue Sky claims arising out of alleged Freddie Mac RMBS purchases between 2005 and 2007.  At issue in this action are claims related to securities from 21 securitizations in which the depositor was a subsidiary of Ally Financial Inc. ("Ally"). (Ally, once known as GMAC and before that as General Motors Acceptance Corp., is currently majority owned by the United States Treasury.)  The defendants in the action are the depositors of loans in the 21 securitizations, various Ally subsidiaries alleged to control the depositors, Ally, and certain underwriters.  Underwriter defendant Residential Funding Securities, LLC is an Ally subsidiary.  The other underwriter defendants are unaffiliated with Ally, and they are all also defendants in at least one of the Federal Actions.  The defendants in this action deny liability.

7.     On September 2, 2011, FHFA also filed three additional similar actions in Supreme Court.  At least two of these actions, *FHFA as Conservator etc. v. Morgan Stanley et al.*, and *FHFA as Conservator etc. v. Countrywide Financial Corp. et al.,* already have been removed to this Court and are pending as Case No. 11 Civ. 6739 (PKC) and Case No. 11 Civ. 6916 (unassigned).

**C.     Procedural Matters**

8.     In compliance with the venue provisions of 28 U.S.C. § 1446(a) and Fed. R. Bankr. P. 9027(a)(1), this Court is the district court for the district and division within which the action has been pending.

9.     The claims asserted against the Removing Defendants are not core proceedings within the meaning of 28 U.S.C. § 157(b).  The Removing Defendants do not consent to entry of final orders or judgments by the bankruptcy judge.

10.     No defendant was served with the summons herein more than 30 days prior to the date hereof, and so removal is timely under 28 U.S.C. § 1446(b) and Fed. R. Bankr. P. 9027(a)(3).

11.     The only papers served on the Removing Defendants, and the only process or pleadings in the action to date, are the summons and complaint reproduced, in accordance with 28 U.S.C. § 1446(a) and Fed. R. Bankr. P. 9027(a)(1), as Exhibit A hereto.  Also filed with Supreme Court last month was the stipulation extending the defendants' time to respond to the complaint, reproduced as Exhibit B hereto.

12.     Pursuant to 28 U.S.C. § 1446(d) and Fed. R. Bankr. P. 9027(b)-(c), the Removing Defendants will serve plaintiff's attorneys with a copy of this Notice of Removal and will file a copy thereof with the Clerk of Supreme Court.

## II.    Grounds For Removal

### A.    Bankruptcy Jurisdiction Removal

13.    This action may be removed under 28 U.S.C. § 1452(a) because it is a civil proceeding "related to" several cases under the Bankruptcy Code, and this Court therefore has original jurisdiction over this action under 28 U.S.C. § 1334(b).

14.    The allegations against the Removing Defendants relate to the following RMBS, each of which contains mortgages originated, or originally purchased and resold, by entities that are in bankruptcy or that are subsidiaries of bankrupt entities and against which one or more of the Removing Defendants has potential claims for indemnification and/or contribution (the "Bankrupt Originators/Sellers").  The Bankrupt Originators/Sellers include, but are not limited to, the following:

| *Offering* | *Bankrupt Originators/Sellers* |
|---|---|
| RALI 2005-QO4 | Choice Capital Funding; Lancaster Mortgage Bankers LLC |
| RALI 2006-QO4 | Choice Capital Funding |
| RALI 2006-QO5 | Aegis Wholesale Corporation; Choice Capital Funding; Franklin Bank Corporation |
| RALI 2006-QO8 | Aegis Wholesale Corporation; Cameron Financial Group, Inc.; Choice Capital Funding; ComUnity Lending, Inc.; First Magnus Financial Corporation; Franklin Bank Corporation; Mortgage Lender's Network |
| RALI 2006-QO9 | Aegis Wholesale Corporation; Cameron Financial Group, Inc.; Choice Capital Funding; ComUnity Lending, Inc.; First Magnus Financial Corporation; Franklin Bank Corporation |
| RALI 2007-QH5 | First Magnus Financial Corporation |

| *Offering* | *Bankrupt Originators/Sellers* |
| --- | --- |
| RAMP 2005-NC1 | First Magnus Financial Corporation; New Century Mortgage Corporation; Premier Mortgage Funding, Inc. |
| RAMP 2005-RS9 | Accredited Home Lenders, Inc.; Ace Mortgage Funding; Alliance Bancorp; American Home Mortgage Acceptance, Inc.; American Home Mortgage Investment Corporation; Cameron Financial Group, Inc.; Choice Capital Funding; ComUnity Lending, Inc.; First Magnus Financial Corporation; First NLC Financial Services LLC; Franklin Bank Corporation; Homebanc Mortgage Corporation; Maverick Residential Mortgage; Mortgage Lender's Network; New Century Mortgage Corporation; Oak Street Mortgage LLC; People's Choice Home Loan, Inc.; Premier Mortgage Funding, Inc.; Realty Mortgage Corporation |
| RAMP 2006-RS1 | Accredited Home Lenders, Inc.; Ace Mortgage Funding; Alliance Bancorp; American Home Mortgage Acceptance, Inc.; Choice Capital Funding; ComUnity Lending, Inc.; First Magnus Financial Corporation; First NLC Financial Services LLC; Homebanc Mortgage Corporation; Lancaster Mortgage Bankers LLC; Mortgage Lender's Network; Oak Street Mortgage LLC; Premier Mortgage Funding, Inc. |
| RASC 2005-EMX3 | Mortgage Lender's Network USA Inc.; Premier Mortgage Funding, Inc. |
| RASC 2005-KS10 | American Home Mortgage Acceptance, Inc.; American Home Mortgage Investment Corporation; Choice Capital Funding; Fieldstone Mortgage Company; Franklin Bank Corporation; Homebanc Mortgage Corporation; Lancaster Mortgage Bankers LLC; Mortgage Lender's Network; New Century Mortgage Corporation; Oak Street Mortgage LLC; People's Choice Home Loan, Inc.; Premier Mortgage Funding, Inc. |

| _Offering_ | _Bankrupt Originators/Sellers_ |
|---|---|
| RASC 2005-KS11 | Choice Capital Funding; First NLC Financial Services LLC; Lancaster Mortgage Bankers LLC; Mortgage Lender's Network; New Century Mortgage Corporation; Oak Street Mortgage LLC; People's Choice Home Loan, Inc.; Premier Mortgage Funding, Inc.; Realty Mortgage Corporation |
| RASC 2006-EMX8 | First Magnus Financial Corporation; Mortgage Lender's Network; Premier Mortgage Funding, Inc. |
| RASC 2006-EMX9 | First Magnus Financial Corporation; Mortgage Lender's Network; Premier Mortgage Funding, Inc. |
| RASC 2006-KS3 | American Home Mortgage Acceptance, Inc.; American Home Mortgage Investment Corporation; Accredited Home Lenders, Inc.; Choice Capital Funding; First NLC Financial Services LLC; Homebanc Mortgage Corporation; Oak Street Mortgage LLC; People's Choice Home Loan, Inc.; Premier Mortgage Funding, Inc.; Realty Mortgage Corporation |
| RASC 2006-KS9 | Aegis Mortgage Corporation; Choice Capital Funding; First Magnus Financial Corporation; Meritage Mortgage Corporation; New Century Mortgage Corporation; Oak Street Mortgage LLC; OwnIt Mortgage Solutions, Inc.; People's Choice Home Loan, Inc. |
| RASC 2007-EMX1 | Mortgage Lender's Network.; Premier Mortgage Funding, Inc. |
| RASC 2007-KS2 | Ace Mortgage Funding; Choice Capital Funding; Maverick Residential Mortgage; New Century Mortgage Corporation; Oak Street Mortgage LLC; OwnIt Mortgage Solutions, Inc.; People's Choice Home Loan, Inc.; Realty Mortgage Corporation |

| *Offering* | *Bankrupt Originators/Sellers* |
|---|---|
| RASC 2007-KS3 | Ace Mortgage Funding; Aegis Mortgage Corporation; Choice Capital Funding; Homebanc Mortgage Corporation; Meritage Mortgage Corporation; New Century Mortgage Corporation; Oak Street Mortgage LLC; OwnIt Mortgage Solutions, Inc.; People's Choice Home Loan, Inc.; Premier Mortgage Funding, Inc.; Realty Mortgage Corporation |

15.     Ace Mortgage Funding is the subject of a Bankruptcy Code case commenced November 5, 2008, in the United States Bankruptcy Court for the District of Delaware, *In re Ace Mortgage Funding, LLC*, Case No. 08-12645.

16.     Aegis Mortgage Corp. is the subject of a Bankruptcy Code case commenced August 13, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re Aegis Mortgage Corporation*, Case No. 07-11119.

17.     Aegis Wholesale Corp. is the subject of a Bankruptcy Code case commenced August 13, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re Aegis Wholesale Corp.*, Case No. 07-11120.

18.     Alliance Bancorp and Alliance Bancorp Inc. are the subjects of Bankruptcy Code cases commenced December 20, 2007 and July 13, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re Alliance Bancorp*, Case No. 07-10942, and *In re Alliance Bancorp, Inc.,* Case No. 07-10943.

19.     American Home Mortgage Investment Corp. and American Home Mortgage Acceptance, Inc. are the subjects of a Bankruptcy Code case commenced August 6, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re American Home Mortgage Holdings, Inc., et al.*, Case No. 07-11047.

20.    Accredited Home Lenders, Inc. is the subject of a Bankruptcy Code case commenced May 1, 2009, in the United States Bankruptcy Court for the District of Delaware, *In re Accredited Home Lenders Holding, Co. et al.*, Case No. 09-11516.

21.    Cameron Financial Group is the subject of a Bankruptcy Code case commenced February 19, 2008, in the United States Bankruptcy Court for the Central District of California, *In re Cameron Financial Group,* Case No. 08-10322.

22.    Choice Capital Funding is the subject of a Bankruptcy Code case commenced July 5, 2007, in the United States Bankruptcy Court for the Northern District of Georgia, *In re Choice Capital Funding, Inc.*, Case No. 07-70717.

23.    ComUnity Lending, Inc. is the subject of a Bankruptcy Code case commenced January 4, 2008, in the United States Bankruptcy Court for the Northern District of California, *In re ComUnity Lending, Incorporated, a California Corporation*, Case No. 08-50030.

24.    Fieldstone Mortgage Company is the subject of a Bankruptcy Code case commenced November 23, 2007, in the United States Bankruptcy Court for the District of Maryland, *In re Fieldstone Mortgage Co..*, Case No. 07-21814-JS.

25.    First Magnus Financial Corp. is the subject of a Bankruptcy Code case commenced August 21, 2007, in the United States Bankruptcy Court for the District of Arizona, *In re First Magnus Financial Corp.*, Case No. 4:07-bk-01578-JMM.

26.    First NLC Financial Services LLC is the subject of a Bankruptcy Code case commenced January 18, 2008, in the United States Bankruptcy Court for the Southern District of Florida, *In re First NLC Financial Services, LLC, et al.*, Case No. 08-10632.

27.     Franklin Bank Corporation is the subject of a Bankruptcy Code case commenced November 12, 2008, in the United States Bankruptcy Court for the District of Delaware, *In re Franklin Bank Corporation,* Case No. 08-12924.

28.     Homebanc Mortgage Corporation is the subject of a Bankruptcy Code case commenced August 9, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re Homebanc Mortgage Corporation, et al.*, Case No. 07-11079.

29.     Lancaster Mortgage Bankers, LLC is the subject of a Bankruptcy Code case commenced August 31, 2007, in the United States Bankruptcy Court for the District of New Jersey, *In re Lancaster Mortgage Bankers, LLC*, Case No. 07-22479-MBK.  Upon information and belief, Lancaster Mortgage Bankers LLC originated mortgages under the name Lancaster Mortgage Services ("Lancaster").

30.     Maverick Residential Mortgage, a/k/a The Mortgage Company, is the subject of a Bankruptcy Code case commenced February 13, 2008, in the United States Bankruptcy Court for the Eastern District of Texas, *In re Maverick Residential Mortgage, Inc.,* Case No. 08-40352.

31.     Meritage Mortgage Corporation is the subject of a Bankruptcy Code case commenced February 17, 2009, in the United States Bankruptcy Court for the Northern District of Texas, *In re Meritage Mortgage Corporation,* Case No. 09-30971.

32.     Mortgage Lender's Network USA, Inc. is the subject of a Bankruptcy Code case commenced February 4, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re Mortgage Lender's Network USA, Inc.*, Case No. 07-10146.

33.   New Century Mortgage Corporation is the subject of a Bankruptcy Code case commenced April 2, 2007, in the United States Bankruptcy Court for the District of Delaware, *In re New Century TRS Holdings, Inc., et al.,* Case No. 07-10416.

34.   Oak Street Mortgage, LLC is the subject of a Bankruptcy Code case commenced June 8, 2007, in the United States Bankruptcy Court for the Southern District of Illinois, *In re Oak Street Mortgage, LLC*, Case No. 07-05279.

35.   OwnIt Mortgage Solutions, Inc. is the subject of a Bankruptcy Code case commenced December 28, 2006, in the United States Bankruptcy Court for the Central District of California, *In re OwnIt Mortgage Solutions, Inc.,* Case No. SV-06-12579.

36.   People's Choice Home Loan, Inc. is the subject of a Bankruptcy Code case commenced March 14, 2007, in the United States Bankruptcy Court for the Central District of California, *In re People's Choice Home Loan, Inc.,* Case No. SA 07-10765.

37.   Premier Mortgage Funding, Inc. is the subject of a Bankruptcy Code case commenced July 3, 2007 in the United States Bankruptcy Court for the Middle District of Florida, *In re Premier Mortgage Funding, Inc.*, Case No. 8:07-BK-05713.

38.   Realty Mortgage Corporation is the subject of a Bankruptcy Code case commenced February 18, 2009, in the United States Bankruptcy Court for the Southern District of Mississippi, *In re Realty Mortgage Corporation,* Case No. 09-00544.

39.   In selling the mortgage loan collateral to certain of the Removing Defendants, each Bankrupt Originator/Seller made representations to one or more of the Removing Defendants regarding that Bankrupt Originator/Seller's loan-underwriting standards and the characteristics of the mortgage-loan collateral for the RMBS — the very

11

subjects of plaintiff's allegations.  (*See, e.g.*, Compl. ¶¶ 71-77, 103-126.)  Pursuant to sale

agreements that contained indemnification and/or contribution provisions for one or more

of the Removing Defendants, the Bankrupt Originators/Sellers owe these Removing

Defendants indemnification and/or contribution for any claims arising out of actual or

alleged material misstatements or omissions by the Bankrupt Originators/Sellers regarding

their underwriting practices and the mortgage loans at issue. These agreements further

require the Bankrupt Originators/Sellers to indemnify one or more of the Removing

Defendants for the costs (including legal fees) of defending such claims, regardless of their

outcome.

        40.    A civil proceeding is "related to" a bankruptcy if "its outcome might

have any conceivable effect on the bankrupt estate." *Publicker Indus., Inc. v. United*

*States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992).  A proceeding

between non-debtors may have a "conceivable effect" on the bankruptcy estate where "the

outcome could alter the debtor's rights, liabilities, options, or freedom of action (either

positively or negatively) and which in any way impacts upon the handling and

administration of the bankrupt estate." *Back v. LTV Corp. (In re Chateaugay Corp.)*, 214

B.R. 633, 638 (S.D.N.Y. 1997).  This Action is related to the bankruptcy cases of the

Bankrupt Originators/Sellers because the Bankrupt Originators/Sellers owe one or more of

the Removing Defendants an indemnity obligation, which, as a result of any costs or

expenses incurred by the Removing Defendants to defend this Action and any judgment

against the Removing Defendants, could affect the property of the Bankrupt

Originators/Sellers.  *See IIG Capital LLC v.  Wollmuth Maher & Deutsch, LLP (In re*

*Amanat)*, 338 B.R. 574, 579-81 (Bankr. S.D.N.Y. 2005).  In addition, removal is proper

under section 1452(a) as this action has a "close nexus" to these proceedings. *See Allstate Ins. Co. v. Ace Secs. Corp.*, No. 11 Civ. 1914 (LBS), 2011 U.S. Dist. LEXIS 91989, at *13-15 (S.D.N.Y. Aug. 16, 2011).

41. An indemnity obligation that affects the property of debtors gives rise to "related to" jurisdiction under 28 U.S.C. § 1334(b). The Removing Defendants may therefore remove this Action to this Court pursuant to 28 U.S.C. § 1452(a). *See Allstate*, 2011 U.S. Dist. LEXIS 91989, at *14-15 (claims for indemnification and contribution against bankrupt mortgage originators created "related to" bankruptcy jurisdiction).

42. The non-removal provisions of Section 22(a) of the Securities Act of 1933 does not bar removal under 28 U.S.C. § 1452(a). *See Cal. Pub. Employees. Ret. Sys. v. Worldcom, Inc.*, 368 F.3d 86, 108 (2d Cir. 2004).

**B.    Federal-Question Jurisdiction Removal**

43. This action may be removed under 28 U.S.C. § 1441(b) because the action arises under the laws of the United States by virtue of 12 U.S.C. § 1452(f)(2), which states that all civil actions to which Freddie Mac "is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions." Under 28 U.S.C. § 1441(c), it is clear that "the entire case" may be removed when one of the plaintiff's claims arises under the laws of the United States, even if that claim is "joined with one or more otherwise non-removable claims or causes of action."

44. The complaint in this action makes clear that FHFA is acting on behalf of, and in the name of Freddie Mac, making Freddie Mac a party to this action. (Compl. ¶ 11.) Under the Housing and Economic Recovery Act of 2008 ("HERA"), Pub.

L. No. 110-289, 122 Stat. 2654, FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to (i) all rights, titles, powers, and privileges of the regulated entity," and may "perform all functions of the regulated entity in the name of the regulated entity." 12 U.S.C. §§ 4617(b)(2)(A), 4617(b)(2)(B)(iii).  Because FHFA succeeded to Freddie Mac's rights, titles and privileges, FHFA stands in Freddie Mac's shoes and *is* Freddie Mac for all relevant legal purposes.  Courts construing similar language in similar acts have reached the same conclusion that the agency "stepped 'into the shoes'" of the depository institution.  *See, e.g., Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 700-701 (D.C. Cir. 1997); *accord O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) (finding that same provision "places [the federal agency] in the shoes of the insolvent S&L.").

45.    Securities Act § 22(a) does not preclude removal under 28 U.S.C. § 1441(b).  *See, e.g., Gallagher v. Donald*, 803 F. Supp. 899, 902-04 (S.D.N.Y. 1992); *Pacific Life Ins. Co.* v. *J.P. Morgan Chase & Co.*, No. SA CV 03-813GLT (ANX), 2003 WL 22025158, at *2 (C.D. Cal. June 30, 2003) ("Section 22(a) proscribes removal based on federal question jurisdiction under 28 U.S.C. § 1441(a), but does not prevent removal based on other grounds."); *see also In re Fannie Mae 2008 Sec. Litig.*, No. 08 Civ. 7831, 09 Civ. 1352, 2009 WL 4067266, at *2-3 (S.D.N.Y. Nov. 24, 2009) (holding that because "federal courts have jurisdiction over Fannie Mae," removal of an action asserting claims under the Securities Act "was appropriate.")

## III.    Other Bases Of Subject-Matter Jurisdiction

### A.    Federal Question Jurisdiction

46.    This Court has subject-matter jurisdiction over this action based on Securities Act § 22(a) and 28 U.S.C. § 1331.

**B.**     **Federal Agency And/Or Federal Corporation Jurisdiction**

47.    As additional or alternative bases for subject-matter jurisdiction, the

Court has subject matter jurisdiction under 28 U.S.C. § 1345 (federal agency action) and/or

28 U.S.C. § 1349 (federally-owned and chartered corporation).  FHFA is an agency of the

United States, 12 U.S.C. § 4511(a), expressly authorized to sue on behalf of Freddie Mac

under 12 U.S.C. § 4617(b)(2)(A) and 12 U.S.C. § 1452(c)(7).

WHEREFORE, the Removing Defendants hereby remove this civil action

to this Court from the Supreme Court of the State of New York, County of New York.

Dated: New York, New York
       October 6, 2011

MAYER BROWN LLP

By: _____
    Richard A. Spehr
    *rspehr@mayerbrown.com*
    Michael O. Ware
    *mware@mayerbrown.com*
    S. Christopher Provenzano
    *cprovenzano@mayerbrown.com*

1675 Broadway
New York, N.Y. 10019
(212) 506-2500

*Attorneys for defendants Ally Financial Inc.;*
*    GMAC Mortgage Group, Inc.; Residential*
*    Capital LLC; GMAC-RFC Holding*
*    Company, LLC; Residential Funding*
*    Company, LLC; Ally Securities, LLC;*
*    Residential Asset Mortgage Products, Inc.;*
*    Residential Asset Securities Corporation;*
*    and Residential Accredit Loans, Inc.*

TO:   CLERK OF THE COURT
        UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT
          OF NEW YORK
          500 Pearl St.
        New York, N.Y. 10007

        KASOWITZ, BENSON, TORRES
          & FRIEDMAN LLP
          1633 Broadway
        New York , N.Y. 10019
*Attorneys for plaintiff*
SULLIVAN & CROMWELL LLP
          125 Broad St.
        New York, N.Y. 10004
*Attorneys for defendants Barclays*
   *Capital Inc., Goldman, Sachs & Co.*
   *and J.P. Morgan Securities LLC*

        PAUL, WEISS, RIFKIND, WHARTON
          & GARRISON LLP
          1285 Avenue of the Americas
        New York, N.Y. 10019
*Attorneys for defendant Citigroup Global*
   *Markets Inc.*

        CRAVATH, SWAIN & MOORE LLP
          Worldwide Plaza
          825 Eighth Ave.
        New York, N.Y. 10019
*Attorneys for defendant Credit Suisse*
   *Securities (USA) LLC.*

        SIMPSON THACHER & BARTLETT LLP
          425 Lexington Ave.
        New York, N.Y. 10017
*Attorneys for defendant RBS Securities, Inc.*

        SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP
          Four Times Square
        New York, N.Y. 10036
*Attorneys for defendant UBS Securities LLC*

**Exhibit A
to Notice of Removal**

*Summons and Complaint*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
HOME LOAN MORTGAGE
CORPORATION,

Plaintiff,

-against-

ALLY FINANCIAL INC. f/k/a GMAC, LLC,
GMAC MORTGAGE GROUP, INC.,
RESIDENTIAL CAPITAL LLC f/k/a
RESIDENTIAL CAPITAL CORPORATION,
GMAC-RFC HOLDING COMPANY, LLC
d/b/a GMAC RESIDENTIAL FUNDING
CORPORATION, RESIDENTIAL FUNDING
COMPANY, LLC f/k/a RESIDENTIAL
FUNDING CORPORATION, ALLY
SECURITIES, LLC f/k/a RESIDENTIAL
FUNDING SECURITIES, LLC d/b/a GMAC
RFC SECURITIES AND f/k/a
RESIDENTIAL FUNDING SECURITIES
CORPORATION, RESIDENTIAL ASSET
MORTGAGE PRODUCTS, INC.,
RESIDENTIAL ASSET SECURITIES
CORPORATION, AND RESIDENTIAL
ACCREDIT LOANS, INC., J.P. MORGAN
SECURITIES LLC f/k/a J.P. MORGAN
SECURITIES, INC. AND AS SUCCESSOR-
IN-INTEREST TO BEAR, STEARNS & CO.
INC., CREDIT SUISSE SECURITIES (USA)
LLC f/k/a CREDIT SUISSE FIRST BOSTON
LLC, RBS SECURITIES, INC. d/b/a RBS
GREENWICH CAPITAL AND f/k/a
GREENWICH CAPITAL MARKETS, INC.,
CITIGROUP GLOBAL MARKETS INC.,
BARCLAYS CAPITAL INC., UBS
SECURITIES LLC, GOLDMAN, SACHS &
CO.,

Defendants.

---

Index No._____
Date Purchased: September 2, 2011

Plaintiff designates New York
County as the place of trial

The basis of venue is the
residence of one or more of the
parties pursuant to CPLR §503

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer, or if the Complaint is not served with this summons, to serve a notice of appearance on Plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to your within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
        September 2, 2011

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ Marc E. Kasowitz
    Marc E. Kasowitz (mkasowitz@kasowitz.com)
    Hector Torres (htorres@kasowitz.com)
    Michael S. Shuster (mshuster@kasowitz.com)
    Christopher P. Johnson (cjohnson@kasowitz.com)
    Charles M. Miller (cmiller@kasowitz.com)
    Michael A. Hanin (mhanin@kasowitz.com)

1633 Broadway
New York, New York  10019
(212) 506-1700

*Attorneys for Plaintiff Federal Housing Finance Agency, as Conservator for the Federal Home Loan Mortgage Corporation*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
HOME LOAN MORTGAGE
CORPORATION,

           Plaintiff,

           -against-

ALLY FINANCIAL INC. f/k/a GMAC, LLC,
GMAC MORTGAGE GROUP, INC.,
RESIDENTIAL CAPITAL LLC f/k/a
RESIDENTIAL CAPITAL CORPORATION,
GMAC-RFC HOLDING COMPANY, LLC
d/b/a GMAC RESIDENTIAL FUNDING
CORPORATION, RESIDENTIAL FUNDING
COMPANY, LLC f/k/a RESIDENTIAL
FUNDING CORPORATION, ALLY
SECURITIES, LLC f/k/a RESIDENTIAL
FUNDING SECURITIES, LLC d/b/a GMAC
RFC SECURITIES and f/k/a RESIDENTIAL
FUNDING SECURITIES CORPORATION,
RESIDENTIAL ASSET MORTGAGE
PRODUCTS, INC., RESIDENTIAL ASSET
SECURITIES CORPORATION, and
RESIDENTIAL ACCREDIT LOANS, INC.,
J.P. MORGAN SECURITIES LLC f/k/a J.P.
MORGAN SECURITIES, INC. and as
successor-in-interest to BEAR, STEARNS &
CO. INC., CREDIT SUISSE SECURITIES
(USA) LLC f/k/a CREDIT SUISSE FIRST
BOSTON LLC, RBS SECURITIES, INC.
d/b/a RBS GREENWICH CAPITAL and f/k/a
GREENWICH CAPITAL MARKETS, INC.,
CITIGROUP GLOBAL MARKETS INC.,
BARCLAYS CAPITAL INC., UBS
SECURITIES LLC, and GOLDMAN, SACHS
& CO.,

           Defendants.

Index No._____

**<u>COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................1

PARTIES ....................................................................................................................4

    Plaintiff .................................................................................................................4

    Defendants ............................................................................................................5

    GMAC Defendants................................................................................................5

    Non-GMAC Defendants........................................................................................7

    Non-Party Originators.........................................................................................10

JURISDICTION AND VENUE ...............................................................................11

FACTUAL ALLEGATIONS ...................................................................................11

I.      FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ...................11

    A.      The Securitizations .................................................................................12

          1.      Residential Mortgage-Backed Securitizations Generally ...........12

          2.      Securitizations at Issue in this Case .........................................13

          3.      Securitization Process ...............................................................16

                  a.      The Sponsors Grouped Mortgage Loans in Special-Purpose Trusts ...........................................................................16

                  b.      The Trusts Issued Securities Backed by the Loans .........17

    B.      Defendants' Participation in the Securitization Process .........................20

          1.      Ally.............................................................................................21

          2.      RFC.............................................................................................21

          3.      RALI, RASC and RAMP ............................................................23

          4.      RFS.............................................................................................23

          5.      GMAC-RFC ...............................................................................24

          6.      Ally, GMACM and ResCap ........................................................24

7. Non-GMAC Underwriters ............................................................................. 25

C. Statements in the Prospectus Supplements ........................................................... 26

    1. Compliance with Underwriting Guidelines ............................................... 26

    2. Occupancy Status of Borrower ................................................................... 29

    3. Loan-to-Value Ratios ................................................................................. 31

    4. Credit Ratings ............................................................................................ 34

D. Falsity of Statements in the Registration Statements and Prospectus
Supplements .......................................................................................................... 36

    1. The Statistical Data Provided in the Prospectus Supplements
    Concerning Owner-Occupancy and Loan-to-Value Ratios was
    Materially False ......................................................................................... 36

        a. Owner-Occupancy Data was Materially False .............................. 36

        b. Loan-to-Value Data was Materially False ..................................... 38

    2. The Originators of the Underlying Mortgage Loans Systematically
    Disregarded Their Underwriting Guidelines ............................................. 41

        a. Government and Private Investigations Confirm That the
        Originators of the Loans in the Securitizations
        Systematically Failed to Adhere to Their Underwriting
        Guidelines ...................................................................................... 42

            i. New Century Violated Its Underwriting Guidelines .......... 43

            ii. HFN Violated Its Underwriting Guidelines ....................... 46

            iii. MLN Violated Its Underwriting Guidelines ...................... 48

        b. The Collapse of the Certificates' Credit Ratings Further
        Shows that the Mortgage Loans were not Originated in
        Adherence to the Stated Underwriting Guidelines ........................ 49

        c. The Surge in Mortgage Delinquency and Default Further
        Demonstrates that the Mortgage Loans were not Originated
        in Adherence to the Stated Underwriting Guidelines .................... 50

E. Freddie Mac's Purchases of the Certificates ........................................................ 52

F. Freddie Mac was Damaged by Defendants' Violations of Sections 11, 12
and 15 of the Securities Act ................................................................................. 53

II.    ADDITIONAL FACTUAL ALLEGATIONS ...................................................................54

    A.    Defendants Were Incentivized to Fund  Risky Residential Mortgage Loans and  to Securitize and Sell Them to Investors..........................................................54

    B.    Defendants' Material Misrepresentations and Omissions in the Offering Materials...........................................................................................................58

    C.    The Fraud Defendants Knew or were Reckless in not Knowing that Their Representations were False and Misleading .....................................................62

    D.    Freddie Mac Justifiably Relied on the Misrepresentations and Omissions in the Offering Materials and was  Damaged by Defendants' Fraudulent Conduct ............................................................................................................70

FIRST CAUSE OF ACTION ........................................................................................72

    Violation of Section 11 of the Securities Act of 1933 (Against Defendants RALI, RASC, RAMP, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs)............................................................................................72

SECOND CAUSE OF ACTION ..................................................................................75

    Violation of Section 12(a)(2) of the Securities Act of 1933 (Against Defendants RALI, RASC, RAMP, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs)...............................................................................75

THIRD CAUSE OF ACTION .......................................................................................78

    Violation of Section 15 of the Securities Act of 1933 (Against RFC, GMAC-RFC, ResCap, GMACM and Ally) .................................................................78

FOURTH CAUSE OF ACTION ...................................................................................81

    Primary Violations of the Virginia Securities Act (Against RALI, RASC, RAMP, RFS, JPM, Credit Suisse,  RBS, Citi, Barclays, UBS and Goldman Sachs).........81

FIFTH CAUSE OF ACTION ........................................................................................84

    Controlling Person Liability Under the Virginia Securities Act (Against RFC, GMAC-RFC, ResCap, GMACM and Ally)..................................................84

SIXTH CAUSE OF ACTION .......................................................................................88

    (Common Law Fraud Against RALI, RAMP, RASC, RFC, RFS JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs).........................................88

SEVENTH CAUSE OF ACTION.................................................................................89

(Aiding and Abetting Fraud Against Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, RALI, RASC and RAMP)......................................................89

EIGHTH CAUSE OF ACTION .......................................................................................91

(Negligent Misrepresentation Against RALI, RASC, RAMP, RFC, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs).............................91

PRAYER FOR RELIEF ..................................................................................................93

Plaintiff Federal Housing Finance Agency ("Plaintiff" or "FHFA"), as Conservator of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), by its attorneys Kasowitz, Benson, Torres & Friedman LLP, for its Complaint against the defendants named herein ("Defendants"), alleges as follows:

## NATURE OF ACTION

1.      This action arises from false and misleading statements and omissions in registration statements, prospectuses, and other offering materials pursuant to which certain residential mortgage-backed securities ("RMBS") were purchased by Freddie Mac.  Among other things, these documents falsely represented that the mortgage loans underlying the RMBS complied with certain underwriting guidelines and standards, and presented a false picture of the characteristics and riskiness of those loans.  These representations were material to Freddie Mac, as they would have been to any reasonable investor, and their falsity violates Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, as well as Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code.  Freddie Mac justifiably relied on Defendants' misrepresentations and omissions of material fact to its detriment.  In addition to its strict statutory liability under federal securities law and liability under state law, Defendants' statements and omissions give rise to liability under state common law.

2.      Between September 23, 2005 and May 30, 2007, Freddie Mac purchased over $6 billion in Certificates issued in connection with 21 securitizations that were virtually all sponsored and underwritten by Defendants.[1]

---

[1]      For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2, *infra*) are referred to as "Certificates."  Holders of Certificates are referred to as "Certificateholders."

3.      The Certificates were offered for sale pursuant to one of six shelf registration statements (the "Shelf Registration Statements") filed with the Securities and Exchange Commission (the "SEC").  For each of the 21 securitizations sold to Freddie Mac (the "Securitizations"), a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement for that Securitization.[2]   The Certificates were marketed and sold to Freddie Mac pursuant to the Registration Statements.

4.      The Registration Statements contained representations concerning, among other things, the characteristics and credit quality of the mortgage loans underlying the Securitizations, the creditworthiness of the borrowers on those underlying mortgage loans, and the origination and underwriting practices used to make and approve the loans.  Such representations were material to a reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac.  Unbeknownst to Freddie Mac, those representations were false because, among other reasons, many of material percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and did not have the credit and other characteristics set forth in the Registration Statements.

5.      Among other things, the Registration Statements presented the loan origination guidelines of the mortgage loan originators who originated the loans that underlay the Certificates.  The Registration Statements falsely represented that those guidelines were adhered to except in specified circumstances, when in fact the guidelines systematically were disregarded in that the loans were not originated in accordance therewith.

---

[2]      The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus, and the Prospectus Supplement and in Appendix A for each referenced Securitization, except where otherwise indicated.

6.      The Registration Statements also set forth for each Securitization statistical summaries of the characteristics of the underlying mortgage loans, such as the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges.  This information was material to reasonable investors, and it was material to Freddie Mac.  However, a loan-level analysis of a sample of loans for each Securitization -- a review that encompassed in the aggregate thousands of mortgages across all of the Securitizations -- has revealed that for each Securitization these statistical summaries were false and misleading.  The statistics reflected or were based upon misrepresentations of other key characteristics of the mortgage loans and inflated property values.

7.      For example, the percentage of owner-occupied properties in the loan pool underlying a RMBS is a material risk factor to the purchasers of certificates, such as Freddie Mac, because a borrower who actually lives in a mortgaged property is generally less likely to stop paying the mortgage and more likely to take care of the property.  The loan-level review revealed that the true percentage of owner-occupied properties for the loans supporting the Certificates was materially lower than that represented in the Prospectus Supplements.  Likewise, the Prospectus Supplements misrepresented such material information as loan-to-value ratios -- that is, the relationship between the principal amount of the loans and the true value of the mortgaged properties securing those loans -- and the ability of the individual mortgage holders to satisfy their debts.

8.      The Registration Statements also set forth ratings for each of the Securitizations. Those AAA ratings were material to a reasonable investor's decision to purchase the Certificates, and they were material to Freddie Mac.  The ratings for the Securitizations were materially

3

inaccurate and were based upon false information supplied by Defendants.  Upon information

and belief, neither the Defendants nor the rating agencies who issued the ratings believed or had

any sound basis to believe in their truthfulness.

9.      Defendants, who are issuers, sponsors, and/or underwriters of the Certificates

purchased by Freddie Mac are liable for the misstatements and omissions of material fact

contained in the Registration Statements and other offering materials because they prepared,

filed, and/or used these documents to market and sell the Certificates to Freddie Mac, or because

they directed and controlled the entities that did so.[3]

10.      Defendants' misstatements and omissions of material facts have caused loss and

injury to Freddie Mac.  Freddie Mac purchased the highest tranches of Certificates offered for

sale by Defendants.  Freddie Mac would not have purchased these Certificates but for

Defendants' material misrepresentations and omissions concerning the mortgage loans

underlying the RMBS.  As the truth concerning the misrepresented and omitted facts has come to

light, and as the hidden risks have materialized, the market value of the Certificates purchased by

Freddie Mac has declined.  Freddie Mac has suffered enormous financial losses as a result of

Defendants' misrepresentations and omissions.  FHFA, as Conservator for Freddie Mac, now

seeks rescission and damages for those losses.

## PARTIES

### Plaintiff

11.      Plaintiff the Federal Housing Finance Agency is a federal agency located at

1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008, pursuant to the

Housing and Economic Recovery Act of 2008 (HERA), Pub L. No. 110-289, 122 Stat. 2654,

---

[3]      The Certificates purchased by Freddie Mac are identified below in paragraph 130 and are
listed *infra* in Table 10.

codified at 12 U.S.C. § 4617 *et seq.* ("HERA"), to oversee the Federal National Mortgage Association ("Fannie Mae"), Freddie Mac and the Federal Home Loan Banks.  On September 6, 2008, the Director of FHFA, also pursuant to HERA, placed Freddie Mac into conservatorship and appointed FHFA as Conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of Freddie Mac, including, but not limited to, the authority to bring suits on behalf of and/or for the benefit of Freddie Mac.  12 U.S.C. § 4617(b)(2).

12.     Freddie Mac is a government-sponsored enterprise chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Freddie Mac invested in RMBS.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

**Defendants**

**GMAC Defendants**

13.     Defendant Ally Financial Inc. ("Ally"), a leading, multi-national financial services firm with a corporate center in New York, has approximately $179 billion of assets and operations in approximately 25 countries.  Ally is the parent and sole owner of Defendants GMAC Mortgage Group, Inc. and Residential Funding Services, LLC.  Prior to 2010, Ally was known as GMAC, LLC.

14.     Defendant GMAC Mortgage Group, Inc. ("GMACM") is a wholly-owned subsidiary and the mortgage arm of Ally.  GMACM is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.  GMACM transacted business in New York.

15.     Defendant Residential Capital LLC ("ResCap") is a wholly-owned subsidiary of GMACM and originates, services, and securitizes mortgage loans in the United States, including New York.  ResCap was incorporated in the State of Delaware and its principal office is located

at One Meridian Crossings, Minneapolis, Minnesota 55423.  Prior to 2007, ResCap was known as Residential Capital Corporation.

16.     Defendant GMAC-RFC Holding Company, LLC, doing business as GMAC Residential Funding Corporation ("GMAC-RFC"), is a wholly-owned subsidiary of ResCap and acquires residential mortgages and loans, which it then packages as mortgage-backed securities and sells to institutional investors.  GMAC-RFC was incorporated in the State of Delaware and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437.  GMAC-RFC transacted business in New York.

17.     Defendant Residential Funding Company, LLC ("RFC") is a wholly-owned subsidiary of GMAC-RFC.  RFC, a Delaware corporation, has an office in New York, has appointed an agent for service of process in New York, and has consented to the jurisdiction of the New York courts.  Prior to October 2006, RFC was known as Residential Funding Corporation.  RFC was the sponsor of all 21 of the Securitizations.  Defendant RFC is the parent and sole owner of Homecomings Financials, LLC ("HFN"), the originator of loans underlying the Certificates for 13 of the 21 Securitizations and, upon information and belief, the only Ally subsidiary that originated residential mortgage loans during the relevant time period.  Prior to 2006, HFN was known as Homecomings Financials Network, Inc.

18.     Defendant Ally Securities, LLC is an SEC-registered broker-dealer and is registered to do business in New York.  Prior to August 1, 2011, Ally Securities, LLC was known as Residential Funding Securities, LLC, which was doing business as GMAC RFC Securities and prior to 2007, Residential Funding Securities, LLC was known as Residential Funding Securities Corporation (collectively, "RFS").  RFS is a wholly-owned subsidiary of Ally, and was registered to do business in New York.  RFS was the co-lead underwriter for five

of the Securitizations and was an underwriter for an additional six of the Securitizations.  Freddie Mac purchased five of the Securitizations from RFS in its capacity as co-lead underwriter of those Securitizations.

19.     Defendant Residential Asset Mortgage Products, Inc. ("RAMP") is a wholly-owned subsidiary of GMAC-RFC and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437.  RAMP was the depositor for five of the Securitizations and transacted business in New York.  RAMP, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934 with respect to the Securitizations.

20.     Defendant Residential Asset Securities Corporation ("RASC") is a wholly-owned subsidiary of GMAC-RFC and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437.  RASC was the depositor for 10 of the Securitizations and transacted business in New York.  RASC, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

21.     Defendant Residential Accredit Loans, Inc. ("RALI") is a wholly-owned subsidiary of GMAC-RFC and its principal office is located at 8400 Normandale Lake Boulevard, Minneapolis, Minnesota 55437.  RALI was the depositor for 6 of the Securitizations and transacted business in New York.  RALI, as depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.  Defendants Ally, GMACM, ResCap, GMAC-RFC, RFS, RAMP, RASC and RALI are referred to together herein as "GMAC."

**Non-GMAC Defendants**

22.     Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its principal place of business located at 200 Park Avenue, New York, New York 10166.  Barclays

is an SEC-registered broker-dealer and served as underwriter or co-underwriter for one Securitization.

23.     Defendant Citigroup Global Markets Inc. ("Citi") is an SEC-registered broker-dealer. Citi is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 388 Greenwich Street, New York, New York 10013. Citi served as underwriter or co-underwriter for one Securitization.

24.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 11 Madison Ave., New York, New York 10010. Prior to January 16, 2006, Credit Suisse was known as Credit Suisse First Boston LLC. Credit Suisse is an SEC-registered broker-dealer, and was the co-lead underwriter for four of the Securitizations. Credit Suisse was co-underwriter for three of the Securitizations.

25.     Defendant Goldman, Sachs & Co. ("Goldman") is a corporation organized and existing under the laws of the State of New York with its principal place of business located at 200 West Street, New York, New York 10282. Goldman is an SEC-registered broker-dealer and served as underwriter or co-underwriter for one Securitization.

26.     Defendant J.P. Morgan Securities, LLC, f/k/a J.P. Morgan Securities, Inc. ("JPM"), is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 277 Park Avenue, New York, New York 10172. JPM is an SEC-registered broker-dealer and was co-lead underwriter for two of the Securitizations.

27.     JPM is also the successor-in-interest to Bear, Stearns & Co., Inc. ("Bear Stearns") because on March 16, 2008, Bear Stearns' parent company, Bear Stearns Companies, Inc. ("BSCI"), entered into an Agreement and Plan of Merger with Bear Stearns Merger Corporation,

a wholly-owned subsidiary of JPMorgan Chase & Co. ("JPMorgan Chase"), making Bear

Stearns a wholly-owned indirect subsidiary of JPMorgan Chase.  Following the merger, on or

about October 1, 2008, Bear Stearns merged with J.P. Morgan Securities Inc., a subsidiary of

JPMorgan Chase, which subsequently changed its name to J.P. Morgan Securities LLC.  Thus,

BSCI is now doing business as Defendant JPM.

28.     In a June 30, 2008 press release describing internal restructuring to be undertaken

pursuant to the Merger, JPMorgan Chase stated its intent to assume Bear Stearns and its debts,

liabilities, and obligations as follows:

> Following completion of this transaction, Bear Stearns plans to
> transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to
> JPMorgan Chase, resulting in a transfer of substantially all of Bear
> Stearns' assets to JPMorgan Chase.  In connection with such
> transfer, JPMorgan Chase will assume (1) all of Bear Stearns'
> then-outstanding registered U.S. debt securities; (2) Bear Stearns'
> obligations relating to trust preferred securities; (3) Bear Stearns'
> then-outstanding foreign debt securities; and (4) Bear Stearns'
> guarantees of then-outstanding foreign debt securities issued by
> subsidiaries of Bear Stearns, in each case, in accordance with the
> agreements and indentures governing these securities.

Further, the former Bear Stearns website, www.bearstearns.com, redirects Bear Stearns visitors

to J.P. Morgan Securities Inc.'s website.

29.     J.P. Morgan Securities Inc. was fully aware of the pending and potential claims

against Bear Stearns when it consummated the merger.  J.P. Morgan Securities Inc. has further

evinced its intent to assume Bear Stearns' liabilities by paying to defend and settle lawsuits

against Bear Stearns.  JPM announced its intention to "convert to a limited liability company,

effective September 1, 2010," as part of which it changed its name to J.P. Morgan Securities

LLC.  As a result of the Merger, Defendant JPM Securities is the successor-in-interest to Bear

Stearns and is jointly and severally liable for the misstatements and omissions of material fact

alleged herein of Bear Stearns.  This action is brought against JPM Securities as successor to

Bear Stearns. Prior to acquisition, Bear Stearns was an SEC-registered broker-dealer and served as an underwriter for one Securitization.

30. Defendant RBS Securities, Inc., doing business as RBS Greenwich Capital ("RBS"), is an SEC-registered broker-dealer incorporated in the State of Delaware with offices located at 101 Park Avenue, New York, New York 10178. Prior to April 2009, RBS was known as Greenwich Capital Markets, Inc. RBS served as underwriter or co-underwriter for two of the Securitizations.

31. Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company with its principal place of business located at 677 Washington Blvd., Stamford, Connecticut 06901. UBS is an SEC-registered broker-dealer and served as underwriter or co-underwriter for one Securitization.

32. Defendants Barclays, Citi, Credit Suisse, Goldman, JPM, RBS, and UBS are referred to together herein as the "Non-GMAC Defendants," and together with RFS as the "Underwriter Defendants."

**Non-Party Originators**

33. The loans underlying the Certificates were acquired by the sponsor RFC for each Securitization from the following mortgage originators: Homecomings Financials Network Inc. ("HFN"); Aegis Mortgage Corporation; Decision One Mortgage Company, LLC; EFC Holdings Corporation and its subsidiary EquiFirst Corporation; Finance America, LLC; First National Bank of Nevada; Home123 Corporation; Homefield Financial Inc.; Mortgage Lenders Network USA, Inc.; New Century Mortgage Corporation; Ownit Mortgage Solutions Inc.; People's Choice Home Loan, Inc.; Pinnacle Financial Corporation; and SCME Mortgage Bankers, Inc. HFN -- a subsidiary of Defendant Ally and an affiliate of Defendant RFC -- originated loans

underlying the Certificates for 13 of the 21 Securitizations.  Together, the entities identified in this paragraph are referred to as the "Non-Party Originators."

**JURISDICTION AND VENUE**

34.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v and Section 7 of Article VI of the New York State Constitution.

35.     This Court has personal jurisdiction over the Defendants pursuant to C.P.L.R. §§ 301 and 302.

36.     Venue is proper in this district pursuant to C.P.L.R. § 503 because one or more of the parties resides in this county.  The underwriters reside or have their principal place of business in this county and many of the alleged acts and transactions, including the preparation and dissemination of the Registration Statements, occurred in substantial part within New York County, New York.

**FACTUAL ALLEGATIONS**

**I.      FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

37.     The factual allegations set forth in paragraphs 38 through 134 below are made with respect to all causes of action against Defendants and are sufficient to establish Defendants' strict statutory liability under the federal Securities Act and the Securities Act of Virginia.  With respect to such liability, no allegations are made or intended, and none are necessary, concerning Defendants' state of mind.  Defendants are strictly liable, without regard to intent on their part or reliance on Freddie Mac's part, for the misstatements in, and material omissions from, the Registration Statements under Sections 11 and 12 and, for control person defendants, under Section 15, of the Securities Act, and Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code.

A.     **The Securitizations**

1.     **Residential Mortgage-Backed Securitizations Generally**

38.     Asset-backed securitization involves pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

39.     In the most common form of securitization of mortgage loans, a sponsor -- the entity that acquires or originates the mortgage loans and initiates the securitization -- directly or indirectly transfers a portfolio of mortgage loans to a trust.  In many instances, the transfer of assets to the trust is a two-step process in which the sponsor first transfers the financial assets to an intermediate entity, typically referred to as a "depositor," and then the depositor transfers the assets to a trust.  The trust is established pursuant to a pooling and servicing agreement or trust indenture entered into by, among others, the depositor for that securitization.

40.     RMBS are the securities backed by the underlying mortgage loans in the trust.  Some residential mortgage-backed securitizations are created from more than one cohort of loans, called collateral groups, in which case the trust issues different tranches of securities backed by different groups of loans.  For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group.  Purchasers of the securities (in the form of certificates) acquire an ownership interest in the assets of the trust, which in turn owns the loans.  These purchasers are thus dependent for repayment of principal and payment of interest upon the cash flows from the designated group of mortgage loans -- primarily mortgagors' payments of principal and interest on the mortgage loans held by the related trust.

41.     RMBS are generally issued and sold pursuant to registration statements filed with the SEC.  These registration statements include prospectuses, which describe the general

structure of the investment, and prospectus supplements, which set forth detailed descriptions of, among other things, the mortgage groups underlying the certificates.  Certificates are issued by the trust and sold pursuant to the registration statement, the prospectus and prospectus supplement.  Underwriters purchase the certificates from the trust and then offer, sell or distribute the certificates to investors.

42.     A mortgage servicer manages the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee.  The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance.  The servicer is required to report key information about the loans to the trustee.  The trustee (or trust administrator) administers the trust funds and delivers payments due each month on the certificates to the investors.

### 2.     Securitizations at Issue in this Case

43.     This case involves the following 21 Securitizations:

  i.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EMX3 ("RASC 2005-EMX3");

 ii.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS10 ("RASC 2005-KS10");

iii.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS11 ("RASC 2005-KS11");

 iv.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX8 ("RASC 2006-EMX8");

  v.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-EMX9 ("RASC 2006-EMX9");

 vi.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS3 ("RASC 2006-KS3");

vii.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2006-KS9 ("RASC 2006-KS9");

13

    viii.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1 ("RASC 2007-EMX1");

    ix.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS2 ("RASC 2007-KS2");

    x.    Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-KS3 ("RASC 2007-KS3");

    xi.    Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC6 ("RAMP 2005-EFC6");

    xii.    Mortgage Asset-Backed Pass-Through Certificates, Series 2005-EFC7 ("RAMP 2005-EFC7");

    xiii.    Mortgage Asset-Backed Pass-Through Certificates, Series 2005-NC1 ("RAMP 2005-NC1");

    xiv.    Mortgage Asset-Backed Pass-Through Certificates, Series 2005-RS9 ("RAMP 2005-RS9");

    xv.    Mortgage Asset-Backed Pass-Through Certificates, Series 2006-RS1 ("RAMP 2006-RS1");

    xvi.    Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 ("RALI 2005-QO4");

    xvii.    Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO4 ("RALI 2006-ii. QO4");

    xviii.    Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO5 ("RALI 2006-QO5");

    xix.    Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO8 ("RALI 2006-QO8");

    xx.    Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9 ("RALI 2007-QO9"); and

    xxi.    Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH5 ("RALI 2007-QH5).

44.    For each of the 21 Securitizations, Table 1 identifies the:  (1) sponsor; (2)

depositor; (3) underwriter; (4) principal amount issued for the tranches[4] purchased by Freddie

---

[4]    A tranche is one of the classes of debt securities issued as part of a single bond or instrument.  Securities are often issued in tranches to meet different investor objectives for portfolio diversification.  Freddie Mac purchased two tranches of Certificates from the RALI 2006-Q04 Securitization, which is why the tables have 22 entries for 21 Securitizations.

Mac; (5) date of issuance; and (6) the loan group or groups backing the Certificate for that

Securitization (referred to as the "Supporting Loan Groups").

**Table 1**

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| RALI 2005-QO4 | IA1 | RFC | RALI | RBS | 143,428,800.00 | 11/29/05 | Group I |
| RALI 2006-QO4 | IA1 | RFC | RALI | RBS | 327,356,000.00 | 04/27/06 | Group I |
| RALI 2006-QO4 | IA2 | RFC | RALI | RBS | 81,838,000.00 | 04/27/06 | Group I |
| RALI 2006-QO5 | IA1 | RFC | RALI | UBS | 179,443,000.00 | 05/30/06 | Group I |
| RALI 2006-QO8 | IIA | RFC | RALI | Lehman Brothers | 409,198,000.00 | 10/30/06 | Group II |
| RALI 2006-QO9 | IIA | RFC | RALI | Lehman Brothers | 284,637,000.00 | 11/29/06 | Group II |
| RALI 2007-QH5 | AII | RFC | RALI | Goldman RFS | 143,007,000.00 | 05/30/07 | Group II |
| RAMP 2005-EFC6 | AII | RFC | RAMP | JPM RFS | 163,581,000.00 | 11/22/05 | Group II |
| RAMP 2005-EFC7 | AII | RFC | RAMP | RFS Barclays | 199,376,000.00 | 12/28/05 | Group II |
| RAMP 2005-NC1 | AII | RFC | RAMP | RFS Credit Suisse | 405,004,000.00 | 12/28/05 | Group II |
| RAMP 2005-RS9 | AII | RFC | RAMP | Bear Credit Suisse RFS RBS | 494,922,000.00 | 11/29/05 | Group II |
| RAMP 2006-RS1 | AII | RFC | RAMP | RFS Credit Suisse RBS BOA | 409,790,000.00 | 01/25/06 | Group II |
| RASC 2005-EMX3 | AII | RFC | RASC | RFS Credit Suisse | 267,481,000.00 | 09/23/05 | Group II |
| RASC 2005-KS10 | AII | RFC | RASC | JPM RFS BOA | 495,741,000.00 | 10/28/05 | Group II |
| RASC 2005-KS11 | AII | RFC | RASC | Credit Suisse RFS RBS | 547,641,000.00 | 11/29/05 | Group II |

| Transaction | Tranche | Sponsor | Depositor | Underwriters | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Groups |
|---|---|---|---|---|---|---|---|
| RASC 2006-EMX8 | AII | RFC | RASC | RFS Barclays | 236,806,000.00 | 09/28/06 | Group II |
| RASC 2006-EMX9 | AII | RFC | RASC | Barclays RFS | 197,896,000.00 | 10/27/06 | Group II |
| RASC 2006-KS3 | AII | RFC | RASC | Citi | 232,006,000.00 | 03/29/06 | Group II |
| RASC 2006-KS9 | AII | RFC | RASC | Barclays | 153,311,000.00 | 10/27/06 | Group II |
| RASC 2007-EMX1 | AII | RFC | RASC | RFS Credit Suisse | 326,812,000.00 | 03/12/07 | Group II |
| RASC 2007-KS2 | AII | RFC | RASC | JPM | 164,400,000.00 | 02/23/07 | Group II |
| RASC 2007-KS3 | AII | RFC | RASC | JPM BOA RFS | 167,618,000.00 | 03/29/07 | Group II |

### 3.    Securitization Process

#### a.    The Sponsors Grouped Mortgage Loans in Special-Purpose Trusts

45.    In each case, the sponsor purchased the mortgage loans underlying the Certificates purchased by Freddie Mac for its Securitizations either directly from the originators or through affiliates of the originators.  RFC sponsored 21 Securitizations and sold the acquired loans to one of three depositors, all of which are RFC-affiliated entities:  RALI, RAMP and RASC.

46.    RALI, RAMP and RASC were wholly-owned, limited-purpose financial subsidiaries of GMAC-RFC and affiliates of RFC.  The sole purpose of RALI, RAMP and RASC as depositors was to act as a conduit through which loans acquired by the sponsor could be securitized and sold to investors.

47.    As depositors for all 21 of the Securitizations, RALI, RAMP and RASC transferred the relevant mortgage loans to the respective trusts for each of those Securitizations, in each case pursuant to Assignment and Recognition Agreements or Mortgage Loan Purchase

Agreements that contained various representations and warranties regarding the mortgage loans for the Securitizations.

48.     As part of each Securitization, the trustee for that Securitization, on behalf of the Certificateholders, executed a Pooling and Service Agreement ("PSA") with the relevant depositor and the relevant servicer.  In each case, the trust, administered by the trustee, was required to hold the mortgage loans, pursuant to the related PSA and issued certificates, including the Certificates, backed by such loans.  Freddie Mac purchased the Certificates, through which it obtained an ownership interest in the assets of the trust, including the mortgage loans.

### b.     The Trusts Issued Securities Backed by the Loans

49.     Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans.  The Certificates were then sold to investors, including Freddie Mac.  Each Certificate entitles its holder to a specified portion of the cash flows from the underlying mortgages in the supporting loan group for that certificate.  Therefore, the value of the Certificates, derived in part from the likelihood of payment of principal and interest on the Securitizations, depends upon the credit quality of the underlying mortgages, *i.e.*, the risk of default by borrowers and the recovery value upon default of foreclosed-upon properties.

50.     The Certificates purchased by Freddie Mac were issued and sold pursuant to Shelf Registration Statements filed with the SEC on a Form S-3.[5]  The Shelf Registration Statements ("S-3") were amended by one or more Form S-3/A (the "Amendments" or "S-3/A") filed with

---

[5]     Defendant RALI filed three Shelf Registration Statements that were used to market six of the Securitizations; Defendant RAMP filed one Shelf Registration Statement that was used to market five of the Securitizations; and Defendant RASC filed two Registration Statements that were used to market 10 of the Securitizations.

the SEC.  The Individual Defendants signed the six Shelf Registration Statements (and amendments thereto) that were filed, in each case, by RALI, RAMP or RASC.  The SEC filing number, registrants, signatories, and filing dates for all six Shelf Registration Statements with Amendments, as well as the Certificates purchased by Freddie Mac covered by each Shelf Registration Statement, are reflected in Table 2 below.

**Table 2**

| SEC File No. | Date S-3 Filed | Date(s) S-3/A(s) Filed | Registrants | Covered Certificates | Signatories of S-3 | Signatories of S-3/A(s)[6] |
|---|---|---|---|---|---|---|
| 333-125485 | 06/03/05 | 07/07/05 | RAMP | RAMP 2005-EFC6 RAMP 2005-EFC7 RAMP 2005-NC1 RAMP 2005-RS9 RAMP 2006-RS1 | Bruce Paradis Kenneth Duncan Ralph  Flees David Walker | Bruce Paradis Kenneth Duncan Ralph Flees David Walker Diane Wold |
| 333-122688 | 02/10/05 | 04/19/05 | RASC | RASC 2005-EMX3 RASC 2005-KS10 RASC 2005-KS11 RASC 2006-KS3 | Bruce Paradis Davee Olson Ralph Flees David Walker | Bruce Paradis Davee Olson Jack Katzmark David Walker Lisa Lundsten |
| 333-126732 | 07/20/05 | 08/09/05 | RALI | RALI 2005-QO4 | Bruce Paradis Kenneth Duncan Ralph Flees David Walker | Bruce Paradis Kenneth Duncan Ralph Flees David Walker Lisa Lundsten |
| 333-131209 | 01/20/06 | 02/23/06 03/21/06 03/30/06 | RASC | RASC 2006-EMX8 RASC 2006-EMX9 RASC 2006-KS9 RASC 2007-EMX1 RASC 2007-KS2 RASC 2007-KS3 | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson Lisa Lundsten |
| 333-131213 | 01/23/06 | 03/03/06 03/06/06 | RALI | RALI 2006-QO4 RALI 2006-QO5 RALI 2006-QO8 RALI 2006-QO9 | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson | Bruce Paradis Kenneth Duncan Ralph Flees Davee Olson Lisa Lundsten |

---

[6]     Some Individual Defendants signed certain S-3/As through a power of attorney.

| SEC File No. | Date S-3 Filed | Date(s) S-3/A(s) Filed | Registrants | Covered Certificates | Signatories of S-3 | Signatories of S-3/A(s)[6] |
|---|---|---|---|---|---|---|
| 333-140610 | 02/12/07 | 04/03/07 | RALI | RALI 2007-QH5 | David Applegate David M. Bricker Ralph Flees James Young | James Jones David Bricker Ralph Flees James Young Lisa Lundsten |

51.     The Prospectus Supplement for each Securitization describes the loan underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans.  In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including:  the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ("LTV") ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt-to-income ratios of the borrowers, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes, information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property, and information concerning whether the loans were delinquent.

52.     The Prospectus Supplement for each Securitization was filed with the SEC as part of the Registration Statements.  The Form 8-Ks attaching the PSAs for each Securitization were also filed with the SEC.  The date on which the Prospectus Supplement and Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

**Table 3**

| Transaction | Date Prospectus Supplement Filed | Date Form 8-K Attaching PSA | Filing No. of Related Registration Statement |
|---|---|---|---|
| RAMP 2005-EFC6 | 11/21/05 | 12/07/05 | 333-125485 |
| RAMP 2005-EFC7 | 12/22/05 | 01/13/06 | 333-125485 |
| RASC 2005-EMX3 | 09/23/05 | 10/14/05 | 333-122688 |
| RASC 2005-KS10 | 10/28/05 | 11/14/05 | 333-122688 |
| RASC 2005-KS11 | 11/28/05 | 12/14/05 | 333-122688 |
| RAMP 2005-NC1 | 12/27/05 | 01/13/06 | 333-125485 |
| RALI 2005-QO4 | 11/28/05 | 12/15/05 | 333-126732 |
| RAMP 2005-RS9 | 11/29/05 | 12/12/05 | 333-125485 |
| RASC 2006-EMX8 | 09/27/06 | 10/13/06 | 333-131209 |
| RASC 2006-EMX9 | 10/27/06 | 11/13/06 | 333-131209 |
| RASC 2006-KS3 | 03/29/06 | 04/13/06 | 333-122688 |
| RASC 2006-KS9 | 10/30/06 | 11/13/06 | 333-131209 |
| RALI 2006-QO4 | 04/28/06 | 05/15/06 | 333-131213 |
| RALI 2006-QO5 | 05/31/06 | 06/14/06 | 333-131213 |
| RALI 2006-QO8 | 11/01/06 | 11/14/06 | 333-131213 |
| RALI 2006-QO9 | 11/30/06 | 12/14/06 | 333-131213 |
| RAMP 2006-RS1 | 01/25/06 | 02/09/06 | 333-125485 |
| RASC 2007-EMX1 | 03/09/07 | 03/27/07 | 333-131209 |
| RASC 2007-KS2 | 02/23/07 | 03/09/07 | 333-131209 |
| RASC 2007-KS3 | 03/28/07 | 04/13/07 | 333-131209 |
| RALI 2007-QH5 | 05/30/07 | 06/14/07 | 333-140610 |

**B.    Defendants' Participation in the Securitization Process**

53.    Each of the Defendants played a role in the securitization process and the marketing for some or all of the Certificates purchased by Freddie Mac, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to Freddie Mac.

54.    The Defendants are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates purchased by Freddie Mac, including issuing, causing, or making materially misleading statements in the Registration Statements, and omitting material

facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1.   Ally

55.     Defendant Ally wholly owns GMACM and RFS and is also the ultimate parent of GMACM, ResCap, GMAC-RFC, RFC, RALI, RASC and RAMP.  The chart below indicates the corporate structure of the relevant GMAC entities.



### 2.   RFC

56.     RFC was formed in 1985 as a wholly-owned subsidiary of GMAC-RFC for the purpose of issuing mortgage-backed securities through its affiliates RALI, RASC and RAMP. RFC was a leading sponsor of mortgage-backed securities at all relevant times based largely in part on GMAC-RFC becoming one of the largest issuers of mortgage-backed securities in the world.  According to *Inside Mortgage Finance*, GMAC-RFC issued (i) $42.336 billion of non-agency mortgage-backed securities in 2004, (ii) $56.93 billion in 2005, making it the fifth largest issuer in 2005; (iii) $66.19 billion in 2006, making it the fourth largest issuer in 2006; and

(iv) $32.4 billion in 2007, which still made GMAC-RFC the eighth largest issuer in 2007.[7] *2011 Mortgage Market Statistical Annual*, Vol. II (Inside Mortgage Finance Publ'ns, Inc., 2011)

57.     Defendant RFC was the sponsor of all 21 Securitizations.  In that capacity, RFC determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the rating agencies to secure investment grade ratings for the Certificates sold to Freddie Mac.  RFC also selected RALI, RASC and RAMP as the special-purpose vehicles that would be used to transfer the mortgage loans from RFC to the trusts, and selected RFS or the Non-GMAC Underwriter Defendants for the Securitizations, including Defendant RFS.  In its role as sponsor, RFC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

58.     For all 21 Securitizations that it sponsored, RFC also conveyed the mortgage loans to RALI, RASC and RAMP, as depositor, pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  In these agreements, RFC made certain representations and warranties to RALI, RASC and RAMP regarding the groups of loans collateralizing the Certificates purchased by Freddie Mac.  These representations and warranties were assigned by RALI, RASC and RAMP to the trustees for the benefit of the Certificateholders.

---

[7]     "Agency" mortgage-backed securities are guaranteed by a government agency or government-sponsored enterprise such as Fannie Mae or Freddie Mac, while "non-agency" mortgage-backed securities are issued by banks and financial companies not associated with a government agency or government-sponsored enterprise.

### 3.      RALI, RASC and RAMP

59.      Defendants RALI, RASC and RAMP have been engaged in the securitization of mortgage loans as depositors since their incorporation in 1995, 1994, and 1999, respectively. They are special-purpose entities formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of their rights and interests in such mortgage loans to the trustee for the benefit of certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

60.      RALI was the depositor for six of the 21 Securitizations, RASC was the depositor for 10 Securitizations, and RAMP was the depositor for five Securitizations.  In their capacity as depositors, RALI, RASC and RAMP purchased the mortgage loans from RFC (as sponsor) pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  RALI, RASC and RAMP then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts.  Together with the other Defendants, RALI, RASC and RAMP were also responsible for preparing and filing the Registration Statements pursuant to which the Certificates purchased by Freddie Mac were offered for sale.  The trusts, in turn, held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors, including Freddie Mac.

### 4.      RFS

61.      Defendant RFS was formed in 1990 and is a wholly-owned subsidiary of Ally. Defendant RFS is an investment bank, solely operating as a registered broker-dealer with respect to the issuance and underwriting of residential and commercial mortgage-backed securities.  At all relevant times, RFS was one of the leading underwriters of mortgage and other asset-backed securities in the United States.  According *to Inside Mortgage Finance* in 2004, RFS underwrote over $8.9 billion of non-agency mortgage-backed securities.  In 2005, the data shows that RFS

underwrote $14.5 billion, and in 2006 and 2007, RFS underwrote $12.4 billion and $10.2 billion in non-agency mortgage-backed securities, respectively.

62.     Defendant RFS was the co-lead and selling underwriter for five of the 21 Securitizations and an underwriter for an additional six Securitizations.  In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Freddie Mac and other investors.  RFS was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

### 5.     GMAC-RFC

63.     GMAC-RFC employed its wholly-owned subsidiaries, RFC, RALI, RASC and RAMP, in the key steps of the securitization process.  Unlike typical arm's length securitizations, the Securitizations involved various Ally subsidiaries and affiliates at virtually each step in the chain.  For all 21 Securitizations, RFC was the sponsor and either RALI, RASC or RAMP was the depositor.

64.     GMAC-RFC, as the sole corporate parent of RFC, RALI, RASC and RAMP had the practical ability, in connection with the Securitizations, and the issuance and sale of the Certificates to Freddie Mac, to direct and control the actions of RFC, RALI, RASC and RAMP, and in fact exercised such direction and control over these activities.

### 6.     Ally, GMACM and ResCap

65.     Defendant ResCap wholly owns GMAC-RFC and Defendant GMACM wholly owns ResCap.  ResCap, as the sole corporate parent of GMAC-RFC, had the practical ability to direct and control the actions of GMAC-RFC, and in fact, exercised such direction and control over the activities of this entity related to the issuance and sale of the Certificates to Freddie

Mac.  GMACM, as the sole corporate parent of ResCap, had the practical ability to direct and control the actions of ResCap, and in fact, exercised such direction and control over the activities of this entity related to the issuance and sale of the Certificates to Freddie Mac.

66.    As detailed, *supra*, the Securitizations involved all of the GMAC Defendants at virtually every step in the process, and Ally profited substantially from this vertically integrated approach to mortgage-backed securitization.  Furthermore, ResCap shared overlapping management with the other GMAC entities.  For example, in 2007, David Applegate served as President of GMACM; the COO of ResCap, GMACM's direct subsidiary; the Chairman and CEO of GMAC-RFC, ResCap's direct subsidiary; and Principal Executive Officer of RALI, GMAC-RFC's direct subsidiary, for which he signed a Shelf Registration and amendment thereto.  Similarly, Bruce Paradis served as CEO of GMAC-RFC and then CEO of ResCap, while also serving as the Director, President, and CEO of RALI, RAMP, and RASC -- in which capacity he signed three Shelf Registration Statements and amendments thereto.

### 7.    Non-GMAC Underwriters

67.    The Non-GMAC Underwriters were the nation's largest non-agency mortgage-backed securities underwriters between 2004 through 2007.  The Non-GMAC Underwriter Defendants were the co-lead underwriters for twelve Securitizations and underwriters for an additional seven Securitizations.  In those roles, the Non-GMAC Defendants were responsible for underwriting and managing the offer and sale of the Certificates to Freddie Mac.  The Non-GMAC Underwriter Defendants also were obligated to conduct due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred and underwritten.

68.     Further, through their positions at GMAC, including Defendants GMACM, ResCap, GMAC-RFC, RFS, RFC, RAMP, RALI, and RASC, certain persons had the practical ability to direct and control the actions of the GMAC Defendants in issuing and selling the Certificates, and in fact, exercised such direction and control over the activities of these entities in connection with the issuance and sale for the Certificates to Freddie Mac.  Many people simultaneously held management positions at GMACM, ResCap, GMAC-RFC, RFS, and/or RFC while also holding management positions at RAMP, RALI and RASC.

**C.      Statements in the Prospectus Supplements**

69.     Plaintiff relies on its claims, in part, upon the Registration Statements in their entirety.  Specific representations and warranties in the Registration Statements that form the basis for the claims herein are set forth for each Securitization in Appendix A hereto.

**1.      Compliance with Underwriting Guidelines**

70.     The Prospectus Supplement for each of the Securitizations contained detailed descriptions of the underwriting guidelines used to originate the mortgage loans included in the Securitizations.  Because payment on, and the value of, the Certificates is based on the cash flows from the underlying mortgage pool, representations concerning compliance with the stated underwriting guidelines were material to reasonable investors.  Investors, including Freddie Mac, did not have access to information concerning the collateral pool, and were required to rely on the representations in the Prospectus Supplements concerning that collateral.

71.     Among other consequences, the failure to originate mortgage loans in accordance with stated guidelines diminished the value of the Certificates by increasing the significant risk that an investor will not be paid its principal and interest.  Misrepresentations concerning, or failing accurately to disclose, borrower, loan, and property characteristics bearing on the risk of default by the borrower as well as the severity of losses given default can artificially inflate the

perceived value of the securities.  Without accurate information regarding the collateral pool, reasonable investors, including Freddie Mac, are unable to accurately and independently assess whether the price of an RMBS adequately accounts for the risks they are assuming when they purchase the security.

72.     The Prospectus Supplements for each of the Securitizations contained several key statements with respect to the loan purchasing and underwriting standards of the entities that originated the loans in the Securitizations.  For example, with respect to the RAMP 2005-EFC7 Securitization, for which EquiFirst Corporation ("EquiFirst") was originator, RFS was a co-underwriter, and RASC was the depositor, the Prospectus Supplement states:

> "*All of the mortgage loans included in the trust were originated by EquiFirst, generally in accordance with [EquiFirst's] underwriting criteria*" (emphasis added) and that

> "EquiFirst's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt, and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan."

73.     With respect to the information evaluated by the originator (in this example, EquiFirst), the Prospectus Supplement stated that:

> *EquiFirst considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.*" (emphasis added)

> "The Credit Bureau Risk Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, and is not a substitute for the underwriter's judgment. EquiFirst's underwriting staff fully reviews each loan to determine whether EquiFirst's guidelines for income, assets, employment and collateral are met.  (Emphasis added).

74.     The Prospectus Supplement for the RAMP 2005-EFC7 Securitization further states:

> EquiFirst's guidelines comply with applicable federal and state
> laws and regulations and generally require an appraisal of the
> mortgaged property which conforms to Freddie Mac and/or Fannie
> Mae standards. All loans are subject to EquiFirst's appraisal
> review process.  Appraisals are provided by qualified independent
> appraisers licensed in their respective states.

75.     The Prospectus Supplements for each of the Securitizations made similar
representations with respect to the underwriting guidelines employed by each of the originators
in the Securitizations, which included:  Aegis Mortgage Corporation, Decision One Mortgage
Company, LLC, EFC Holdings Corporation and its subsidiary EquiFirst Corporation, Finance
America, LLC, First National Bank of Nevada, Home123 Corporation, Homefield Financial Inc.,
Mortgage Lenders Network USA, Inc., New Century Mortgage Corporation, Ownit Mortgage
Solutions Inc., People's Choice Home Loan, Inc., Pinnacle Financial Corporation and SCME
Mortgage Bankers, Inc.  *See* Appendix A.

76.     Contrary to those representations, however, these originators routinely and
egregiously departed from, or abandoned completely, their stated underwriting guidelines, as
discussed in Section I.D.2, *infra*.  As a result, the representations concerning compliance with
underwriting guidelines and the inclusion and descriptions of those guidelines in the Prospectus
Supplements were false and misleading, and the actual mortgages underlying each Securitization
exposed the purchasers, including Freddie Mac, to a materially greater risk to investors than that
represented in the Prospectus Supplements.

77.     As reflected more fully in Appendix A, for the vast majority of the
Securitizations, the Prospectus Supplements included representations that: (i) the mortgage loans
were underwritten in accordance with each originator's underwriting guidelines in effect at the
time of origination, subject only to limited exceptions; and (ii) the origination and collection

practices used by the originator with respect to each mortgage note and mortgage were in all respects legal, proper and customary in the mortgage origination and servicing business.

78.     The inclusion of these representations in the Prospectus Supplements had the purpose and effect of providing assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations.  These representations were material to a reasonable investor's decisions to purchase the Certificates, and they were material to Freddie Mac.  As alleged more fully below, Defendants' representations were materially false.

## 2.     Occupancy Status of Borrower

79.     The Prospectus Supplements for each Securitization set forth information about the occupancy status of the borrowers of the loans underlying the Securitization; that is, whether the property securing a mortgage is (i) the borrower's primary residence; (ii) a second home; or (iii) an investment property.  This information was presented in tables, typically titled "Occupancy Status of the Mortgage Loans," that assigned all the properties in the collateral group to one of the following categories:  (i) "Primary," or "Owner-Occupied;" (ii) "Second Home," or "Secondary"; and (iii) "Investor" or "Non-Owner."  For each category, the table stated the number of loans purportedly in that category.  Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[8]

---

[8]     Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories:  owner-occupied, investor, and second home.  These numbers have been converted to percentages for ease of comparison.

**Table 4**

| Transaction | Tranche | Supporting Loan Group | Primary or Owner-Occupied | Second Home / Secondary | Investor |
|---|---|---|---|---|---|
| RALI 2005-QO4 | IA1 | Group I | 81.68% | 1.71% | 16.61% |
| RALI 2006-QO4 | IA1 | Group I | 79.14% | 5.53% | 15.33% |
| RALI 2006-QO4 | IA2 | Group I | 79.14% | 5.53% | 15.33% |
| RALI 2006-QO5 | IA1 | Group I | 81.13% | 4.10% | 14.76% |
| RALI 2006-QO8 | IIA | Group II | 81.78% | 3.41% | 14.81% |
| RALI 2006-QO9 | IIA | Group II | 80.99% | 4.05% | 14.97% |
| RALI 2007-QH5 | AII | Group II | 77.36% | 5.74% | 16.90% |
| RAMP 2005-EFC6 | AII | Group II | 98.15% | 0.37% | 1.48% |
| RAMP 2005-EFC7 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RAMP 2005-NC1 | AII | Group II | 83.96% | 5.56% | 10.48% |
| RAMP 2005-RS9 | AII | Group II | 65.80% | 1.35% | 32.85% |
| RAMP 2006-RS1 | AII | Group II | 78.45% | 2.11% | 19.44% |
| RASC 2005-EMX3 | AII | Group II | 93.92% | 2.29% | 3.79% |
| RASC 2005-KS10 | AII | Group II | 94.42% | 0.85% | 4.72% |
| RASC 2005-KS11 | AII | Group II | 89.88% | 2.53% | 7.59% |
| RASC 2006-EMX8 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RASC 2006-EMX9 | AII | Group II | 100.00% | 0.00% | 0.00% |
| RASC 2006-KS3 | AII | Group II | 99.24% | 0.76% | 0.00% |
| RASC 2006-KS9 | AII | Group II | 95.82% | 2.81% | 1.36% |
| RASC 2007-EMX1 | AII | Group II | 93.65% | 1.98% | 4.37% |
| RASC 2007-KS2 | AII | Group II | 95.23% | 0.71% | 4.05% |
| RASC 2007-KS3 | AII | Group II | 95.56% | 1.27% | 3.17% |

80.     As Table 4 makes clear, the Prospectus Supplements reported that 17 of the 22 Supporting Loan Groups contained at least 80 percent owner-occupied loans, and 11 of the 22 Supporting Loan Groups contained at least 90 percent owner-occupied loans.

81.     Because information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan -- and, therefore, the securitization that it backs -- the statements in the Prospectus Supplements concerning occupancy status were material to a

reasonable investor's decision to invest in the Certificates, and they were material to Freddie Mac. These statements were material because, among other reasons, borrowers who live in mortgaged properties are substantially less likely to default and more likely to care for their primary residence than borrowers who purchase properties as second homes or investments and live elsewhere. For example, as stated in the Prospectus Supplement for the RALI 2005-QO4 Securitization: "[T]he rate of default on mortgage loans or manufactured housing contracts that are secured by investment properties . . . may be higher than on other mortgage loans or manufactured housing contracts." Accordingly, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization.

82.     Other things being equal, the lower the percentage of loans secured by owner-occupied residences, the greater the risk of loss to Certificateholders. Even modest differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate. As discussed *infra* at paragraphs 94 through 98, the Prospectus Supplements for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner-occupied, thereby misrepresenting the degree of risk of the Certificates purchased by Freddie Mac.

### 3.     Loan-to-Value Ratios

83.     The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

84.     The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property. In a refinancing

or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan or home-equity loan.  Accordingly, an accurate appraisal is essential to an accurate LTV ratio.  In particular, an inflated appraisal will understate, sometimes greatly, the credit risks associated with a given loan.

85.     The Prospectus Supplements for the Securitizations contain information about the LTV ratio for each Supporting Loan Group.  Table 5 below reflects two categories of important information reported in the Prospectus Supplements concerning the LTV ratios for each Supporting Loan Group: (i) the percentage of loans with an LTV ratio of 80 percent or less; and (ii) the percentage of loans with an LTV ratio greater than 100 percent. [9]

**Table 5**

| Transaction | Supporting Loan Group | % of Loans, by Aggregate Principal Balance, with LTV Less than or Equal to 80% | % of Loans, by Aggregate Principal Balance, with LTV Greater than 100% |
|---|---|---|---|
| RAMP 2005-EFC6 | Group II | 57.86% | 0.00% |
| RAMP 2005-EFC7 | Group II | 71.74% | 0.00% |
| RASC 2005-EMX3 | Group II | 47.33% | 0.00% |
| RASC 2005-KS10 | Group II | 45.62% | 0.00% |
| RASC 2005-KS11 | Group II | 61.19% | 0.00% |
| RAMP 2005-NC1 | Group II | 57.07% | 0.00% |
| RALI 2005-QO4 | Group I | 94.77% | 0.00% |
| RAMP 2005-RS9 | Group II | 53.93% | 0.00% |
| RASC 2006-EMX8 | Group II | 53.72% | 0.00% |
| RASC 2006-EMX9 | Group II | 41.34% | 0.00% |
| RASC 2006-KS3 | Group II | 61.60% | 0.00% |
| RASC 2006-KS9 | Group II | 45.21% | 0.00% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 94.37% | 0.00% |
| RALI 2006-QO5 | Group I | 95.44% | 0.00% |

---

[9]     As used in this Complaint, "LTV" refers to the loan-to-value ratio for first lien mortgages and for properties with second liens subordinate to the lien included in the securitization (*i.e.*, only the securitized lien is included in the numerator of the LTV calculation).  Where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

| Transaction | Supporting Loan Group | % of Loans, by Aggregate Principal Balance, with LTV Less than or Equal to 80% | % of Loans, by Aggregate Principal Balance, with LTV Greater than 100% |
|---|---|---|---|
| RALI 2006-QO8 | Group II | 95.56% | 0.00% |
| RALI 2006-QO9 | Group II | 93.89% | 0.00% |
| RAMP 2006-RS1 | Group II | 44.73% | 0.00% |
| RASC 2007-EMX1 | Group II | 52.14% | 0.00% |
| RASC 2007-KS2 | Group II | 44.68% | 0.00% |
| RASC 2007-KS3 | Group II | 43.00% | 0.00% |
| RALI 2007-QH5 | Group II | 93.70% | 0.00% |

86.     The LTV ratio is among the most important measures of the risk of a mortgage loan for several reasons.  First, the LTV ratio is a strong indicator of the likelihood of default because a higher LTV ratio makes it more likely that a decline in the value of a property will completely eliminate a borrower's equity, and will incentivize the borrower to stop making mortgage payments and abandon the property.  Second, the LTV ratio is a strong predictor of the severity of loss in the event of a default because the higher the LTV ratio, the smaller the "equity cushion," and the greater the likelihood that the proceeds of foreclosure will not cover the unpaid balance of the mortgage loan.

87.     Thus, LTV ratios are material to a reasonable investor's investment decision with respect to the Certificates, and they were material to Freddie Mac.  Even small differences between the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that collateral groups will generate sufficient funds to pay certificateholders in that securitization.  Such differences are important to the decision of a reasonable investor on whether to purchase any such certificate, and they affect the intrinsic value of the certificate.

88.     As Table 5 makes clear, the Prospectus Supplements for the majority of the Securitizations reported that the majority of the mortgage loans in the Supporting Loan Groups

had an LTV ratio of 80 percent or less.  The Prospectus Supplements also reported that *none* of the Supporting Loan Groups contained a single loan with an LTV ratio over 100 percent.

89.     As discussed *infra* at paragraphs 99 through 104, the Prospectus Supplements for the Securitizations materially *overstated* the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially *understated* the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk to Certificateholders.

### 4.     Credit Ratings

90.     Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Standard & Poor's, Moody's Investor Service, and Fitch Ratings.  Each credit rating agency uses its own scale with letter designations to describe various levels of risk.  In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments.  C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery.  At the time Freddie Mac purchased the Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent.  Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent.  As a result, securities with credit ratings between AAA or its equivalent through BBB- or its equivalent were generally referred to as "investment grade."

91.     Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors.  Rating agencies determine the likelihood of repayment by estimating cash flows based on the quality of the underlying mortgages by using sponsor-provided loan-level data.  Credit enhancements, such as subordination, represent the

amount of "cushion" or protection from loss incorporated into a given securitization.[10]  This

cushion is intended to improve the likelihood that holders of highly-rated certificates receive the

interest and principal to which they are contractually entitled.  The level of credit enhancement

offered is based on the composition of the loans in the underlying collateral group and entire

securitization.  Riskier loans underlying the securitization necessitate higher levels of credit

enhancement to insure payment to senior certificate holders.  If the collateral within the deal is of

a higher quality, then rating agencies require less credit enhancement for an AAA or its

equivalent rating.

92.     For almost a hundred years, investors like pension funds, municipalities,

insurance companies, and university endowments have relied heavily on credit ratings to assist

them in distinguishing between safe and risky investments.

93.     Each tranche of the Securitizations received a credit rating before issuance, which

purported to describe the riskiness of that tranche.  Defendants reported the credit ratings for

each tranche in the Prospectus Supplements.  For each of the Certificates purchased by Freddie

Mac was AAA or its equivalent the credit rating provided.  The accuracy of these ratings was

material to a reasonable investor's decision to purchase the Certificates, and it was material to

Freddie Mac.  Among other things, the ratings provided additional assurance that investors in the

Certificates would receive the expected interest and principal payments.  As set forth in Table 8,

*infra* at paragraph 126, the ratings for the majority of the Securitizations were severely

downgraded after Freddie Mac's purchase of the Certificates.  Upon information and belief, the

---

[10]     "Subordination" refers to the fact that the certificates for a mortgage-backed
securitization are issued in a hierarchical structure, from senior to junior.  The junior certificates
are "subordinate" to the senior certificates in that, should the underlying mortgage loans become
delinquent or default, the junior certificates suffer losses first.  These subordinate certificates
thus provide a degree of protection to the senior certificates from certain losses on the underlying
loans.

initial ratings were based in substantial part upon the materially inaccurate and incomplete information in the Registration Statements and related information provided to the ratings agencies.

**D.   Falsity of Statements in the Registration Statements and Prospectus Supplements**

**1.   The Statistical Data Provided in the Prospectus Supplements Concerning Owner-Occupancy and Loan-to-Value Ratios was Materially False**

94.     A review of loan-level data was conducted to assess whether the statistical information provided in the Prospectus Supplements was true and accurate.  For each Securitization, the review included an analysis either of:  (i) a sample of 1,000 loans randomly selected from the Supporting Loan Group; or (ii) all the loans in the Supporting Loan Group if there were fewer than 1,000 such loans.  The review of sample data has confirmed, on a statistically-significant basis, that the data provided in the Prospectus Supplements concerning owner-occupancy and LTV ratios was materially false, and that the Prospectus Supplements contained material misrepresentations with respect to the underwriting standards employed by the originators, and certain key characteristics of the mortgage loans across the Securitizations.

**a.   Owner-Occupancy Data was Materially False**

95.     The data review has revealed that the owner-occupancy statistics reported in the Prospectus Supplements were materially false and inflated.  Indeed, the Prospectus Supplements overreported the number of underlying properties that were occupied by their owners, and underreported the number of underlying properties held as second homes or investment properties.

96.     To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, *inter alia*, whether, months after the loan

closed, the borrower's tax bill was being mailed to the property or to a different address, whether the borrower had claimed a tax exemption on the property, and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records.  Failing two or more of these tests constitutes strong evidence that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, rendering it much more likely that a borrower will not repay the loan.

97.     For each Securitization, a significant number of the underlying loans failed two or more of these tests, demonstrating that the owner-occupancy statistics provided to Freddie Mac were materially false and misleading.  For example, the Prospectus Supplement for the RAMP 2005-EFC6 Securitization -- for which RFC was the sponsor and RFS was a co-underwriter -- stated that 1.85 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied.  But the data review revealed that the true percentage of non-owner-occupied properties was 13.67 percent,[11] approximately 700 percent greater than the percentage reported in the Prospectus Supplement because for 12.04 percent of the properties represented as owner-occupied, the owners lived elsewhere.

98.     The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner-occupied properties.  The true percentage of non-owner-occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization, is reflected in Table 6 below.  Table 6

---

[11]     The true percentage of non-owner-occupied properties (Table 6 Column C) is calculated by adding the percentage reported in the Prospectus Supplement (Table 6 Column A) to the product of owner-occupied properties reported in the Prospectus Supplement (100 minus Column A) and the percentage of properties reported as owner-occupied but with strong indication of non-owner-occupancy (Table 6 Column B).

demonstrates that the Prospectus Supplements for each Securitization significantly understated the percentage of non-owner-occupied properties.

**Table 6**

|  |  | A | B | C | D |
|---|---|---|---|---|---|
| **Transaction** | **Supporting Loan Group** | **Reported % of Non-Owner-Occupied Properties** | **Percentage of Properties As Owner-Occupied Misrepresented in the Registration Statements** | **Actual % of Non-Owner-Occupied Properties** | **Understatement of Non-Owner-Occupied Properties in the Offering Materials** |
| RAMP 2005-EFC6 | Group II | 1.85% | 12.04% | 13.67% | 11.82% |
| RAMP 2005-EFC7 | Group II | 0.00% | 11.88% | 11.88% | 11.88% |
| RASC 2005-EMX3 | Group II | 6.08% | 9.03% | 14.56% | 8.48% |
| RASC 2005-KS10 | Group II | 5.58% | 11.97% | 16.88% | 11.30% |
| RASC 2005-KS11 | Group II | 10.12% | 11.41% | 20.38% | 10.26% |
| RAMP 2005-NC1 | Group II | 16.04% | 10.72% | 25.04% | 9.00% |
| RALI 2005-QO4 | Group I | 18.32% | 14.93% | 30.52% | 12.19% |
| RAMP 2005-RS9 | Group II | 34.20% | 13.42% | 43.03% | 8.83% |
| RASC 2006-EMX8 | Group II | 0.00% | 12.38% | 12.38% | 12.38% |
| RASC 2006-EMX9 | Group II | 0.00% | 12.52% | 12.52% | 12.52% |
| RASC 2006-KS3 | Group II | 0.76% | 13.20% | 13.86% | 13.10% |
| RASC 2006-KS9 | Group II | 4.18% | 9.06% | 12.86% | 8.68% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 20.86% | 14.86% | 32.62% | 11.76% |
| RALI 2006-QO5 | Group I | 18.87% | 13.14% | 29.53% | 10.66% |
| RALI 2006-QO8 | Group II | 18.22% | 13.18% | 29.00% | 10.78% |
| RALI 2006-QO9 | Group II | 19.01% | 13.84% | 30.22% | 11.21% |
| RAMP 2006-RS1 | Group II | 21.55% | 11.66% | 30.69% | 9.15% |
| RASC 2007-EMX1 | Group II | 6.35% | 9.44% | 15.19% | 8.84% |
| RASC 2007-KS2 | Group II | 4.77% | 10.28% | 14.56% | 9.79% |
| RASC 2007-KS3 | Group II | 4.44% | 11.10% | 15.05% | 10.60% |
| RALI 2007-QH5 | Group II | 22.64% | 15.76% | 34.83% | 12.20% |

### b.      Loan-to-Value Data was Materially False

99.      The data review has further revealed that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated, as more specifically set out below.  For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated.  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing.  AVMs rely upon similar

data as appraisers -- primarily county assessor records, tax rolls, and data on comparable properties. AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

100.    Applying the AVM to the available data for the properties securing the sampled loans shows that the retroactive appraised value given to such properties was significantly higher than the actual value of such properties. The result of this overstatement of property values is a material understatement of LTV. That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value. This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default. As stated in the Prospectus Supplement for RALI 2005-QO4: "The rate of default . . . on mortgage loans or manufactured housing contracts with higher LTV ratios may be higher than for other types of mortgage loans or manufactured housing contracts."

101.    For example, for the RALI 2005-QH5 Securitization, for which RFC was the sponsor and RFS was a co-underwriter, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent. In fact, 18.26 percent of the sample of loans included in the data review had LTV ratios above 100 percent. In addition, the Prospectus Supplement stated that 93.70 percent of the loans had LTV ratios at or below 80 percent. The data review indicated that only 45.89 percent of the loans had LTV ratios at or below 80 percent.

102.    The data review revealed that for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well the percentage of loans that had an LTV ratio at or below 80 percent. Table 7 reflects (i) the true percentage of mortgages in the Supporting Loan Group with LTV ratios above 100 percent,

versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of

mortgages in the Supporting Loan Group with LTV ratios at or below 80 percent, versus the

percentage reported in the Prospectus Supplement.  The percentages listed in Table 7 were

calculated by aggregated principal balance.

**Table 7**

| Transaction | Supporting Loan Group | PROSPECTUS | DATA REVIEW | PROSPECTUS | DATA REVIEW |
|---|---|---|---|---|---|
| | | % of Loans Reported to have LTV Ratio at or Less than 80% | True % of Loans with LTV Ratio at or Less than 80% | % of Loans Reported to have LTV Ratio Over 100% | True % of Loans with LTV Ratio Over 100% |
| RAMP 2005-EFC6 | Group II | 57.86% | 35.31% | 0.00% | 16.70% |
| RAMP 2005-EFC7 | Group II | 71.74% | 38.91% | 0.00% | 13.32% |
| RASC 2005-EMX3 | Group II | 47.33% | 29.10% | 0.00% | 19.47% |
| RASC 2005-KS10 | Group II | 45.62% | 31.29% | 0.00% | 17.94% |
| RASC 2005-KS11 | Group II | 61.19% | 44.25% | 0.00% | 14.41% |
| RAMP 2005-NC1 | Group II | 57.07% | 44.83% | 0.00% | 13.01% |
| RALI 2005-QO4 | Group I | 94.77% | 61.17% | 0.00% | 8.18% |
| RAMP 2005-RS9 | Group II | 53.93% | 36.91% | 0.00% | 17.27% |
| RASC 2006-EMX8 | Group II | 53.72% | 30.69% | 0.00% | 26.94% |
| RASC 2006-EMX9 | Group II | 41.34% | 21.70% | 0.03% | 33.84% |
| RASC 2006-KS3 | Group II | 61.60% | 44.12% | 0.00% | 11.68% |
| RASC 2006-KS9 | Group II | 45.21% | 27.87% | 0.00% | 26.92% |
| RALI 2006-QO4 (IA1 & IA2) | Group I | 94.37% | 57.25% | 0.00% | 8.43% |
| RALI 2006-QO5 | Group I | 95.44% | 53.64% | 0.00% | 11.09% |
| RALI 2006-QO8 | Group II | 95.56% | 46.48% | 0.00% | 11.62% |
| RALI 2006-QO9 | Group II | 93.89% | 48.39% | 0.00% | 13.12% |
| RAMP 2006-RS1 | Group II | 44.73% | 29.46% | 2.60% | 22.23% |
| RASC 2007-EMX1 | Group II | 52.14% | 27.06% | 0.00% | 26.46% |
| RASC 2007-KS2 | Group II | 44.68% | 28.40% | 0.00% | 28.40% |
| RASC 2007-KS3 | Group II | 43.00% | 27.04% | 0.00% | 29.22% |
| RALI 2007-QH5 | Group II | 93.70% | 45.89% | 0.00% | 18.26% |

103.    As Table 7 demonstrates, the Prospectus Supplements for all the Securitizations

falsely reported that only two of the Supporting Loan Groups had mortgage loans with an LTV

ratio over 100 percent:  the data review revealed that at least eight percent of the mortgage loans

for *every* Securitization had an LTV ratio over 100 percent, and for most Securitizations this

figure was much larger.  Indeed, for 19 of the 21 Securitizations, the data review revealed that

more than 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.  For 12 Securitizations, the data review revealed that more than 15 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent and for seven Securitizations, the data review revealed that more than 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

104.     These misrepresentations with respect to reported LTV ratios also demonstrate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties.  Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.  The Financial Crisis Inquiry Commission ("FCIC"), created by Congress to investigate the mortgage crisis and attendant financial collapse in 2008, identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results.  (*See* FCIC, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report"), at 91.)

### 2.     The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines

105.     The Prospectus Supplements each contained material misstatements and omissions concerning the underwriting guidelines used by the originators of the loans included in the Securitizations, defined herein as the Non-Party Originators.  Among other things, the Prospectus Supplements stated that the Non-Party Originators underwrote all loans in

compliance with their respective underwriting guidelines.  *See* Appendix A, Sections I-XXI at Subsections B.

106.    The Non-Party Originators -- companies such as New Century, Decision One, and others -- systematically disregarded their respective underwriting guidelines, as confirmed not only by the pervasively false owner-occupancy and LTV figures alleged *supra*, but also by:  (1) government investigations and private actions relating to their underwriting practices, which have revealed widespread abandonment of their reported underwriting guidelines during the period of the Securitizations; (2) the collapse of the credit ratings of Certificates purchased by Freddie Mac; and (3) the surge in delinquencies and defaults in the mortgages in the Securitizations.

> **a.      Government and Private Investigations Confirm That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines**

107.    An extraordinary volume of publicly-available information, including government reports and investigations, confirms that the originators whose loans were included by the Defendants in the Securitizations abandoned their loan origination guidelines throughout the period of the Securitizations.

108.    For example, in November 2008, the Office of the Comptroller of the Currency ("OCC"), an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Aegis, Decision One, New Century, Ownit,[12] and

---

[12]    Ownit, which originated loans for one of the Securitizations, was identified by the OCC as the fifteenth worst subprime lender in the country based on the delinquency rates of the mortgages it originated in the ten metropolitan areas between 2005 and 2007 with the highest

People's Choice -- the companies that originated loans for eight of the Securitizations at issue here -- were all on that list. *See* "Worst Ten in the Worst Ten," Office of the Comptroller of the Currency Press Release, November 13, 2008. Several of the Non-Party Originators -- including New Century, HFN and MLN -- have been the target of government investigations or private actions that allege a complete abandonment of their reported underwriting guidelines.

### i.      New Century Violated Its Underwriting Guidelines

109.     New Century and its subsidiary, Home123, originated loans for at least four of the Securitizations. As stated in the Prospectus Supplement for the RAMP 2005-NC1 Securitization, "[f]or the quarter ending September 30, 2005, New Century Financial Corporation originated $40.4 billion in mortgage loans." By the end of 2006, Inside Mortgage Finance reports that New Century was the second largest subprime mortgage loan originator in the United States, with a loan production volume that year of $51.6 billion. Before its collapse in the first half of 2007, New Century was one of the largest subprime lenders in the country. New Century filed for protection from its creditors under Chapter 11 of the federal Bankruptcy Code on April 2, 2007.

110.     In 2010, the OCC identified New Century as *the* worst subprime lender in the country based on the delinquency rates of the mortgages it originated in the 10 metropolitan areas between 2005 and 2007 with the highest rates of delinquency. *See* "Worst Ten in the Worst Ten: Update," Office of the Comptroller of Currency Press Release, March 22, 2010. Further, in January 2011, the FCIC Report detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. *See* FCIC Report. The FCIC Report singled out New Century for its role:

---

rates of delinquency. *See* "Worst Ten in the Worst Ten: Update," Office of the Comptroller of Currency Press Release, March 22, 2010.

New Century—once the nation's second-largest subprime lender—
ignored early warnings that its own loan quality was deteriorating
and stripped power from two risk-control departments that had
noted the evidence. In a June 2004 presentation, the Quality
Assurance staff reported they had found severe underwriting
errors, including evidence of predatory lending, federal and state
violations, and credit issues, in 25% of the loans they audited in
November and December 2003. In 2004, Chief Operating Officer
and later CEO Brad Morrice recommended these results be
removed from the statistical tools used to track loan performance,
and in 2005, the department was dissolved and its personnel
terminated. The same year, the Internal Audit department
identified numerous deficiencies in loan files; out of nine reviews
it conducted in 2005, it gave the company's loan production
department "unsatisfactory" ratings seven times. Patrick Flanagan,
president of New Century's mortgage-originating subsidiary, cut
the department's budget, saying in a memo that the "group was out
of control and tries to dictate business practices instead of audit."

111.    On February 29, 2008, after an extensive document review and conducting over

100 interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a

detailed report on the various deficiencies at New Century, including lax mortgage standards and

a failure to follow its own underwriting guidelines.  Among his findings, the Examiner reported:

New Century had a brazen obsession with increasing loan
originations without due regard for the risks associated with that
business strategy. . . . Although the primary goal of any mortgage
banking company is to make more loans, New Century did so in an
aggressive manner that elevated the risks to dangerous and
ultimately to fatal levels.

New Century also made frequent exceptions to its underwriting
guidelines for borrowers who might not otherwise qualify for a
particular loan.  A Senior Officer of New Century warned in 2004
that the "number one issue is exceptions to the guidelines."
Moreover, many of the appraisals used to value the homes that
secured the mortgages had deficiencies.

New Century . . . layered the risks of loan products upon the risks
of loose underwriting standards in its loan originations to high risk
borrowers.

Final Report of Michael J. Missal, Bankruptcy Examiner, *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008).

112.    On December 9, 2009, the SEC charged three of New Century's top officers with violations of federal securities laws.  The SEC's complaint details the blatant falsity of New Century's representations regarding its underwriting guidelines, for example, its representations that it was committed to "adher[ing] to high origination standards in order to sell [its] loan products in the secondary market" and to "only approv[ing] subprime loan applications that evidence a borrower's ability to repay the loan."

113.    New Century's failure to adhere to its underwriting guidelines is further reflected in allegations in the Assurance of Discontinuance signed by Morgan Stanley and the Attorney General of Massachusetts (the "Assurance of Discontinuance"), in *In re: Morgan Stanley & Co. Inc.*, Civil Action No. 10-2538 (Suffolk Cnty. Super. Ct. June 24, 2010).  The Massachusetts Attorney General alleged:

- New Century "stretch[ed] underwriting guidelines to encompass or approve loans not written in accordance with the guidelines."  (*Id*. ¶¶ 17, 23.)

- "One recurring issue identified by Morgan Stanley was New Century's origination of loans that violated Massachusetts Division of Banks' borrower's best interest standard []." (*Id*. ¶ 18.)

- During the period 2006-2007, 91 percent of the loans approved for securitization that did not meet New Century's underwriting guidelines did not have "sufficient compensating factors to offset such exceptions."  (*Id*. ¶ 27.)

- "In the last three quarters of 2006, Morgan Stanley waived more than half of all material exceptions found by Clayton . . ., and purchased a substantial number of New Century loans found by Clayton to violate guidelines without sufficient compensating factors."  (*Id*. ¶ 28.)

- The loans originated by New Century were "unfair loans to Massachusetts borrowers" and "were in violation of Massachusetts law . . . ."  (*Id*. ¶¶ 43-44.)

114.     As a result, on or about June 24, 2010, Morgan Stanley paid $102 million to settle the claims asserted by the Attorney General and also agreed to drastic changes in its underwriting practices.

115.     Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century.  Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income.  (*See* Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdn-media/fcic.testimony/2010-0407-Lindsay.pdf, at 3.)

116.     Ms. Lindsay also testified that appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value."  (*See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.)  Indeed, on May 7, 2007, *The Washington Post* reported that a former New Century appraiser, Maggie Hardiman, recounted how she "didn't want to turn away a loan because all hell would break loose" and that, when she did reject a loan, "her bosses often overruled her and found another appraiser to sign off on it."  (David Cho, *Pressure at Mortgage Firm Led to Mass Approval of Bad Loans*, The Washington Post (May 7, 2007).)

### ii.     HFN Violated Its Underwriting Guidelines

117.     HFN originated loans for 13 of the Securitizations -- as discussed *infra*, HFN was the GMAC entity responsible for the origination of all of GMAC's residential mortgage loans during the relevant time period.

118.    MBIA Insurance Corporation, which insured mortgage-backed securities issued by GMAC, has filed two actions against GMACM and RFC, both parents of HFN, alleging, among other things, that GMACM and RFC made fraudulent representations regarding adherence to GMAC's loan origination underwriting guidelines.  MBIA alleged that it performed an extensive a review of loan files in advance of making its allegations.  Its complaint explains that it performed a review of "loan files associated with 4,104 delinquent or charged off loans" and that its review revealed that "[a]t least 89% of the 4,104 delinquent or charged off loans . . . were not originated in material compliance with GMAC Mortgage's Underwriting Guidelines." (Complaint at ¶ 6, *MBIA Insurance Corp. v. GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation)*, No. 6008737-2010 (N.Y. Sup. Ct.) (filed Compl. Apr. 1, 2010).)  MBIA's complaint further alleges that MBIA, or the experts that performed its review, found that "a significant number of mortgage loans were made on the basis of 'stated incomes' that were grossly unreasonable or were approved despite [debt-to-income] or CLTV ratios in excess of the limits stated in GMAC Mortgage's Underwriting Guidelines," and that, "contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves."  (*Id.* at ¶ 76.)

119.    In its complaint against RFC, the direct parent of HFN, MBIA also asserted a claim for fraud, among other things, alleging that MBIA's review "[o]f the 1,847 mortgage loans [revealed that] . . . only 129 mortgage loans -- less than 7% of the mortgage loans reviewed -- were originated or acquired in material compliance with RFC's representations and warranties

. . . with respect to the underwriting of the mortgage loans contributed to the RFC transactions." (Complaint at ¶ 46, *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552-2008 (N.Y. Sup. Ct.) (filed Compl. Dec. 4, 2008).)

120.    Further, on June 29, 2011, the SEC and the DOJ launched investigations of, among other things, "potential fraud related to the origination and/or underwriting of mortgage loans" by GMAC.  As an originator of residential mortgage loans for the GMAC entities, the scope of the SEC and the DOJ's investigation will likely include a review of HFN's compliance with its own loan origination underwriting guidelines.

### iii.    MLN Violated Its Underwriting Guidelines

121.    Mortgage Loan Networks USA, Inc. ("MLN"), which originated the loans for four of the Securitizations, filed for bankruptcy on February 5, 2007, and on January 6, 2011, the Liquidating Trustee for MLN filed a motion seeking to destroy certain MLN records and releasing the Trustee from responding to any future requests concerning those records.  The United States Attorney objected to the Trustee's motion on the basis that "federal law enforcement records indicate that [MLN's] loans are the subject of many ongoing investigations. As a result, [MLN's] records, including but not limited to the loan files and loan related information . . . , may be relevant to pending federal criminal investigations into mortgage fraud."  (Objection to Debtor's Motion for the Destruction for Certain Records, *In re Mortgage Lenders Network USA, Inc.*, No. 07-10146-PJW (Bankr. Del.) (Dkt. 3281).)  Accordingly, upon information and belief, government investigations into MLN's origination of loans and compliance with its own underwriting guidelines are ongoing.

122.    The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines.  The FCIC found that mortgage loan originators throughout the industry pressured appraisers, during the period of the

Securitizations, to issue inflated appraisals that met or exceeded the amounts needed for the

subject loans to be approved, regardless of the accuracy of such appraisals, and especially when

the originators aimed at putting the mortgages into a package of mortgages that would be sold for

securitization.  Upon information and belief, these inflated appraisals resulted in inaccurate LTV

ratios.

>            **b.      The Collapse of the Certificates' Credit Ratings Further Shows
>                     that the Mortgage Loans were not Originated in Adherence to
>                     the Stated Underwriting Guidelines**

123.     The total collapse in the credit ratings of the Certificates invested in by Freddie

Mac, typically from AAA or its equivalent to non-investment speculative grade, is further

evidence of the originators' systematic disregard of underwriting guidelines, underscoring that

these Certificates were impaired from the start.

124.     The Certificates purchased by Freddie Mac originally were assigned credit ratings

of AAA or its equivalent, which purportedly reflected the description of the mortgage loan

collateral and underwriting practices set forth in the Registration Statements.  Those ratings

artificially were inflated, however, upon information and belief, in part as a result of the same

misrepresentations that the Defendants made to investors in the Prospectus Supplements.

125.     Upon information and belief, GMAC provided information at the loan level to the

rating agencies, including LTV ratios, owner-occupancy rates, and other loan characteristics, that

the rating agencies used in part to calculate the assigned ratings of the Certificates purchased by

Freddie Mac.  Upon information and belief, because the information that GMAC provided,

which information included among other things the Registration Statements or portions thereof,

the ratings were inflated.  As a result, the Certificates were offered and purchased at prices

suitable for investment grade securities when in fact the Certificates actually carried a severe risk

of loss and inadequate credit enhancement.

126.     Since the issuance of the Certificates, the ratings agencies dramatically have

downgraded their ratings to reflect the revelations regarding the true underwriting practices used

to originate the mortgage loans, and the true value and credit quality of the mortgage loans.

Table 8 details the extent of the downgrades.[13]

**Table 8**

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| RAMP 2005-EFC6 | AII | Aaa/AAA/-- | A1/AAA/-- |
| RAMP 2005-EFC7 | AII | Aaa/AAA/-- | Ca/D/-- |
| RASC 2005-EMX3 | AII | Aaa/AAA/-- | Aa1/AAA/-- |
| RASC 2005-KS10 | AII | Aaa/AAA/-- | Baa3/AAA/-- |
| RASC 2005-KS11 | AII | Aaa/AAA/-- | Ba1/AAA/-- |
| RAMP 2005-NC1 | AII | Aaa/AAA/-- | Ca/D/-- |
| RALI 2005-QO4 | IA1 | Aaa/AAA/AAA | Caa3/CCC/C |
| RAMP 2005-RS9 | AII | Aaa/AAA/-- | Ca/D/-- |
| RASC 2006-EMX8 | AII | Aaa/AAA/-- | Ca/CCC/-- |
| RASC 2006-EMX9 | AII | Aaa/AAA/-- | Caa3/CCC/-- |
| RASC 2006-KS3 | AII | Aaa/AAA/-- | Caa1/AA/-- |
| RASC 2006-KS9 | AII | Aaa/AAA/AAA | Ca/CCC/C |
| RALI 2006-QO4 | IA1 | Aaa/AAA/-- | Ca/CCC/-- |
| RALI 2006-QO4 | IA2 | Aaa/AAA/-- | Ca/D/-- |
| RALI 2006-QO5 | IA1 | Aaa/AAA/-- | Caa3/AA-/-- |
| RALI 2006-QO8 | IIA | Aaa/AAA/-- | Ca/D/-- |
| RALI 2006-QO9 | IIA | Aaa/AAA/-- | Ca/D/-- |
| RAMP 2006-RS1 | AII | Aaa/AAA/-- | Caa3/CCC/-- |
| RASC 2007-EMX1 | AII | Aaa/AAA/-- | Ca/D/-- |
| RASC 2007-KS2 | AII | Aaa/AAA/AAA | Caa3/CCC/CC |
| RASC 2007-KS3 | AII | Aaa/AAA/-- | Caa3/CCC/-- |
| RALI 2007-QH5 | AII | Aaa/AAA/-- | Ca/CC/-- |

**c.      The Surge in Mortgage Delinquency and Default Further Demonstrates that the Mortgage Loans were not Originated in Adherence to the Stated Underwriting Guidelines**

127.     Even though the Certificates were marketed as long-term, stable investments, a

significant percentage of the mortgage loans backing the Certificates have defaulted, have been

---

[13]      Applicable ratings are shown in sequential order separated by forward slashes:
S&P/Moody's/Fitch.  A double-hyphen indicates that the relevant agency did not provide a
rating at issuance.

foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders. The overall poor performance of the mortgage loans is a direct consequence of the fact that their underlying mortgage loans were not underwritten in accordance with applicable underwriting guidelines as represented in the Prospectus Supplements.

128.    Loan groups that were underwritten properly and contained loans with the characteristics represented in the Prospectus Supplements would have experienced substantially fewer delinquencies and substantially lower percentages of defaults, foreclosures, and delinquencies than occurred here. Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

**Table 9**

| Transaction | Supporting Loan Group | Percentage of Delinquent / Defaulted / Foreclosed Loans |
|---|---|---|
| RAMP 2005-EFC6 | Group II | 33.5% |
| RAMP 2005-EFC7 | Group II | 40.2% |
| RASC 2005-EMX3 | Group II | 36.6% |
| RASC 2005-KS10 | Group II | 30.6% |
| RASC 2005-KS11 | Group II | 28.8% |
| RAMP 2005-NC1 | Group II | 29.0% |
| RALI 2005-QO4 | Group I | 42.3% |
| RAMP 2005-RS9 | Group II | 28.8% |
| RASC 2006-EMX8 | Group II | 53.0% |
| RASC 2006-EMX9 | Group II | 61.7% |
| RASC 2006-KS3 | Group II | 34.0% |
| RASC 2006-KS9 | Group II | 33.3% |
| RALI 2006-QO4 (IA1) | Group I | 39.2% |
| RALI 2006-QO4 (IA2) | Group I | 39.2% |
| RALI 2006-QO5 | Group I | 39.9% |
| RALI 2006-QO8 | Group II | 40.6% |
| RALI 2006-QO9 | Group II | 40.7% |
| RAMP 2006-RS1 | Group II | 27.5% |
| RASC 2007-EMX1 | Group II | 43.4% |
| RASC 2007-KS2 | Group II | 33.2% |
| RASC 2007-KS3 | Group II | 37.9% |
| RALI 2007-QH5 | Group II | 43.2% |

129.    The confirmed misstatements concerning owner-occupancy and LTV ratios; the confirmed systematic underwriting failures by the originators responsible for the mortgage loans

across the Securitizations; and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations all demonstrate that the mortgage loans in the Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

### E.      Freddie Mac's Purchases of the Certificates

130.    Between September 23, 2005 and May 30, 2007, Freddie Mac purchased from RFS, JPM, Credit Suisse, RBS, UBS, Bear Stearns, Citi, Barclays, Lehman Brothers and Goldman over $6 billion in RMBS issued in connection with the Securitizations.  Table 10 reflects each of Freddie Mac's purchases of the Certificates.[14]  To date, Freddie Mac has not sold any of the Certificates.

### Table 10

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| RAMP 2005-EFC6 | AII | 76112BL32 | 11/22/05 | 163,581,000.00 | 100 | JPM |
| RAMP 2005-EFC7 | AII | 76112BR85 | 12/28/05 | 199,376,000.00 | 100 | RFS |
| RASC 2005-EMX3 | AII | 75405MAE4 | 09/23/05 | 267,481,000.00 | 100 | RFS |
| RASC 2005-KS10 | AII | 75405WAD4 | 10/28/05 | 495,741,000.00 | 100 | JPM |
| RASC 2005-KS11 | AII | 76110W7C4 | 11/29/05 | 547,641,000.00 | 100 | Credit Suisse |
| RAMP 2005-NC1 | AII | 76112BR36 | 12/28/05 | 405,004,000.00 | 100 | Credit Suisse |
| RALI 2005-QO4 | IA1 | 761118NL8 | 11/30/05 | 143,428,800.00 | 100 | RBS |
| RAMP 2005-RS9 | AII | 76112BL99 | 11/29/05 | 494,922,000.00 | 100 | Bear Stearns |
| RASC 2006-EMX8 | AII | 74924UAE1 | 09/28/06 | 236,806,000.00 | 100 | RFS |
| RASC 2006-EMX9 | AII | 74924VAE9 | 10/27/06 | 197,896,000.00 | 100 | RFS |
| RASC 2006-KS3 | AII | 76113ABK6 | 03/29/06 | 232,006,000.00 | 100 | Citi |
| RASC 2006-KS9 | AII | 75406YAE7 | 10/27/06 | 153,311,000.00 | 100 | Barclays |
| RALI 2006-QO4 | IA1 | 75114GAA7 | 04/27/06 | 327,356,000.00 | 100 | RBS |
| RALI 2006-QO4 | IA2 | 75114GAB5 92911DAA4 | 04/27/06 | 81,838,000.00 | 100 | RBS |

---

[14]      Purchases and holdings of securities in Table 10 are stated in terms of unpaid principal balance ("UPB") of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.  To date, Freddie Mac has not sold any of the Certificates it purchased as described in this section.

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| RALI 2006-QO5 | IA1 | 75114HAA5 | 05/30/06 | 179,443,000.00 | 100 | UBS |
| RALI 2006-QO8 | IIA | 75115FAT7 | 10/31/06 | 409,198,000.00 | 100 | Lehman Brothers |
| RALI 2006-QO9 | IIA | 75115HAB2 | 11/30/06 | 284,637,000.00 | 100 | Lehman Brothers |
| RAMP 2006-RS1 | AII | 76112BU24 | 01/25/06 | 409,790,000.00 | 100 | Credit Suisse |
| RASC 2007-EMX1 | AII | 74924XAE5 | 03/12/07 | 326,812,000.00 | 100 | RFS |
| RASC 2007-KS2 | AII | 74924WAE7 | 02/23/07 | 164,400,000.00 | 100 | JPM |
| RASC 2007-KS3 | AII | 74924YAE3 | 04/19/07 | 167,618,000.00 | 99.96094 | JPM |
| RALI 2007-QH5 | AII | 75116EAD4 | 05/30/07 | 143,007,000.00 | 100 | Goldman |

**F.      Freddie Mac was Damaged by Defendants' Violations of Sections 11, 12 and 15 of the Securities Act**

131.    The statements and information in the Registration Statement regarding the credit quality and characteristics of the mortgage loans underlying the Certificates, and the origination and underwriting practices pursuant to which the mortgage loans purportedly were originated, were material to a reasonable investor.  But for the misrepresentations and omissions in the Registration Statement concerning those matters, Freddie Mac would not have purchased the Certificates.

132.    Based upon sales of the Certificates or similar certificates in the secondary market and other indications of value, Freddie Mac has incurred substantial losses on the Certificates due to a decline in value that is directly attributable to Defendants' material misrepresentations and omissions.  Among other things, the mortgage loans underlying the Certificates experienced defaults and delinquencies at a higher rate than would have been the case had the loans underlying the Certificates actually conformed to the origination guidelines, and had the Certificates merited the credit ratings set forth in the Registration Statement.

133.     Defendants' misstatements and omissions in the Registration Statement were the direct, proximate and actual cause of Freddie Mac's losses resulting from its purchase of the Certificates.  The precise extent of Freddie Mac's injuries will be proven at trial.

134.     At the time it purchased the Certificates, Freddie Mac was unaware of the Defendants' misrepresentations, omissions, and/or untrue statements.  Plaintiff was appointed Conservator of Freddie Mac less than one year after the discovery of the untrue statements and omissions contained in the Registration Statement and within three years of the Certificates being offered for sale to the public.  Despite the exercise of reasonable diligence, Freddie Mac could not reasonably have discovered the untrue statements and omissions in the Registration Statement more than one year prior to the appointment of the Plaintiff as Conservator.  This action is timely pursuant to 12 U.S.C. §§ 4617(b)(12) & (13), which provides for extension or tolling of all statutory time periods applicable to the claims brought herein.

## II.     ADDITIONAL FACTUAL ALLEGATIONS

135.     The allegations in paragraphs 160 through 176 below concerning Defendants' knowledge or recklessness concerning the information set forth in or omitted from the Registration Statements and any other materials provided to Freddie Mac are made solely with respect to Plaintiff's common law claims, as are the allegations set forth in paragraphs 177 through 185 concerning Freddie Mac's reliance on the material misrepresentations and omissions alleged herein.

### A.     Defendants Were Incentivized to Fund
### Risky Residential Mortgage Loans and
### to Securitize and Sell Them to Investors

136.     Securitizing large volumes of loans was a highly lucrative and competitive business for the Defendants.  All of the underwriter defendants engaged in this business on a massive scale, each doing multiple billions of dollars worth of securitizations during the period

when they sold the Certificates to Freddie Mac.  Fees, which were a percentage of the balance of the loan pool being purchased, and other transaction revenues associated with the Certificates at issue here, and with the RMBS securitization business more generally, accounted for a substantial portion of the underwriter (and other) Defendants' earnings in the relevant time period.  The more and the larger the securitizations the Defendants arranged and participated in, the greater their earnings.  This financial motive accounts for Defendants' willingness, intentionally or recklessly, to make false statements in, or to omit material facts from, the Registration Statements and other offering materials.  In furtherance of this motive, the Defendant underwriters took measures and entered into arrangements designed to ensure that a continuous and high volume of mortgage loans would be available for securitization.

137.    Thus, among other things, the underwriters provided "warehouse" funding to mortgage originators to enable these originators to make, and to continue to make, loans.  These subprime mortgage originators used those funds to make large numbers of loans, which they then turned around and sold back to the underwriters whose funds enabled them to make the loans in the first place.  The banks then securitized the loans they effectively had funded, and transferred the risk to investors like Freddie Mac through the sale of the RMBS resulting from the securitizations.

138.    These arrangements between the underwriters and loan originators undermined the underwriting process for the Certificates because the underwriters had no incentive to identify and exclude from the securitizations loans that did not conform to the loan originators' stated guidelines.  To the contrary, the underwriters had the motive to, and did, include loans that upon information and belief, they knew did not conform to those guidelines, and that lacked the characteristics or merited the ratings set forth in the Registration Statement.

139.     Credit Suisse, Citi, Bear Stearns, Barclays, UBS and Goldman Sachs -- all of whom were underwriters of the Securitizations -- provided billions of dollars of warehouse lending to New Century.  From 2000 to 2010, Citi extended warehouse lines of credit of up to $7 billion to unaffiliated originators, including $950 million to New Century and over $3.5 billion to Ameriquest.  (FCIC Report at 113.)  Citi and JPM lent their own mortgage origination subsidiaries at least $26.3 billion and $30 billion, respectively, between 2005 and 2007.  (*See* "Who is Behind The Financial Meltdown:  The Top 25 Subprime Lenders and their Wall Street Backers," The Center for Integrity, available at http://www.publicintegrity.org/investigations/economic_meltdown/the_subprime_25/.)  As reported by the FCIC, Barclay's provided at least $221 million in warehouse financing to New Century in connection with just a single financing.  Upon information and belief, Barclay's provided similar financing to originators in connection with several securitizations, leading to the same conflicts of interest.  Upon information and belief, RBS also engaged in the same warehouse lending practices.

140.     The practice was pervasive among investment banks.  Thus, for example, Bear Stearns kept its pipeline flowing by operating its own mortgage loan originators and loan servicers:  EMC Mortgage Corporation ("EMC"), Bear Stearns Residential Mortgage Corporation, and Encore Credit Corp.  As a result of its strategy, Bear Stearns' fixed income net revenues were a record $4.0 billion in 2006, up 23 percent from $3.3 billion in 2005.  Bear Stearns did not report how it manipulated its wholly-owed originators and servicers to push through non-compliant loans.  A former EMC employee, who vetted loans for securitizations, told *The Atlantic* that "Bear traders pushed EMC analysts to get loan analysis done in only one to three days.  That way, Bear could sell them off fast to eager investors and didn't have to carry

the cost of holding these loans on their books." ("More Corruption: Bear Stearns Falsified Information as Raters Shrugged," The Atlantic, by Teri Buhl, May 14, 2010.) EMC analysts fabricated data such as FICO scores if lenders did not provide real information quickly enough, and Bear Stearns analysts in New York, rather than EMC employees who had access to loan information, decided how to report and calculate the presence and quality of loan documentation without adequate research. (*Id.*)

141.     GMAC itself was a fully, vertically-integrated RMBS operation that was dependent on volume. GMACM and HFN originated subprime and Alt A loans; RFC sponsored securitizations of such loans and transferred them to affiliated depositors RALI, RAMP and RASC; and RFS marketed and sold the RMBS to investors. HFN, which originated loans for 13 of the Securitizations here, was under enormous pressure to extend risky loans. A former loan officer at HFN recounted that "[t]he main focus was doing Alt A because that's where the money was," and "[i]n order to keep your market share, you had to be more aggressive." (*See* "Shaky loans may spur new foreclosure wave," *The Portland Tribune* (Oct. 30, 2009).) A mortgage broker confirmed such pressure, stating: "'The V.P.s came down to the office beating the drums about Option ARMs' … 'I had Wachovia march through here; I had GMAC.'" (*Id.*)

142.     Defendants were motivated to churn out and securitize as many mortgages as possible because they earned so much in revenues on both ends of the securitization process, while transferring the ultimate risk of default to investors, such as Freddie Mac. Indeed, several of the Defendants ranked in the top ten of the nation's largest underwriters of RMBS between 2004 and 2007, according to Inside Mortgage Finance. The three underwriters that sold the Certificates to Freddie Mac -- JPM, Credit Suisse and RBS -- were especially prolific. By 2007, RBS ranked fifth with $50.3 billion in transactions, Credit Suisse ranked sixth with $44.1 billion,

and JPM ranked seventh with $43.5 billion.  (*2011 Mortgage Market Statistical Annual*, Vol. II

(Inside Mortgage Finance Publ'ns, Inc., 2011).)

### B.    Defendants' Material Misrepresentations and Omissions in the Offering Materials

143.    In connection with the sale of the Certificates, the selling underwriters RFS, JPM,

Credit Suisse, RBS, Citi, Barclays, UBS, and Goldman; the depositors RALI, RASC, and

RAMP; and the sponsor RFC (together, the "Fraud Defendants") each made misrepresentations

and omissions of material fact to Freddie Mac in term sheets, Registration Statements,

Prospectuses, Prospectus Supplements, and other draft and final written offering documents (the

"Offering Materials").  These Offering Materials describe the credit quality and other

characteristics of the underlying mortgage loans and were provided to investors, including

Freddie Mac.

144.    Accordingly, Freddie Mac required the Fraud Defendants to provide

representations and warranties regarding the origination and quality of the mortgage loans,

including that the mortgage loans had been underwritten by the loan originators pursuant to

extensive guidelines.

145.    Through term sheets or other offering documents, the Fraud Defendants also

furnished Freddie Mac with anticipated credit ratings on the proposed pool of mortgage loans

intended for securitization.

146.    On information and belief, the Fraud Defendants solicited the anticipated ratings

from credit rating agencies based on misrepresentations by Defendants as to the credit quality of

the mortgage loans and the amount of the overcollateralization in the deal.  All of the

Securitizations had shadow ratings of at least AAA or its equivalent.

147.    Furthermore, the Fraud Defendants delivered Prospectus Supplements to Freddie Mac that included more specific information about the loans underlying the Certificates in each Securitization.

148.    The materially false and misleading information contained in the initial and final Prospectus Supplements that the Fraud Defendants provided to Freddie Mac included reproductions of the same schedules that the Fraud Defendants provided to Freddie Mac, containing false data about LTV ratios and owner-occupancy statistics.

149.    The Offering Materials, among other things:  (1) misrepresented the loans and loan originators' adherence to the stated underwriting guidelines; (2) overstated the number of loans for owner-occupied properties; (3) understated the loan pools' average LTV ratios; and (4) failed to disclose that the credit ratings of the Certificates were based on false information.  Each misrepresentation and omission created an additional, hidden layer of risk well beyond that known to be associated with non-agency loans or subprime loans.

150.    First, the Fraud Defendants' statements regarding the mortgage pools' compliance with stated underwriting guidelines were false.  The falsity of such representations is evident from disclosures concerning the originators' systematic disregard of their stated underwriting guidelines, as well as the Certificates' high default rates and plummeting credit ratings.  Indeed, of the 15 originators whose loans were sold into the Securitizations, five were cited as among the "worst ten" in the "worst ten" metropolitan areas:  Aegis, Decision One, New Century, Ownit, and People's Choice.  Government and private investigations have confirmed that these originators failed to apply any standards at all when making high-risk loans.  Moreover, the high default rates and low credit ratings confirm that the loans were not properly underwritten in the first place.  As shown in Tables 8 and 9, the average rate of default

across the Securitizations is 38.03 percent, and although the Certificates invested in by Freddie Mac for all 21 of the Securitizations had been rated AAA (or its equivalent) at the time of purchase, by July 31, 2011, 18 had been downgraded, and most had been downgraded to junk or nearly junk-bond status, with eight downgraded to CCC (or its equivalent), the lowest rating above junk. *See supra* Section I.D.2.b.

151.    These misstatements were material because, as discussed above, the quality of loans in the pool determined the risk of the Certificates backed by those loans. Because a reasonable underwriting process had not been followed, the entire loan pool was much riskier and more prone to default and market losses than represented. The systemic underwriting failures decreased the reliability of *all* the information provided to Freddie Mac about the loans, and thus increased the actual risk to investors. As a result of those failures, the value of the Certificates was substantially lower than the price paid by Freddie Mac for those Certificates.

152.    Second, as shown in Table 6, the Fraud Defendants materially understated the non-owner-occupied status for each Securitization by an average of 10.73 percent. This information was material to Freddie Mac because high owner-occupancy rates reported to Freddie Mac should have made the Certificates purchased by Freddie Mac safer investments than certificates backed by second homes or investment properties.

153.    Third, the Fraud Defendants understated the loan pools' average LTV ratios, which overstates the borrowers' equity "cushion" in the property. As Table 7 demonstrates, on average, only 38.5 percent of the loans actually had LTV ratios of less than 80 percent, as opposed to 64.2 percent as represented in the Prospectus Supplements. Moreover, while all but two of the Certificates were represented to have no loans with an LTV over 100 percent, in reality, every deal contained at least eight percent loans with greater than 100 percent LTV, with

an average of 18.5 percent.  In other words, in almost all of the Securitizations, a significant

percentage of the mortgage loans either were under-secured or "under water" from the start.  The

understatement of LTV ratios was misleading because it misrepresented the risk of a borrower

abandoning a property if the value dropped below the unpaid balance of the loan, as well as the

risk that proceeds from a foreclosure sale would fail to cover the unpaid balance.

154.     Further, the Fraud Defendants failed to disclose that the Certificates' credit ratings

were false and misleading because Defendants provided to the ratings agencies the same

misinformation contained in the Offering Materials in an attempt to manufacture predetermined

ratings.  In testimony before the Senate Permanent Subcommittee on Investigations, Susan

Barnes, the North American Practice Leader for RMBS at S&P from 2005 to 2008, confirmed

that the rating agencies relied upon investment banks to provide accurate information about the

loan pools:

> The securitization process relies on the quality of the data
> generated about the loans going into the securitizations.  *S&P
> relies on the data produced by others and reported to both S&P
> and investors about those loans . . . .  S&P does not receive the
> original loan files for the loans in the pool.*  Those files are
> reviewed by the arranger or sponsor of the transaction, who is also
> responsible for reporting accurate information about the loans in
> the deal documents and offering documents to potential investors.

(SPSI hearing testimony, April 23, 2010) (emphasis added).  As a result, the ratings failed to

reflect accurately the actual risk underlying the Certificates purchased by Freddie Mac because

the ratings agencies were analyzing a mortgage pool that had no relation to the pool that actually

backed the Certificates purchased by Freddie Mac.

155.     The AAA (or equivalent) anticipated and final credit ratings were material to

Freddie Mac, because the ratings provided additional assurances that Freddie Mac would receive

the expected interest and principal payments.  Freddie Mac would not have purchased the

Certificates without the proper ratings.

156.    Each of the Fraud Defendants is responsible for the representations made in or

omitted from the Offering Materials.  Specific false and misleading statements in the

Registration Statements for the Certificates purchased by Freddie Mac are detailed in Sections

I.C. and I.D., in paragraphs 69-134 *supra* and Appendix A, which are incorporated by reference.

157.    Because payment on the Certificates ultimately was funded by payments from the

mortgagors, Freddie Mac faced a risk of non-payment if too many borrowers defaulted on their

loans and the value of the mortgaged properties was insufficient to cover the unpaid principal

balance.  Accordingly, any representation bearing on the riskiness of the underlying mortgage

loans was material to Freddie Mac.  By misrepresenting the true risk profile of the underlying

loan pools, the Fraud Defendants defrauded Freddie Mac.

158.    As the FCIC found:

> The Commission concludes that firms securitizing mortgages
> failed to perform adequate due diligence on the mortgages they
> purchased and at times knowingly waived compliance with
> underwriting standards. *Potential investors were not fully informed
> or were misled* about the poor quality of the mortgages contained
> in some mortgage-related securities. *These problems appear to
> have been significant.*

(FCIC Report at 187 (emphasis added).)

### C.    The Fraud Defendants Knew or were Reckless in not Knowing that Their Representations were False and Misleading

159.    The Fraud Defendants knew or were reckless in not knowing that their

representations in the Offering Materials were false, and that the information they omitted from

documents rendered them materially misleading.  The consistency of the misrepresentations and

omissions across all of the 21 Securitizations is strong evidence that the Fraud Defendants did

not innocently make materially false statements and omissions, but actually knew or were reckless in not knowing that (1) the loan originators systematically disregarded their own underwriting guidelines, (2) the LTV ratios presented in the Registration Statements were materially inaccurate, (3) the owner-occupancy rates presented in the Registration Statements were materially inaccurate, and (4) the credit ratings for the Certificates were based on incomplete and inaccurate information and were not believed by the ratings agencies when provided.

160.    The Fraud Defendants' financial interests and relationships with mortgage originators compromised their approach to securitizing RMBS.  Thus, for example, six of the Fraud Defendants -- Credit Suisse, Citi, Bear Stearns, Barclays, Goldman Sachs, and UBS -- provided warehouse lines of credit to New Century, whose departure from its stated underwriting guidelines has now been extensively investigated and documented.  Given all the revelations about New Century's flagrant conduct and the Fraud Defendants' disincentives to perform meaningful due diligence, the Fraud Defendants knew or were reckless in disregarding that New Century loans backing the Certificates were not originated in accordance with the sound underwriting practices.

161.    In the case of GMAC, the GMAC entities were so closely integrated and the abusive lending practices so rampant from the top down that the depositors (RALI, RAMP and RASC), the sponsor (RFC) and the underwriter (RFS), knew -- or were reckless in not knowing -- that HFN -- a subsidiary of the sponsor -- systematically was disregarding prudent underwriting standards and that its loans lacked the characteristics represented in the Offering Materials.  As detailed above, a sampling of GMACM loans conducted by MBIA has revealed a non-compliance rate of at least 89 percent.

162.     Further, GMACM's abusive or reckless lending and servicing practices, including commingling funds from custodial bank accounts and questionable and unlawful foreclosure practices, have also been revealed.  (*See* "Moody's downgrades $1.4 billion in GMAC subprime RMBS" *available at* http://www.housingwire.com/2011/03/25/allstates-mbs-exposure-hits-2-78-billion.)  The GMAC entities also shared substantial overlapping management; for instance, David M. Applegate held simultaneous positions as the President and CEO of GMACM and the Principal Executive Officer of RALI, while Bruce Paradis was the CEO of GMAC-RFC, RALI, RAMP, and RASC.  Given the overlapping management and the integrated structure, GMAC knew or was reckless in not knowing of the misrepresentations and omissions concerning HFN's underwriting guidelines.

163.     Further, several of the Fraud Defendants knew that the mortgage loans they securitized were non-compliant because they had been informed of such by third-party experts. Clayton Holdings, Inc. ("Clayton") was a due diligence firm that sampled loans for many of the key players in the RMBS market.[15]  Clayton was "hired to identify, among other things, whether the loans met the originators' stated underwriting guidelines and, in some measure, to enable clients to negotiate better prices on pools of loans."  (FCIC Report at 166 (footnote omitted).) Yet, upon information and belief, the Fraud Defendants routinely disregarded and manipulated Clayton's findings.

---

[15]     Clayton was the leading provider of third-party due diligence during the relevant time period.  In 2006, Clayton analyzed over $418 billion in loans underlying mortgage-backed securities, which represented 22.8% of the total outstanding U.S. non-agency mortgage-backed securities for that year.  (Clayton, Form 10-K.)  During 2004, 2005, and 2006, Clayton worked with each of the ten largest non-agency mortgage-backed securities underwriters, as ranked by *Inside MBS & ABS*, which accounted for 73% to 78% of the total underwriting volume during those years.  The belief that GMAC used Clayton for due diligence is based upon the information that GMAC and Clayton shared senior management.  (*See* http://nationalmortgageprofessional.com/news16031/national-groups-expands-its-executive-team.)

164.    In January 2008, Clayton disclosed that it had entered into an agreement with the New York Attorney General ("NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  According to *The New York Times*, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."  Upon information and belief, the Fraud Defendants were included in that group of investment banks**.**  Thus, these Defendants made a conscious decision *not to* avail themselves of comprehensive due diligence regarding the loans they were securitizing, which alone renders their misrepresentations concerning those loans knowing or reckless.

165.    For the 18 month period ending on June 31, 2007, a significant percentage of the loans sampled by Clayton at the direction of the Fraud Defendants failed to meet the various loan originator's underwriting guidelines.  This information was provided to the securities underwriters.  Nonetheless, several of the Fraud Defendants overruled Clayton's findings and "waived in" substantial percentages of these loans (approximately 51 percent for JPM, 29 percent for Bear Stearns, 33 percent for Credit Suisse, 53 percent for RBS, 31 percent for Citi, 28 percent for Barclays, 33 percent for UBS, and 29 percent for and Goldman).  (*See* Clayton Trending Reports, available at http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisis-sacramento#documents; FCIC Report, 167.)

166.    Upon information and belief, these Defendants waived in these loans, found by Clayton to be non-compliant with the relevant originator's origination guidelines, without taking any adequate steps of their own to verify Clayton's findings.  These loans then found their way into RMBS that were sold to investors like Freddie Mac.  *See* FCIC Report, 167; *see* September

23, 2010 All Clayton Trending Reports, 1st Quarter 2006 -- 2nd Quarter 2007.  Consequently, the Fraud Defendants were aware that the mortgage loans making up the pools for the Certificates were not as safe as had been represented, and were priced too high for the level of risk assumed.

167.    Similarly, Citi's knowledge concerning origination practices went far beyond a general awareness that originators systematically were disregarding their own underwriting guidelines. Citi knew its representations to Freddie Mac were false.  In April 2010, Richard M. Bowen III, an executive of a Citi affiliate testified before the FCIC that during the 2006-2007 time frame -- when Freddie Mac purchased Certificates -- 60 percent to 80 percent of the RMBS Citi sold were defective and in contravention to the representations and warranties made to those investors, including specifically Freddie Mac.  (Written Testimony of Richard M. Bowen, III to the FCIC, April 7, 2010, at 1-2, 6.)

168.    In a November 3, 2007 e-mail, Mr. Bowen recounted Citi's misrepresentations to Freddie Mac:

> We currently purchase from mortgage companies and sell to third party investors . . . mortgage loans which have not been underwritten by us but which we rep and warrant to the investors (primarily Fannie/Freddie) that these files are complete and have been underwritten to our policy criteria.
>
> Our internal Quality Assurance function, which underwrites a small sample of these files post-purchase, has reflected since 2006 . . . that 40-60% of these files are either outside of policy criteria or have documentation missing from the files.  QA for recent months indicate 80% of the files fall into this category.

(Bowen Testimony, Ex. 1.)  Citi retaliated against this whistleblower by decreasing the number of his direct reports from 220 people to two, slashing his bonus, and giving him poor performance reviews.  (FCIC Report at 19.)

169.     Defendant Goldman Sachs' malfeasance in the RMBS market has also been reviewed and reported in detail by the United States Senate.  The SPSI Report found that in exchange for lucrative fees, Goldman Sachs helped lenders like Long Beach, Fremont, and New Century, securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting RMBS, and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system.  (*See* Sen. Levin, Carl and Sen. Coburn, Tom, U.S. Senate Permanent Subcommittee on Investigations, *Wall Street and the Financial Crisis:  Anatomy of a Financial Collapse* (Committee on Homeland Security and Governmental Affairs, April 13, 2011) ("SPSI Report"), p. 377.)

170.     Bear Stearns likewise participated in -- and therefore knew about -- the origination practices behind the loans it securitized.  As reported in *The Atlantic*, Bear Stearns manipulated its wholly-owned originators to push through non-compliant loans.  A former EMC employee revealed that "Bear traders pushed EMC analysts to get loan analysis done in only one to three days.  That way, Bear could sell them off fast to eager investors and didn't have to carry the cost of holding these loans on their books."  ("More Corruption:  Bear Stearns Falsified Information as Raters Shrugged," The Atlantic, by Teri Buhl, May 14, 2010.)  EMC analysts fabricated data such as FICO scores if lenders did not provide real information quickly enough, and Bear Stearns analysts in New York, rather than EMC employees who had access to loan information, decided how to report and calculate the presence and quality of loan documentation without adequate research.  (*Id.*)

171.     As active participants in fraudulent origination practices, the Fraud Defendants knew or were reckless in disregarding the falsity of their statements in the Offering Materials concerning underwriting guidelines.

172.    The Fraud Defendants also knew or recklessly disregarded that the owner-occupancy statistics and LTV ratios reported in the Offering Materials were false and misleading.  Given their role as underwriters of the securities, the relationships they had with loan originators, and this expertise in underwriting and securitizing RMBS, the Fraud Defendants had the practical ability to gain access to loan files and the ability and resources to test the reported data points, such as owner-occupancy rates and LTV ratios.  They intentionally elected not to do so, rendering their representations concerning those data knowingly or recklessly false.

173.    Moreover, upon information and belief, underwriters, including certain of the Fraud Defendants, influenced the appraisals used to determine LTV ratios.  Government investigations have uncovered widespread evidence of appraisers being pressured to overvalue properties so more loans could be originated.  For instance, several witnesses, ranging from the President of the Appraisal Institute to appraisers and lenders on the ground, confirmed that appraisers felt compelled to come in "at value" -- *i.e.*, at least the amount needed for the loan to be approved -- or face losing future business or their livelihoods.  Given the systemic pressure applied to appraisers, upon information and belief, the appraisers themselves, the originators, and the underwriters did not believe that the appraised values of the properties -- and therefore LTV ratios -- were true and accurate at the time they communicated the information to potential investors, including the GSEs.

174.    Further, the Fraud Defendants knew or were reckless in not knowing that the credit ratings reported for the Certificates failed to reflect the actual risk of the securities, and that the ratings agencies had no basis to believe in the accuracy of those ratings.  Not only did these Defendants provide the ratings agencies false, loan-level information, but they also routinely engaged in "ratings shopping" -- *i.e.*, pressuring the ratings agencies for favorable

68

ratings and playing the rating agencies off one another with the threat of withholding future

business if the sponsoring bank was not given favorable treatment.  As detailed in the SPSI

Report:

> At the same time Moody's and S&P were pressuring their RMBS and CDO analysis to increase market share and revenues, the investment banks responsible for bringing RMBS and CDO business to the firms were pressuring those same analysts to ease rating standards.  Former Moody's and S&P analysts and managers interviewed by the Subcommittee described, for example, how investment bankers pressured them to get their deals done quickly, increase the size of the tranches that received AAA ratings, and reduce the credit enhancements protecting the AAA tranches from loss.  They also pressed the CRA analysts and managers to ignore a host of factors that could be seen as increasing credit risk. Sometimes described as "ratings shopping," the analysts described how some investment bankers threatened to take their business to another credit rating agency if they did not get the favorable treatment they wanted.  The evidence collected by the Subcommittee indicates that the pressure exerted by investment banks frequently impacted the ratings process, enabling the banks to obtain more favorable treatment than they otherwise would have received.

(SPSI Report, at 278.)

175.    As one S&P director put it in an August 8, 2006 e-mail:  "[Our RMBS friends

have] become so beholden to their top issuers for revenue [that] they have all developed a kind

of Stockholm syndrome which they mistakenly tag as Customer Value creation."  Ratings

analysts who complained about the pressure, or did not do as they were told, were quickly

replaced on deals or terminated.

176.    Summarizing the intense pressure investment banks put on ratings analysts to

provide favorable ratings, a former Moody's VP and Senior Credit Officer testified before the

FCIC that "[t]he willingness to decline to rate, or to just say no to proposed transactions, steadily

diminished over time.  That unwillingness to say no grew in parallel with the company's share

price and the proportion of total firm revenues represented by structured finance transactions . . .

coincident with the steady drive toward commoditization of the instruments we were rating . . . .

The threat of losing business . . . even if not realized, absolutely tilted the balance away from

independent arbiter of risk towards a captive facilitator of risk transfer . . . .  The message from

management was . . . 'Must say yes.'" (*See* Written Testimony of Richard Michalek (FCIC

Hearing, June 2, 2010), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-

testimony/2008-0602-Michalek-corrected-oral.pdf; see *also* Written Statement of Eric

Kolchinsky, Managing Director, Moody's Derivatives Group ("Managers of rating groups were

expected by their supervisors and ultimately the Board of Directors . . . to build, or at least

maintain, market shares.  It was an unspoken understanding that loss of market share would

cause a manager to lose his or her job;" "[L]owering credit standards . . . was one easy way for a

managing director to regain market share."), available at

http://hsgac.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=bd65f802-961c-

4727-b176-72ece145baef.)

> ### D. Freddie Mac Justifiably Relied on the Misrepresentations and Omissions in the Offering Materials and was Damaged by Defendants' Fraudulent Conduct

177.    Freddie Mac is a government-sponsored enterprise chartered by Congress to

provide liquidity, stability, and affordability to the U.S. housing and mortgage markets.  In

furtherance of this mission, Freddie Mac purchases mortgages and invest in RMBS.

178.    Generally when purchasing RMBS, Freddie Mac requires compliance with their

investment requirements, as well as various representations and warranties concerning, among

other things, the credit quality of the underlying loans, evaluation of the borrower's ability to

pay, the accuracy of loan data provided, and adherence to applicable local, state and federal law.

Such representations and warranties were material to Freddie Mac's decision to purchase RMBS,

including the Certificates.

179.    The Fraud Defendants intended for investors, including Freddie Mac, to rely on their representations of material facts about the assets backing the Certificates.  These Defendants regularly provided prospective RMBS investors with information concerning the volume of their annual securitization business to assure investors that, by virtue of their expertise in and share of the RMBS market, Freddie Mac should rely upon the representations and warranties in their Offering Materials. *See*, *e.g.*, Prospectus Supplement for the RALI 2006-QO8 Securitization.

180.    The Fraud Defendants knew that Freddie Mac had specific requirements for investing in non-agency mortgage-backed securities and intended for Freddie Mac to rely on their fraudulent misstatements as shown by their provision of representations, warranties and shadow credit ratings in connection with the Certificates, and their repetition of false loan statistics in term sheets, free writing prospectuses, and Prospectus Supplements, among other materials.

181.    In fact, Freddie Mac did rely, to its detriment, on the Fraud Defendants' misrepresentations and material omissions in the Offering Materials.

182.    Freddie Mac's reliance was justifiable because Freddie Mac necessarily was required to rely upon the Fraud Defendants to provide accurate information regarding the loans. Freddie Mac lacked access to the actual loan files, and the loan-level data essential to perform the necessary statistical tests with respect to, among other things, owner-occupancy and LTV ratios.

183.    Freddie Mac's reliance also was justifiable because industry practice was for an investor to rely upon the representations and warranties of the sponsors and underwriters regarding the quality of the mortgage loans and the standards under which they were originated.

Information regarding the originators' compliance with underwriting guidelines, owner-occupancy rates, LTV ratios, and the information provided to credit ratings agencies, was peculiarly within the knowledge of the Fraud Defendants.

184.    Freddie Mac was induced into buying the Certificates based on the false and misleading Offering Materials.  Freddie Mac would not have purchased the Certificates had it known the truth concerning the matters alleged herein.  Alternatively, Freddie Mac suffered damages because the price it paid for the Certificates was higher than their actual value.

185.    From the day Freddie Mac purchased the Certificates, it suffered injury.  As a result of Defendants' misrepresentations, the true value of the Certificates on the date of purchase was far lower than the price paid for them by Freddie Mac.

## FIRST CAUSE OF ACTION

### Violation of Section 11 of the Securities Act of 1933
### (Against Defendants RALI, RASC, RAMP, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs)

186.    Plaintiff realleges paragraphs 1 through 134 above as if fully set forth herein.  For purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be construed as sounding in fraud.

187.    This claim is brought by FHFA pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued pursuant to the Registration Statements for the Securitizations listed in paragraph 43.

188.    This claim is for strict liability based on the material misstatements and omissions in the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005 for the 21 Securitizations (as specified in Table 1, *supra* at paragraph 44), and is asserted against RALI, RASC, RAMP, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS, and Goldman Sachs (together, the "Section 11 Defendants").

189.     RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS, and/or Goldman Sachs (the "Underwriter Defendants") acted as underwriter in connection with the sale of the Certificates for each of the 21 Securitizations (as specified in Table 1, *supra* at paragraph 44), directly and indirectly participated in distributing the Certificates, and directly and indirectly participated in drafting and disseminating the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.  The Underwriter Defendants were underwriters for the Certificates, and are strictly liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

190.     Depositors RALI, RASC, and RAMP (the "Depositor Defendants") filed Shelf Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005 (as specified in Table 2, *supra* at paragraph 50) pursuant to which the Securitizations were carried out, and are the "issuers" of the Certificates issued pursuant to the Registration Statements within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a).

191.     At the time that they became effective, each of the Registration Statements, as set forth above, contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated or omitted were material to a reasonable investor in the securities sold pursuant to the Registration Statements.

192.     The untrue statements of material facts and omissions of material fact in the Registration Statements are principally those set forth herein in Section IV, and pertain to purported compliance with underwriting guidelines, occupancy status, loan-to-value ratios and credit ratings.

193.   Freddie Mac purchased or otherwise acquired the Certificates pursuant to the false and misleading Registration Statements and in the primary market.  At the time it purchased the Certificates, Freddie Mac was unaware of the false and misleading statements and omissions alleged herein, and if Freddie Mac had known those facts, it would not have purchased the Certificates.

194.   The Section 11 Defendants were obligated to make a reasonable investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct, and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

195.   The Section 11 Defendants did not exercise such due diligence and failed to conduct a reasonable investigation.  In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein.  In addition, although the performance of due diligence is not an affirmative defense available to the Depositor Defendants on this strict liability claim, they nonetheless also failed to take reasonable steps to ensure the accuracy of the representations made in the Registration Statements.

196.   By virtue of the foregoing, Freddie Mac sustained substantial damages, including depreciation in the value of the securities, as a result of the misstatements and omissions in the Registration Statements.  Plaintiff is entitled to damages, jointly and severally, from each of the Section 11 Defendants.

197.   Based on the foregoing, the Section 11 Defendants are jointly and severally liable for their wrongdoing.

## SECOND CAUSE OF ACTION

**Violation of Section 12(a)(2) of the Securities Act of 1933**
**(Against Defendants RALI, RASC, RAMP, RFS, JPM, Credit Suisse, RBS, Citi, Barclays,**
**UBS and Goldman Sachs)**

198.     Plaintiff realleges paragraphs 1 through 134 as if fully set forth herein.  For

purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be

construed as sounding in fraud.

199.     This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities

Act of 1933 and is asserted on behalf of Freddie Mac, which purchased the Certificates issued

pursuant to the Registration Statements in the Securitizations listed in paragraph 43.

200.     The Underwriter Defendants are prominently identified as underwriters in each of

the Prospectuses used to sell the Certificates.  The Underwriter Defendants offered, promoted,

and/or sold the Certificates publicly, including selling to Freddie Mac their Certificates, as set

forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.  The

Underwriter Defendants offered, promoted, and/or sold the Certificates to Freddie Mac as

specified in Table 2, *supra* at paragraph 50.

201.     The Underwriter Defendants offered, promoted, and/or sold the Certificates to

Freddie Mac by means of the Prospectuses that contained untrue statements of material facts and

omitted to state material facts necessary to make the statements, in light of the circumstances

under which they were made, not misleading.  The Underwriter Defendants successfully solicited

Freddie Mac's purchases of the Certificates, and generated millions of dollars in commissions in

connection with the sale of the Certificates.

202.     The Underwriter Defendants offered the Certificates for sale, sold them, and

distributed them by the use of means or instruments of transportation and communication in

interstate commerce.

203.    The Depositor Defendants are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements that they filed.  These Prospectuses were the primary documents each used to sell the Certificates for the 21 Securitizations under those Registration Statements.  The Depositor Defendants offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.

204.    With respect to the Securitizations for which they filed Registration Statements, the Depositor Defendants offered the Certificates to Freddie Mac by means of Prospectuses that contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading.  Upon information and belief, the Depositor Defendants reviewed and participated in drafting the Prospectuses.

205.    The Depositor Defendants offered the Certificates for sale by the use of means or instruments of transportation and communication in interstate commerce.

206.    The Underwriter Defendants and Depositor Defendants (together, the "Section 12 Defendants") actively participated in the solicitation of Freddie Mac's purchase of the Certificates, and did so in order to benefit themselves.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and/or assisting in marketing and selling the Certificates.

207.    Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

208.     The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

209.     The Section 12 Defendants offered and sold the Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

210.     The Section 12 Defendants owed to Freddie Mac a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  The Section 12 Defendants failed to exercise such reasonable care, and in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

211.     Freddie Mac did not know of the misstatements and omissions contained in the Prospectuses at the time they purchased the Certificates.  If Freddie Mac had known of those misstatements and omissions, it would not have purchased the Certificates.

212.     Freddie Mac acquired the Certificates in the primary market pursuant to the Prospectuses.

213.     Freddie Mac sustained substantial damages in connection with its investments in the Certificates and has the right to rescind and recover the consideration paid for the Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the Securities Act of 1933
### (Against RFC, GMAC-RFC, ResCap, GMACM and Ally)

214.     Plaintiff realleges paragraphs 1 through 134 above as if fully set forth herein.  For purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be construed as sounding in fraud.

215.     This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against RFC, GMAC-RFC, ResCap, GMACM, and Ally for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.

216.     RFC was the sponsor for all 21 Securitizations carried out pursuant to the Registration Statements filed by RALI, RAMP, and RASC (as specified in Table 1, *supra* at paragraph 44), and culpably participated in their violations of Sections 11 and 12(a)(2) by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the Depositors as special-purpose vehicles, and selecting RFS or the Non-GMAC Underwriters as underwriters.  In its role as sponsor, RFC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

217.     RFC sold the mortgage loans to the Depositor Defendants (as specified in Table 1, *supra* at paragraph 44), and conveyed the mortgage loans to the Depositor Defendants pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  RFC controlled all aspects of the business of the Depositor Defendants, who were special-purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.

Upon information and belief, the officers and directors of RFC overlapped with the officers and directors of the Depositor Defendants. In addition, RFC was able to, and did in fact, control the contents of the Registration Statements filed by the Depositors, including the Prospectuses and Prospectus Supplements that contained material misstatements of fact and omitted facts necessary to make the contents therein not misleading.

218. Defendant GMAC-RFC is the corporate parent of, and controlled the business operations of, RFC and the Depositor Defendants. As the sole corporate parent of RFC and the Depositor Defendants, GMAC-RFC had the practical ability to direct and control the actions of RFC and the Depositor Defendants in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RFC and the Depositor Defendants.

219. GMAC-RFC culpably participated in the violations of Section 11 and 12(a)(2) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositors and the issuing trusts to serve as conduits for the mortgage loans.

220. Defendant ResCap wholly owns GMAC-RFC and is thus, a parent of RFC and the Depositor Defendants. ResCap culpably participated in the violations of Section 11 and 12(a)(2) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

221. Defendant GMACM wholly owns ResCap, and is thus, a parent of GMAC-RFC, RFC, and the Depositor Defendants. GMAC-RFC culpably participated in the violations of

Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

222.    Defendant Ally wholly owns GMACM and RFS and is the ultimate parent of GMAC-MG, ResCap, GMAC-RFC, RFC, and the Depositor Defendants.  As the sole corporate parent of RFS, Ally had the practical ability to direct and control the actions of RFS in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RFS in connection with the issuance and sale of the Certificates.  Ally culpably participated in the violations of Section 11 and 12(a)(2) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

223.    Ally, GMACM, ResCap, and GMAC-RFC are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of RFC, RFS, and the Depositor Defendants at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

224.    Freddie Mac purchased the Certificates in the primary market, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, in the primary market which at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

225.     Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the Certificates.

226.     Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

### FOURTH CAUSE OF ACTION

**Primary Violations of the Virginia Securities Act**
**(Against RALI, RASC, RAMP, RFS, JPM, Credit Suisse,**
**RBS, Citi, Barclays, UBS and Goldman Sachs)**

227.     Plaintiff realleges paragraphs 1 through 134 above as if fully set forth herein.  For purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be construed as sounding in fraud.

228.     This claim is brought by Plaintiff pursuant to Section 13.1-522(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac with respect to those Certificates identified in Table 10 above that were purchased by Freddie Mac and issued pursuant to the Registration Statements.

229.     The Depositor Defendants (as specified in Table 1, *supra*) made false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for each Securitization. The Underwriter Defendants (as specified in Table 1, *supra*) made false and materially misleading statements in the Prospectuses for the Securitizations effected under the Shelf Registration Statements.

230.     The Underwriter Defendants are prominently identified in the Prospectuses, the primary documents that they used to sell the Certificates.  The Underwriter Defendants offered

the Certificates publicly, including selling to Freddie Mac the Certificates, as set forth in the "Method of Distribution" or equivalent underwriting section of each Prospectus.

231.    The Underwriter Defendants offered and sold the Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading.  The Underwriter Defendants reviewed and participated in drafting the Prospectuses.

232.    The Underwriter Defendants successfully solicited Freddie Mac's purchases of the Certificates.  The Underwriter Defendants were paid a substantial commission based on the amount it received from the sale of the Certificates to the public.

233.    The Underwriter Defendants offered the Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

234.    The Depositor Defendants are prominently identified in the Prospectuses for the Securitizations carried out under the Registration Statements.  These Prospectuses were the primary documents used to sell Certificates for the Securitizations pursuant to the Registration Statements.  The Depositor Defendants offered the Certificates publicly and actively solicited their sale, including to Freddie Mac.  The Depositor Defendants were paid a percentage of the total dollar amount of the offering upon completion of the Securitizations effected pursuant to the Shelf Registration Statements.

235.    With respect to the Securitizations for which it filed the Shelf Registration Statements, including the related Prospectus Supplements, the Depositor Defendants offered the Certificates to Freddie Mac by means of Prospectuses which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in the light of

the circumstances under which they were made, not misleading.  The Depositor Defendants reviewed and participated in drafting the Prospectuses.

236.    Each of the Underwriter Defendants and the Depositor Defendants actively participated in the solicitation of the Freddie Mac's purchase of the Certificates, and did so in order to benefit itself.  Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the Certificates.

237.    Each of the Prospectuses contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses, and specifically to Freddie Mac.

238.    The untrue statements of material facts and omissions of material facts in the Registration Statements, which include the Prospectuses, are set forth above, and include compliance with underwriting guidelines, occupancy status, loan-to-value ratios, and accurate credit ratings.

239.    The Underwriter Defendants and the Depositor Defendants offered and sold the Certificates directly to Freddie Mac pursuant to the materially false, misleading, and incomplete Prospectuses.

240.    The Underwriter Defendants owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.  The Depositor Defendants owed the same duty with respect to the Prospectuses for the Securitizations effected under the Shelf Registration Statements.

241.     The Underwriter Defendants and the Depositor Defendants failed to exercise such reasonable care.  These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations, as set forth above.

242.     In contrast, Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses at the time it purchased the Certificates.  If Freddie Mac had known of those untruths and omissions, it would not have purchased the Certificates.

243.     Freddie Mac sustained substantial damages in connection with its investments in the Certificates and has the right to rescind and recover the consideration paid for the Certificates, with interest thereon.  Plaintiff hereby seeks rescission and makes any necessary tender of its Certificates.  In the alternative, Plaintiff seeks damages according to proof.

### FIFTH CAUSE OF ACTION

**Controlling Person Liability Under the Virginia Securities Act
(Against RFC, GMAC-RFC, ResCap, GMACM and Ally)**

244.     Plaintiff realleges paragraphs 1 through 134 above as if fully set forth herein.  For purposes of this cause of action, Plaintiff hereby expressly excludes any allegation that could be construed as sounding in fraud.

245.     This claim is brought under Section 13.1-522(C) of the Virginia Code and is asserted on behalf of Freddie Mac, which purchased the Certificates (identified in Table 10, supra) that were issued pursuant to the Registration Statements.  This claim is brought against RFC, GMAC-RFC, ResCap, GMACM, and Ally (the "Control Persons") for controlling-person liability with regard to the claim brought by Plaintiff pursuant to Section 13.1-522(A)(ii).

246.     RFC was the sponsor for all 21 Securitizations carried out pursuant to the Registration Statements filed by the Depositor Defendants (as specified in Table 1, supra), and culpably participated in their violations of Section 13.1-522(A)(ii) by initiating these Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting the Depositors as special-purpose vehicles, and selecting RFS or the Non-GMAC Underwriters as underwriters.  In its role as sponsor, RFC knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the mortgages would be issued by the relevant trusts.

247.     RFC sold the mortgage loans to the Depositor Defendants (as specified in Table 1 *supra*), and conveyed the mortgage loans to the Depositor Defendants pursuant to an Assignment and Recognition Agreement or a Mortgage Loan Purchase Agreement.  RFC controlled all aspects of the business of the Depositor Defendants, who were special-purpose entities created for the purpose of acting as a pass-through for the issuance of the Certificates.  Upon information and belief, the officers and directors of RFC overlapped with the officers and directors of the Depositor Defendants.  In addition, RFC was able to, and did in fact, control the contents of the Registration Statements filed by the Depositors, including the Prospectuses and Prospectus Supplements that contained material misstatements of fact and omitted facts necessary to make the contents therein not misleading.

248.     Defendant GMAC-RFC is the corporate parent of, and controlled the business operations of, RFC and the Depositor Defendants.  As the sole corporate parent of RFC and the Depositor Defendants, GMAC-RFC had the practical ability to direct and control the actions of

RFC and the Depositor Defendants in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of RFC and the Depositor Defendants.

249.    GMAC-RFC culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

250.    Defendant ResCap wholly owns GMAC-RFC and is thus, a parent of RFC and the Depositor Defendants.  ResCap culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

251.    Defendant GMACM wholly owns ResCap, and is thus, a parent of GMAC-RFC, RFC, and the Depositor Defendants.  GMAC-RFC culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

252.    Defendant Ally wholly owns GMACM and RFS and is the ultimate parent of GMAC-MG, ResCap, GMAC-RFC, RFC, and the Depositor Defendants.  As the sole corporate parent of RFS, Ally had the practical ability to direct and control the actions of RFS in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of

RFS in connection with the issuance and sale of the Certificates.  Ally culpably participated in the violations of Section 13.1-522(A)(ii) set forth above.  It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as the Depositor Defendants and the issuing trusts to serve as conduits for the mortgage loans.

253.    Ally, GMACM, ResCap, and GMAC-RFC are controlling persons within the meaning of Section 13.1-522(C) of the Virginia Code by virtue of their actual power over, control of, ownership of, and/or directorship of RFC, RFS, and the Depositor Defendants at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

254.    Freddie Mac purchased the Certificates, which were issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements, and specifically to Freddie Mac.

255.    Freddie Mac did not know, and in the exercise of reasonable diligence could not have known, of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the Certificates.

256.    Freddie Mac has sustained substantial damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation, and for which the Control Persons are jointly and severally liable.

## SIXTH CAUSE OF ACTION

**(Common Law Fraud Against RALI, RAMP, RASC, RFC, RFS JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs)**

257.    Plaintiff realleges paragraphs 1 through 185 as if fully set forth herein.

258.    Freddie Mac was fraudulently induced to purchase the Certificates by the Fraud Defendants' misrepresentations and omissions of material facts.

259.    The material representations set forth above and in Appendix A were fraudulent, and the Fraud Defendants' representations falsely and misleadingly misrepresented and omitted material statements of fact.  The representations at issue are identified in Sections I.C. and I.D. and in Appendix A.

260.    The Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made, or made such representations and omissions recklessly without knowledge of their truth or falsity.

261.    Each of the Fraud Defendants made the misleading statements with the intent and for the purpose of inducing Freddie Mac to purchase the Certificates.

262.    Freddie Mac justifiably relied on the Fraud Defendants' false representations and misleading omissions.

263.    But for the Fraud Defendants' fraudulent misrepresentations and omissions regarding the Fraud Defendants' underwriting practice and quality of the loans making up the securitizations, Freddie Mac would not have purchased the Certificates.

264.    As a result of the foregoing, Freddie Mac has suffered damages in an amount to be proven at trial.  Plaintiff hereby demands rescission and makes any necessary tender of the Certificates.

265.     Because the Fraud Defendants defrauded Freddie Mac willfully and wantonly, and because, by their acts, the Fraud Defendants knowingly affected the general public, including but not limited to all persons with interest in the Certificates, Plaintiff is entitled to recover punitive damages.

### SEVENTH CAUSE OF ACTION

**(Aiding and Abetting Fraud Against Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, RALI, RASC and RAMP)**

266.     Plaintiff realleges paragraphs 1 through 185 as if fully set forth herein.

267.     This is a claim for aiding and abetting fraud, in the alternative, should it be found that the Underwriting Defendants alone are liable for fraud.  This claim is brought against Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, the Depositor Defendants, arising from the intentional and substantial assistance each rendered to the Underwriter Defendants to advance the fraud on Freddie Mac.

268.     Through overlapping personnel, strategies, and intertwined business operations, and the fluid transfer of information among the Defendants, each of Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, the Depositor Defendants knew of the Fraud Defendants' and fraudulent scheme to offload the credit risks of non-agency loans to investors, including Freddie Mac.  Each of these Defendants acted in concert to defraud Freddie Mac.

269.     Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, the Depositor Defendants, through their employees and representatives, substantially assisted in, among other things: (a) the extension of warehouse loans to originators; (b) acquiring the underlying mortgage loans from the originators; (c) packaging up those loans into pools which were deposited into the Trust; (d) waiving into the collateral pools of the Trusts loans previously rejected by Clayton or otherwise non-compliant loans, despite the lack of compensating factors;

(e) creating and structuring the Trusts whose Certificates would be sold to investors including Freddie Mac; and (f) preparing the Registration Statements which would be used to market the Certificates.

270.   The Underwriter Defendants would not have been able to implement their fraud against Freddie Mac without such substantial assistance.

271.   Through overlapping personnel, strategies, and intertwined business operations, and the fluid transfer of information among the Defendants, each of the Defendants knew of the fraud perpetrated on Freddie Mac.

272.   The Underwriter Defendants could not have perpetrated their fraud without the substantial assistance of each other defendant, and they all provided financial, strategic, and marketing assistance for their scheme.  Defendants are highly intertwined and interdependent businesses and each benefitted from the success of the scheme.  Through the fraudulent sale of the Certificates to the Freddie Mac, the Selling Underwriters were able to materially improve their financial condition by reducing their exposure to declining subprime-related assets and garnering millions of dollars in fees from the structuring and sale of the Certificates.

273.   As a direct, proximate, and foreseeable result of the conduct of Ally, GMACM, GMAC-MG, ResCap, GMAC-RFC, RFC, and the Depositor Defendants, Freddie Mac has suffered and will continue to suffer damages in an amount to be proven at trial.  Plaintiff hereby demands rescission and makes any necessary tender of the Certificates.

274.   Because the Fraud Defendants defrauded Freddie Mac willfully and wantonly, and because, by their acts, the Fraud Defendants knowingly affected the general public, including but not limited to all persons with interest in the Certificates, Plaintiff is entitled to recover punitive damages.

## EIGHTH CAUSE OF ACTION

**(Negligent Misrepresentation Against RALI, RASC, RAMP, RFC, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS and Goldman Sachs)**

275.     Plaintiff realleges paragraphs 1 through 185 as if fully set forth herein.

276.     Between September 23, 2005 and May 30, 2007, RALI, RASC, RAMP, RFC, RFS, JPM, Credit Suisse, RBS, Citi, Barclays, UBS, Goldman Sachs (the "Negligent Misrepresentation Defendants") sold the Certificates Freddie Mac as described above.  Because the Depositor Defendants owned and then conveyed the underlying mortgage loans to the issuing trusts, the Depositor Defendants had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations through their possession of the loan files and other documentation.

277.     Likewise, as underwriters of the Securitizations, the Underwriter Defendants had the access to and ability to review loan file information and were obligated to perform adequate due diligence to ensure the accuracy of the Offering Materials.  Accordingly, the Underwriter Defendants had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

278.     The Negligent Misrepresentation Defendants also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements.  Freddie Mac lacked access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates.  Accordingly, when determining whether to purchase the Certificates, Freddie Mac could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis.  Freddie Mac therefore reasonably relied on the knowledge and

representations of the Negligent Misrepresentation Defendants regarding the underlying mortgage loans.

279.     The Negligent Misrepresentation Defendants were aware that Freddie Mac reasonably relied on these Defendants for complete, accurate, and timely information.  The standards under which the underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by Freddie Mac prior to the closing of the Securitizations.  Freddie Mac reasonably relied upon these Defendants' misrepresentations and omissions in the Offering Materials.

280.     The Negligent Misrepresentation Defendants breached their duty of disclosure by making false or misleading statements of material facts to Freddie Mac when they knew or should have known of the falsity of their statements.  The misrepresentations are set forth in Sections I.C. and I.D. above and Appendix A.;

281.     In addition, having false or misleading representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, the Negligent Misrepresentation Defendants had a duty to correct the misimpressions left by their statements, including with respect to any "half truths."  The Negligent Misrepresentation Defendants failed to correct in a timely manner any of their misstatements or half truths.

282.     Freddie Mac reasonably relied on the information provided by the Selling Negligent Misrepresentation Defendants, and as a result, Freddie Mac suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that judgment be entered:

An award in favor of Plaintiff against all Defendants, jointly and severally, for:

    a.   Rescission and recovery of the consideration paid for the Certificates, with interest thereon (in connection with this request for rescission, the Certificates are hereby tendered to the Defendants);

    b.   Freddie Mac's monetary losses, including any diminution in value of the Certificates, as well as lost principal and lost interest payments thereon;

    c.   Punitive damages;

    d.   Attorney's fees and costs;

    e.   Prejudgment interest at the maximum legal rate; and

    f.   Such other and further relief as the Court may deem just and proper.

DATED:     New York, New York
             September 2, 2011

                          KASOWITZ, BENSON, TORRES
                           & FRIEDMAN LLP

                         By:  /s/ Marc E. Kasowitz
                           Marc E. Kasowitz (mkasowitz@kasowitz.com)
                           Hector Torres (htorres@kasowitz.com)
                           Michael S. Shuster (mshuster@kasowitz.com)
                           Christopher P. Johnson (cjohnson@kasowitz.com)
                           Michael Hanin (mhanin@kasowitz.com)
                           Kanchana W. Leung (kleung@kasowitz.com)

                         1633 Broadway
                         New York, New York  10019
                         (212) 506-1700

                         Attorneys for Plaintiff
                         Federal Housing Finance Agency

# Appendix A[1]

I.    **RASC 2005-EMX3 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed September 23, 2005 for the RASC 2005-EMX3 Securitization**

A.    **Untrue or misleading statements about underwriting guidelines**

1.    **Untrue or misleading statements about conformity with underwriting guidelines**

(a)    "Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts-- Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-74]

(b)    "Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding on the basis of criteria set forth in Residential Funding's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-78]

---

[1]    Although specific representations and warranties in the Registration Statements that form the basis for Plaintiff's claims are set forth herein, Plaintiff relies for its claims upon the Registrations Statements in their entirety.

2.   **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a)   "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." [s-74]

3.   **Untrue or misleading statements concerning information evaluated in the loan application**

(a)   "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- he adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan." [s-75]

(b)   "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy. The information may have been supplied solely in the loan application. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes. With respect to mortgaged property

consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-75]

(c)     "The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-74]

4.     **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-75]

(b)     "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors.  Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-77]

**B.     Untrue or misleading statements about owner-occupancy status**

1.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 2,456 out of a total pool of 2,615 loans (93.92%). [*See* s-53]

2.     "The mortgaged properties may be owner-occupied or non-owner-occupied and may include vacation homes, second homes and investment properties.  The percentage of mortgage loans that are owner-occupied will be disclosed in the accompanying prospectus supplement." [10]

3

C.     **Untrue or misleading statements about LTV ratios**

1.     "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 83.90%." [s-51]

2.     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 84.09%." [s-65]

3.     "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator." [s-75-76]

4.     "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."  [s-76]

5.     "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-76]

6.     "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [11]

7.  "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [11]

**D.  Untrue or misleading statements about credit ratings**

1.  Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-7]

**E.  Additional Untrue or misleading statements**

1.  "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-29]

2.  "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

    - None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

    - Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

    - None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

    - None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

    - None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.  None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination." [s-28]

5

3.      "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing. [25-26]

4.      "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans. [26]

5.      "In addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

6

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [26]

6.  "As of the cut-off date, none of the Group II Loans are currently 30 to 59 days delinquent in payment of principal and interest.  As of the cut-off date, none of the Group II Loans are currently 60 or more days delinquent in the payment of principal and interest." [s-45]

7.  "The depositor and Residential Funding will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates.  The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan." [s-25-26]

8.  "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-27]

II.     **RASC 2005-KS10 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed October 28, 2005 for the RASC 2005-KS10 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

    1.    **Untrue or misleading statements about conformity with underwriting guidelines**

       (a)    "Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-75]

       (b)    "THE ALTERNET PROGRAM

Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding on the basis of criteria set forth in Residential Funding's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-80]

    2.    **Untrue or misleading statements concerning borrower's ability to repay the loan**

       (a)    "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan

8

and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-76]

(b)   "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property.  Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of junior mortgage loans, payments required to be made on any senior mortgage." [11]

3.   **Untrue or misleading statements concerning information evaluated in the loan application**

(a)   "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan." [s-77]

(b)   "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each

9

mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy. The information may have been supplied solely in the loan application. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes. With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-77]

(c)     "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-77]

4.      **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding. Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted. Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in

10

the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-77]

(b)     "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors.  Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-80]

## B.     Untrue or misleading statements about owner-occupancy status

1.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 4,419 out of a total pool of 4,680 loans (94.42%). [*See* s-54]

2.     "The mortgaged properties may be owner-occupied or non-owner-occupied and may include vacation homes, second homes and investment properties.  The percentage of mortgage loans that are owner-occupied will be disclosed in the accompanying prospectus supplement." [9]

## C.     Untrue or misleading statements about LTV ratios

1.     "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 83.06%."  [s-52]

2.     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 83.36%."  [s-67]

3.     "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator." [s-77]

4.     "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [s-78]

11

5.    "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-76-77]

6.    "Appraised values may be determined by either:

- a statistical analysis

- a broker's price opinion, or

- an automated valuation, drive-by appraisal or other certification of value." [9]

7.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [11]

**D.    Untrue or misleading statements about credit ratings**

1.    Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.    Additional Untrue or misleading statements**

1.    "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-34]

2.    "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

12

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.  None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination." [s-33-34]

3.  "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing." [26]

4.  "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the

13

mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." [26]

5.    "In addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [25-26]

6.    "As of the cut-off date, approximately 0.2% of the Group II Loans are currently 30 to 59 days delinquent in payment of principal and interest. As of the cut-off date, none of the Group II Loans are currently 60 or more days delinquent in the payment of principal and interest." [s-46]

7.  "The depositor and Residential Funding will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates. . . .   The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan." [s-24-25]

8.  "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-26]

III.   **RAMP 2005-EFC6 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed November 21, 2005 for the RAMP 2005-EFC6 Securitization**

A.   **Untrue or misleading statements about underwriting guidelines**

1.   **Untrue or misleading statements about conformity with underwriting guidelines**

(a)   "All of the mortgage loans included in the trust were originated by EquiFirst, generally in accordance with the underwriting criteria described herein." [s-39]

(b)   "The Credit Bureau Risk Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, and is not a substitute for the underwriter's judgment. EquiFirst's underwriting staff fully reviews each loan to determine whether EquiFirst's guidelines for income, assets, employment and collateral are met." [s-39]

(c)   "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of loan-to-value ratio, or LTV ratio, to serve as the collateral for a mortgage loan." [s-35]

2.   **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a)   "EquiFirst's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." [s-39]

(b)   "Under the mortgage loan programs, the borrower's income, credit and equity are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan.  These risk categories establish the maximum permitted loan-to-value ratio

16

and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio." [s-41]

(c) "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." [s-36]

### 3. Untrue or misleading statements concerning information evaluated in the loan application

(a) "All of the mortgage loans included in the trust were originated by EquiFirst Corporation.  Approximately 87.1%, 88.8% and 87.7% of the Group I Loans, Group II Loans and all mortgage loans, respectively, were acquired and evaluated by Residential Funding under its AlterNet Program and approximately 12.9%, 11.2% and 12.3% of the Group I Loans, Group II Loans and all mortgage loans were acquired and evaluated by Residential Funding under its "Negotiated Conduit Asset Program" or NCA program." [s-34]

(b) "A portion of AlterNet loans typically will be reviewed by Residential Funding or by a designated third party for compliance with applicable underwriting criteria.  Residential Funding may conduct this review using an automated underwriting system.  See "Trust Asset Program--Underwriting Standards--Automated Underwriting," in the prospectus.  Some AlterNet loans will be purchased from AlterNet Program sellers who will represent to Residential Funding that AlterNet loans were originated under underwriting standards determined by a mortgage insurance company acceptable to Residential Funding." [s-35]

(c) "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  .  .  .  In the case of investment properties, income derived from the mortgaged

17

property may have been considered for underwriting purposes. With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-35-36]

(d)     "The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-36]

(e)     "Those mortgage loans included in the trust that were acquired and evaluated under Residential Funding's "Negotiated Conduit Asset Program" or NCA program were intended for Residential Funding's AlterNet program." [s-38]

4.     **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted. Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-35]

(b)     "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors.  Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-37]

(c)     "On a case by case basis, EquiFirst may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is not expected that a substantial portion of the mortgage loans may represent such underwriting exceptions." [s-40]

18

5.   **Untrue or misleading statements concerning quality control procedures**

(a)   "EquiFirst conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management." [s-40-41]

**B.   Untrue or misleading statements about owner-occupancy status**

1.   Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,329 out of a total pool of 1,354 loans (98.15%). [*See* III-5]

**C.   Untrue or misleading statements about LTV ratios**

1.   "The weighted average Loan-to-Value ratio at origination of the Group II Loans will be approximately 82.60%." [III-3]

2.   "The weighted average Loan-to-Value ratio at origination of the mortgage loans will be approximately 82.51%." [IV-3]

3.   "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [s-35]

4.   "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-35]

5.   "EquiFirst's guidelines comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards.  All loans are subject to EquiFirst's appraisal review process.  Appraisals are

19

provided by qualified independent appraisers licensed in their respective states." [s-40]

6.   "Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The appraisal review process includes steps that may require (but are not limited to) an automated valuation report, or a manual review from one of our internal staff appraisers to confirm or support the original appraiser's value of the mortgaged premises.  A second independent appraisal (ordered by EquiFirst) is required for all loan amounts exceeding $500,000 in states other than California." [s-40]

**D.    Untrue and misleading statements about credit ratings**

1.   Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA.  [*See* s-6]

**E.    Additional untrue or misleading statements**

1.   "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-33]

2.   Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act;

- Each mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws;

- None of the mortgage loans in the mortgage pool are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

20

- With respect to each mortgage loan, no borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of the mortgage loan; and

- None of the Group I Loans contain prepayment penalties that extend beyond three years after the date of origination. None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination. [s-32-33]

3. "At the time of issuance of a series of securities, the depositor will cause the loans and any other assets included in the related trust to be assigned without recourse to the trustee or owner trustee or its nominee, which may be the custodian, together with, unless specified in the accompanying prospectus supplement, all principal and interest received on the trust assets after the last day of the month of the cut-off date, but not including principal and interest due on or before such date or any Excluded Spread. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. Each schedule of loans will include, among other things, information as to the principal balance of each loan as of the cut-off date, as well as information respecting the loan rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or combined LTV ratio and junior mortgage ratio, as applicable, at origination or modification." [28]

4. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS (Registered Trademark) , assignments of mortgages for any trust asset in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark)  System. For trust assets registered through the MERS (Registered Trademark)  System, MERS (Registered Trademark)  shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those trust assets." [28-29]

5. "In addition, except as provided below for some series of securities backed by Trust Balances of revolving credit loans or as described in the accompanying prospectus supplement, the depositor will, as to each loan that is a trust asset, deliver to an entity specified in the accompanying prospectus supplement, which may be the trustee, a custodian or another entity appointed by the trustee, the legal documents relating to each loan that are in possession of the depositor. Depending on the type of trust asset, the legal documents may include the following, as applicable:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or owner trustee or a nominee or a lost note affidavit together with a copy of the related mortgage note;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or a Mexico Loan, the respective security agreements and any applicable UCC financing statements;

- an assignment in recordable form of the mortgage, except in the case of a mortgage registered with MERS (Registered Trademark), or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security

- agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan and multifamily mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, with respect to a Mexico Loan, an assignment of the borrower's beneficial interest in the Mexican trust;

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related agreement; and

- if applicable, the original contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing the related contract." [29]

6.   "Assignments of the loans, including contracts secured by liens on property, will be recorded in the appropriate public recording, except for mortgages registered with MERS (Registered Trademark) or in where, in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's interests in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans, or except as otherwise specified in the accompanying prospectus supplement." [28-29]

7.      "Residential Funding will make some representations and warranties regarding the mortgage loans sold by it as of the date of issuance of the certificates. . . .  Further, Residential Funding will be required to repurchase or substitute for any mortgage loan sold by it as to which a breach of its representations and warranties relating to that mortgage loan occurs if the breach materially and adversely affects the interests of the certificateholders in the mortgage loan." [s-26-27]

IV.   <u>RASC 2005-KS11 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed November 28, 2005 for the RASC 2005-KS11 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

1.      **Untrue or misleading statements about conformity with underwriting guidelines**

(a)      "Prior to assignment to the depositor, Residential Funding reviewed the underwriting standards for the mortgage loans and purchased all the mortgage loans from mortgage collateral sellers who participated in or whose loans were in substantial conformity with the standards set forth in Residential Funding's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts-- Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-37]

(b)      "Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding on the basis of criteria set forth in Residential Funding's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-42]

(a)      "A portion of AlterNet loans and Credit Gap Loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria.  Residential Funding Corporation may conduct this review using an automated underwriting system.  See "--Automated Underwriting," below.  Some AlterNet loans will be purchased from AlterNet Program Sellers who will represent to Residential Funding Corporation that AlterNet loans were originated under underwriting standards determined by a

mortgage insurance company acceptable to Residential Funding Corporation." [13]

2. **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a) "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property." [11]

(b) "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." [s-39]

3. **Untrue or misleading statements concerning information evaluated in the loan application**

(a) "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan."

(b) "The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than

25

specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-39]

(b)  "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes."

4.  **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)  "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-39]

(b)  "As described above, the indicated underwriting standards applicable to the mortgage loans include the foregoing categories and characteristics as guidelines only.  The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors.  Examples of compensating factors include strong residual income, strong

26

prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-41]

**B.     Untrue or misleading statements about owner-occupancy status**

2.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 4,752 out of a total pool of 5,287 loans (89.88%). [*See* II-16]

**C.     Untrue or misleading statements about LTV ratios**

1.    "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 79.87%." [II-14]

2.    "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 83.36%." [s-67]

3.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.

4.    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.

5.    "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-40]

6.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal

27

will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

7. "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [12]

**D.    Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.    Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-27]

2. "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination." [s-26]

3.  "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-26]

3.  "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

4.  "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

5.  "In addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee,

29

or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [25-26]

6.   "As of the cut-off date, approximately 0.3% of the Group II Loans are currently 30 to 59 days delinquent in payment of principal and interest. As of the cut-off date, none of the Group II Loans are currently 60 or more days delinquent in the payment of principal and interest." [s-32]

7.   "The depositor and Residential Funding will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan." [s-24]

## V. RALI 2005-QO4 Securitization

**Misrepresentations in the prospectus supplement and/or prospectus filed November 28, 2005 for the RALI 2005-QO4 Securitization**

### A. Untrue or misleading statements about underwriting guidelines

#### 1. Untrue or misleading statements about conformity with underwriting guidelines

(a) "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor." [s-37]

(a) "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." [12]

#### 4. Untrue or misleading statements concerning borrower's ability to repay the loan

(b) "Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." [15]

(c) "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." [s-38]

#### 2. Untrue or misleading statements concerning information evaluated in the loan application

(a) "Program Underwriting Standards. In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the

description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of non-owner occupied properties, income derived from the mortgaged property may be considered for underwriting purposes.  For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes." [s-37-38]

(a)　"Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [s-38]

application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes.  In the case of certain borrowers with acceptable payment histories, no income will be required to be stated, or verified, in connection with the loan application."

(b)　"If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program.  Such program permits some mortgage loans to be refinanced with only limited verification or updating of the

underwriting information that was obtained at the time that the original mortgage loan was originated.  For example, a new appraisal of a mortgaged property may not be required if the related original mortgage loan was originated up to 24 months prior to the refinancing.  In addition, a mortgagor's income may not be verified, although continued employment is required to be verified.  In certain circumstances, a mortgagor may be permitted to borrow up to 105% of the outstanding principal amount of the original mortgage loan.  Each mortgage loan underwritten pursuant to this program will be treated as having been underwritten pursuant to the same underwriting documentation program as the mortgage loan that it refinanced, including for purposes of the disclosure in the accompanying prospectus supplement."

(b)     "As described in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs.  Under a limited documentation, stated documentation or no documentation program, minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator and the underwriting may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination." [11-12]

## B.     Untrue or misleading statements about owner-occupancy status

5.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group I was 905 out of a total pool of 1,108 loans (81.68%). [*See* I-5]

## C.     Untrue or misleading statements about LTV ratios

1.     "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.25%." [I-22]

2.     "The weighted average loan-to-value ratio at origination of the Group I Loans will be approximately 72.97%." [I-31]

3.     "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide.  Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new,

has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-38]

4.      "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [13]

**D.      Untrue or misleading statements about credit ratings**

1.      Defendants represented that Certificates in the IA1 tranche would be assigned a rating of not lower than the following by Moody's Investors Service, Standard & Poor's Ratings services, and Fitch, Inc., respectively: Aaa, AAA, and AAA. [*See* s-7]

**E.      Additional untrue or misleading statements**

1.      "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-29]

2.      "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

•       Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws.

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994.  None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.  See "Certain Legal Aspects of the Mortgage Loans - The Mortgage Loans - Homeownership Act and Similar State Laws" in the prospectus.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans and Group II Loans contain prepayment charges that extend beyond three years after the date of origination." [s-29]

6. "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-29]

3. "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

4. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered

through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

5.  "In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [26-27]

6.  "As of the cut-off date, none of the Group I Loans are currently 30 days or more delinquent in payment of principal and interest." [s-32]

7.  "Except in the case of a Designated Seller Transaction or unless otherwise specified in the accompanying prospectus supplement, with respect to any mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, in most cases Residential Funding Corporation will generally represent and warrant that:

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

36

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Seller Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Corporation's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Corporation had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination;

- the mortgage loan or contract was not 30 or more days delinquent in payment of principal and interest as of the related cut-off date and was not so delinquent more than once during the twelve month period to the cut-off date; and

- there is no delinquent tax or assessment lien against the related mortgaged property." [20-21]

8. "In the event of a breach of a representation or warranty made by Residential Funding Corporation that materially adversely affects the interests of the certificateholders in the mortgage loan or contract, Residential Funding Corporation will be obligated to repurchase any mortgage loan or contract or substitute for the mortgage loan or contract as described below." [21]

**VI.**    <u>RAMP 2005-RS9 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed November 29, 2005 for the RAMP 2005-RS9 Securitization**

**A.**    **Untrue or misleading statements about underwriting guidelines**

    1.    **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." [21]

        (a)    "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." [21]

    2.    **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)    "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property." [26]

    3.    **Untrue or misleading statements concerning information evaluated in the loan application**

        (b)    "The originator's guidelines for loans will, in most cases, specify that scheduled payments on a loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective borrower's gross income.  The originator may also consider the amount of liquid assets available to the borrower after origination." [26]

    4.    **Untrue or misleading statements concerning quality control procedures**

(a) "Evaluation Standards for Negotiated Conduit Asset Program Loans: . . .  Periodic quality control reviews are performed." [28]

(b) "The level of review by Residential Funding Corporation, if any, will vary depending on several factors, including its experience with the seller.  Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the loans purchased by Residential Funding Corporation for conformity with Residential Funding Corporation's underwriting standards or applicable underwriting standards specified in this prospectus or the accompanying prospectus supplement, and to assess the likelihood of repayment of the loan from the various sources for such repayment, including the borrower, the mortgaged property, and primary mortgage insurance, if any. " [27]

**B.     Untrue or misleading statements about owner-occupancy status**

1.  Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 2,091 out of a total pool of 3,178 loans (65.80%). [IV-5]

2.  "The mortgaged properties may be owner occupied or non-owner occupied and may include vacation homes, second homes and investment properties.  The percentage of loans secured by mortgaged properties that are owner-occupied will be disclosed in the accompanying prospectus supplement.  The basis for any statement that a given percentage of the loans are secured by mortgaged properties that are owner-occupied will be one of the following:

    •   the making of a representation by the borrower at origination of a loan that the borrower intends to use the mortgaged property as a primary residence;

    •   a representation by the originator of the loan, which may be based solely on the above clause; or

    •   the fact that the mailing address for the borrower is the same as the address of the mortgaged property."

3.  "Any representation and warranty regarding owner-occupancy may be based solely on this information.  Loans secured by investment properties, including two- to four-unit dwellings and multifamily residential rental properties, may also be secured by an assignment of leases and rents and operating or other cash flow guarantees relating to the loans." [18]

C.   **Untrue or misleading statements about LTV ratios**

    1.     "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 83.84%." [at IV-3]

    2.     The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 83.65%. [at V-3]

    7.     "The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal.  Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or combined LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the seller or originator."

    3.     "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described above, currently supports, except with respect to Home Loans, and is anticipated to support in the future, the outstanding loan balance." [24]

D.   **Untrue or misleading statements about credit ratings**

    1.     Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA.  [*See* s-6]

E.   **Additional untrue or misleading statements**

    1.     "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-35]

    2.     "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act;

- Each mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws;

- None of the mortgage loans in the mortgage pool are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies; and

- None of the Group I Loans contain prepayment penalties that extend beyond 5 years after the date of origination.

- None of the Group II Loans contain prepayment penalties that extend beyond 3 years after the date of origination.

8. "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders or the certificate insurer in that mortgage loan in accordance with the agreements." [s-35]

3. "At the time of issuance of a series of securities, the depositor will cause the loans and any other assets included in the related trust to be assigned without recourse to the trustee or owner trustee or its nominee, which may be the custodian, together with, unless specified in the accompanying prospectus supplement, all principal and interest received on the trust assets after the last day of the month of the cut-off date, but not including principal and interest due on or before such date or any Excluded Spread. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. Each schedule of loans will include, among other things, information as to the principal balance of each loan as of the cut-off date, as well as information respecting the loan rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or combined LTV ratio and junior mortgage ratio, as applicable, at origination or modification.

4.   "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS(R), assignments of mortgages for any trust asset in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For trust assets registered through the MERS(R) System, MERS(R) shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those trust assets.

5.   "In addition, except as provided below for some series of securities backed by Trust Balances of revolving credit loans or as described in the accompanying prospectus supplement, the depositor will, as to each loan that is a trust asset, deliver to an entity specified in the accompanying prospectus supplement, which may be the trustee, a custodian or another entity appointed by the trustee, the legal documents relating to each loan that are in possession of the depositor. Depending on the type of trust asset, the legal documents may include the following, as applicable:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or owner trustee or a nominee or a lost note affidavit together with a copy of the related mortgage note;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or a Mexico Loan, the respective security agreements and any applicable UCC financing statements;

- an assignment in recordable form of the mortgage, except in the case of a mortgage registered with MERS(R), or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan and multifamily mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, with respect to a Mexico Loan, an assignment of the borrower's beneficial interest in the Mexican trust;

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related agreement; and

- if applicable, the original contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing the related contract." [33-34]

6.  "As of the cut-off date, approximately 0.4% of the Group II Loans are currently 30 to 59 days delinquent in the payment of principal and interest.  As of the cut-off date, none of the Group II Loans are currently 60 or more days delinquent in the payment of principal and interest." [s-25]

VII.   <u>RAMP 2005-EFC7 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed on December 22, 2005 for the RAMP 2005-EFC7 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

     1.      **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)      "All of the mortgage loans included in the trust were originated by EquiFirst, generally in accordance with the underwriting criteria described herein." [s-32]

        (a)      "Residential Funding has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding on the basis of criteria set forth in Residential Funding's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding purchased from sellers in this program, each mortgage loan determined by Residential Funding to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-32]

        (b)      "A portion of AlterNet loans typically will be reviewed by Residential Funding or by a designated third party for compliance with applicable underwriting criteria.  Residential Funding may conduct this review using an automated underwriting system.  See "Trust Asset Program--Underwriting Standards--Automated Underwriting," in the accompanying prospectus.  Some AlterNet loans will be purchased from AlterNet Program sellers who will represent to Residential Funding that AlterNet loans were originated under underwriting standards determined by a mortgage insurance company acceptable to Residential Funding." [s-32]

        (c)      "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

            •      the creditworthiness of a mortgagor,

            •      the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed

obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of loan-to-value ratio, or LTV ratio, to serve as the collateral for a mortgage loan." [s-33]

2.  **Untrue or misleading statements concerning borrower's ability to repay the loan**

    (a)    "EquiFirst's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." [s-36]

    (b)    "Under the mortgage loan programs, the borrower's income, credit and equity are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan.  These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio." [s-38]

    (b)    "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses." [s-33]

9.  **Untrue or misleading statements concerning information evaluated in the loan application**

    (c)    "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits

45

at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-32]

(a)    "The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-33]

(d)    "The Credit Bureau Risk Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, and is not a substitute for the underwriter's judgment.  EquiFirst's underwriting staff fully reviews each loan to determine whether EquiFirst's guidelines for income, assets, employment and collateral are met." [s-37]

3.    **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)    "On a case by case basis, EquiFirst may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is not expected that a substantial portion of the mortgage loans may represent such underwriting exceptions." [s-37]

(b)    "Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-33]

4.    **Untrue or misleading statements concerning quality control procedures**

    (a)    "EquiFirst conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management." [s-38]

**B.    Untrue or misleading statements about owner-occupancy status**

1.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,387 out of a total pool of 1,387 loans (100%). [*See* III-5]

10.    "The mortgaged properties may be owner occupied or non-owner occupied and may include vacation homes, second homes and investment properties.  The percentage of loans secured by mortgaged properties that are owner-occupied will be disclosed in the accompanying prospectus supplement." [16]

**C.    Untrue or misleading statements about LTV ratios**

1.    "The weighted average Loan-to-Value ratio at origination of the Group II Loans will be approximately 83.95%." [*See* III-3]

2.    "The weighted average Loan-to-Value ratio at origination of the mortgage loans will be approximately 82.77%." [*See* IV-3]

3.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre established guidelines established by the originator." [s-32]

4.    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of

47

comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."

**D.    Untrue or misleading statements about credit ratings**

1.    Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA.  [*See* s-6]

**E.    Additional untrue or misleading statements**

1.    "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-31]

2.    Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act;

- Each mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws;

- None of the mortgage loans in the mortgage pool are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

- With respect to each mortgage loan, no borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of the mortgage loan; and

- None of the Group I Loans contain prepayment penalties that extend beyond three years after the date of origination.

48

- None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination." [s-31]

3. "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders or the certificate insurer in that mortgage loan in accordance with the agreements." [s-31]

4. "At the time of issuance of a series of securities, the depositor will cause the loans and any other assets included in the related trust to be assigned without recourse to the trustee or owner trustee or its nominee, which may be the custodian, together with, unless specified in the accompanying prospectus supplement, all principal and interest received on the trust assets after the last day of the month of the cut-off date, but not including principal and interest due on or before such date or any Excluded Spread. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. Each schedule of loans will include, among other things, information as to the principal balance of each loan as of the cut-off date, as well as information respecting the loan rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or combined LTV ratio and junior mortgage ratio, as applicable, at origination or modification.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS (Registered Trademark) , assignments of mortgages for any trust asset in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark)  System. For trust assets registered through the MERS (Registered Trademark)  System, MERS (Registered Trademark)  shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those trust assets.

6. "In addition, except as provided below for some series of securities backed by Trust Balances of revolving credit loans or as described in the accompanying prospectus supplement, the depositor will, as to each loan that is a trust asset, deliver to an entity specified in the accompanying prospectus supplement, which may be the trustee, a custodian or another entity appointed by the trustee, the legal documents relating to each loan that are in possession of the depositor. Depending on the type of trust asset, the legal documents may include the following, as applicable:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the

trustee or owner trustee or a nominee or a lost note affidavit together with a copy of the related mortgage note;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or a Mexico Loan, the respective security agreements and any applicable UCC financing statements;

- an assignment in recordable form of the mortgage, except in the case of a mortgage registered with MERS (Registered Trademark), or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan and multifamily mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, with respect to a Mexico Loan, an assignment of the borrower's beneficial interest in the Mexican trust;

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related agreement; and

- if applicable, the original contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing the related contract." [28-29]

50

VIII.   <u>RAMP 2005-NC1 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed December 27, 2005 for the RAMP 2005-NC1 Securitization**

A.    **Untrue or misleading statements about underwriting guidelines**

1.    **Untrue or misleading statements about conformity with underwriting guidelines**

(a)    "All of the mortgage loans included in the trust were originated by either New Century Mortgage Corporation or Home123 Corporation." [s-31]

(b)    "The mortgage loans were originated or acquired by the originators in accordance with the underwriting guidelines established by them." [s-36]

(c)    Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been generally made by the original lender that the borrower's monthly income would be sufficient to enable the borrower to meet its monthly obligations on the loan and other expenses related to the property." [21]

(d)    "A portion of AlterNet loans typically will be reviewed by Residential Funding or by a designated third party for compliance with applicable underwriting criteria.  Residential Funding may conduct this review using an automated underwriting system.  See "Trust Asset Program--Underwriting Standards--Automated Underwriting," in the accompanying prospectus.  Some AlterNet loans will be purchased from AlterNet Program sellers who will represent to Residential Funding that AlterNet loans were originated under underwriting standards determined by a mortgage insurance company acceptable to Residential Funding." [s-32]

(e)    "Residential Funding's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

•    the creditworthiness of a mortgagor,

•    the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

51

- the adequacy of the mortgaged property expressed in terms of loan-to-value ratio, or LTV ratio, to serve as the collateral for a mortgage loan." [s-33]

## 2. Untrue or misleading statements concerning borrower's ability to repay the loan

(a) "The underwriting guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan." [s-36]

(b) "The underwriting guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan.  All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."  [s-37]

(c) "The mortgage loans were originated consistent with and generally conform to the underwriting guidelines' full documentation, limited documentation and stated income documentation residential loan programs.  Under each of the programs, the related originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.  In determining the ability of the applicant to repay the loan, a qualifying rate has been created under the underwriting guidelines that generally is equal to the interest rate on that loan." [s-37]

(d) "Each applicant completes an application which includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The underwriting guidelines require a credit report on each applicant from a credit reporting company.  The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments." [s-37]

52

3.  **Untrue or misleading statements concerning information evaluated in the loan application**

(a)  "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy. The information may have been supplied solely in the loan application. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes. With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-32]

(b)  "The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-32]

(c)  "The mortgage loans were originated or acquired by the originators in accordance with the underwriting guidelines established by them." [s-36]

(d)  "The underwriting guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the related originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance." [s-37-38]

(e)  "The underwriting guidelines require that the income of each applicant for a mortgage loan under the full and limited documentation programs be verified. The specific income documentation required for the originators' various programs are

as follows: under the full documentation program, applicants usually are required to submit one written form of verification from the employer of stable income for at least 12 months for salaried employees and 24 months for self-employed applicants or for any special program applicant with a credit score of less than 580; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements.  Under the stated income program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria.  All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment.  Verification of the source of funds, if any, required to be deposited by the applicant into escrow in the case of a purchase money loan is required."

(f)     "In evaluating the credit quality of borrowers, the originators utilize credit bureau risk scores, or a credit score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian." [s-38]

4.   **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-33]

(b)     "The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors.  Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-35]

B.   **Untrue or misleading statements about owner-occupancy status**

1.   Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 2,131 out of a total pool of 2,538 loans (83.96%).  [*See* III-5]

54

### C.   Untrue or misleading statements about LTV ratios

1.   "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 79.19%." [*See* III-3]

2.   "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 80.50%." [*See* IV-3]

3.   The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [s-34]

4.   "Mortgaged properties that are to secure mortgage loans are appraised by qualified independent appraisers.  These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition.  . . .  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are on forms acceptable to Fannie Mae and Freddie Mac.  The underwriting guidelines require a review of the appraisal by a qualified employee of the related originator or by an appraiser retained by that originator.  If the appraised value of a mortgaged property as determined by a review is more than 7% but less than 25% lower than the value as determined by the appraisal, then the related originator uses the value as determined by the review in computing the loan-to-value ratio of the related mortgage loan.  If the appraised value of a mortgaged property as determined by a review is 25% or more lower than the value as determined by the appraisal, then the related originator obtains a new appraisal from a different appraiser and repeats the review process." [s-37]

5.   "The underwriting guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the related originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal, currently supports the outstanding loan balance." [s-37]

### D.   Untrue or misleading statements about credit ratings

1.   Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors

Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.     Additional untrue or misleading statements**

1.     "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-32]

2.     "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act;

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws;

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

- With respect to each mortgage loan, no borrower obtained a prepaid single-premium credit-life, credit disability, credit unemployment or credit property insurance policy in connection with the origination of the mortgage loan; and

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.

- None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination."

3.     Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders or the certificate insurer in that mortgage loan in accordance with the agreements." [s-31-32]

4.     "At the time of issuance of a series of securities, the depositor will cause the loans and any other assets included in the related trust to be assigned

without recourse to the trustee or owner trustee or its nominee, which may be the custodian, together with, unless specified in the accompanying prospectus supplement, all principal and interest received on the trust assets after the last day of the month of the cut-off date, but not including principal and interest due on or before such date or any Excluded Spread. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. Each schedule of loans will include, among other things, information as to the principal balance of each loan as of the cut-off date, as well as information respecting the loan rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or combined LTV ratio and junior mortgage ratio, as applicable, at origination or modification.

5.  "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS (Registered Trademark) , assignments of mortgages for any trust asset in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark)  System. For trust assets registered through the MERS (Registered Trademark)  System, MERS (Registered Trademark)  shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those trust assets.

6.  "In addition, except as provided below for some series of securities backed by Trust Balances of revolving credit loans or as described in the accompanying prospectus supplement, the depositor will, as to each loan that is a trust asset, deliver to an entity specified in the accompanying prospectus supplement, which may be the trustee, a custodian or another entity appointed by the trustee, the legal documents relating to each loan that are in possession of the depositor. Depending on the type of trust asset, the legal documents may include the following, as applicable:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or owner trustee or a nominee or a lost note affidavit together with a copy of the related mortgage note;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or,  in the case of a Cooperative Loan or a Mexico Loan, the respective security agreements and any applicable UCC financing statements;

- an assignment in recordable form of the mortgage, except in the case of a mortgage registered with MERS (Registered Trademark),

57

or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan and multifamily mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, with respect to a Mexico Loan, an assignment of the borrower's beneficial interest in the Mexican trust;

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related agreement; and

- if applicable, the original contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing the related contract." [28-29]

IX.   **RAMP 2006-RS1 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed January 25, 2006 for the RAMP 2006-RS1 Securitization**

A.   **Untrue and misleading statements about underwriting guidelines**

1.   **Untrue and misleading statements about conformity with underwriting guidelines**

(a)   "The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." [19]

(b)   "The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a loan will be considered to be originated generally in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.  For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.  In the case of a Designated Seller Transaction, the applicable underwriting standards will be those of the designated seller or of the originator of the loans, and will be described in the accompanying prospectus supplement." [19]

2.   **Statements concerning borrower's ability to repay the loan**

3.   **Statements concerning information evaluated in the loan application**

(a)   "In most cases, under a traditional "full documentation" program, each borrower will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the borrower.  As part of the description of the borrower's financial condition, the borrower will have furnished information, which may or may not be verified, describing the borrower's assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's available credit history with local merchants and lenders and any record of

bankruptcy.  The borrower may also have been required to authorize verifications of deposits at financial institutions where the borrower had demand or savings accounts.  In the case of investment properties, only income derived from the mortgaged property may have been considered for underwriting purposes, rather than the income of the borrower from other sources.  For mortgaged property consisting of vacation or second homes, no income derived from the property will typically have been considered for underwriting purposes.

(b)  "The underwriting standards applied by originators in some cases allow for loans to be supported by alternative documentation.  For alternatively documented loans, a borrower may demonstrate income and employment directly by providing alternative documentation in the form of copies of the borrower's own records relating to income and employment, rather than having the originator obtain independent verifications from third parties, such as the borrower's employer or mortgage servicer." [20]

### 4.  Other statements concerning quality control procedures

(a)  "Evaluation Standards for Negotiated Conduit Asset Program Loans:....  Periodic quality control reviews are performed." [25]

## B.  Untrue or misleading statements about owner-occupancy status

1.  Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 2,345 out of a total pool of 2,989 loans (78.45%). [*See* III-1]

## C.  Untrue or misleading statements about LTV ratios

1.  "The weighted average Loan-to-Value ratio at origination of the Group II Mortgage Loans will be approximately 86.81%." [III-4]

2.  "The weighted average Loan-to-Value ratio at origination of the Mortgage Loans will be approximately 83.15%."  [IV-3]

3.  "Appraisals

The adequacy at origination of a mortgaged property as security for repayment of the related loan will typically have been determined by an appraisal.  Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property

60

was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio or combined LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the seller or originator. Alternatively, as specified in the accompanying prospectus supplement, values may be supported by:

- a statistical valuation;

- a broker's price opinion;

- an automated appraisal, drive by appraisal or other certification of value; or

- a statement of value by the borrower." [20]

**D.     Untrue or misleading statements about credit ratings**

1.     Defendants represented that Certificates in the IIA tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-3]

**E.     Additional untrue or misleading statements**

1.     "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-50]

2.     "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act;

- Each mortgage loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws;

- None of the mortgage loans in the mortgage pool are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees;

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies; and

- None of the Group I Loans contain prepayment penalties that extend beyond 5 years after the date of origination.

- None of the Group II Loans contain prepayment penalties that extend beyond 3 years after the date of origination.

3. "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan in accordance with the agreements." [s-50]

4. "At the time of issuance of a series of securities, the depositor will cause the loans and any other assets included in the related trust to be assigned without recourse to the trustee or owner trustee or its nominee, which may be the custodian, together with, unless specified in the accompanying prospectus supplement, all principal and interest received on the trust assets after the last day of the month of the cut-off date, but not including principal and interest due on or before such date or any Excluded Spread. Each loan will be identified in a schedule appearing as an exhibit to the related agreement. Each schedule of loans will include, among other things, information as to the principal balance of each loan as of the cut-off date, as well as information respecting the loan rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or combined LTV ratio and junior mortgage ratio, as applicable, at origination or modification.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of MERSCORP, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS(R), assignments of mortgages for any trust asset in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For trust assets registered through the MERS(R) System, MERS(R) shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those trust assets.

6.      "In addition, except as provided below for some series of securities backed by Trust Balances of revolving credit loans or as described in the accompanying prospectus supplement, the depositor will, as to each loan that is a trust asset, deliver to an entity specified in the accompanying prospectus supplement, which may be the trustee, a custodian or another entity appointed by the trustee, the legal documents relating to each loan that are in possession of the depositor. Depending on the type of trust asset, the legal documents may include the following, as applicable:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or owner trustee or a nominee or a lost note affidavit together with a copy of the related mortgage note;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or a Mexico Loan, the respective security agreements and any applicable UCC financing statements;

- an assignment in recordable form of the mortgage, except in the case of a mortgage registered with MERS(R), or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan and multifamily mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, with respect to a Mexico Loan, an assignment of the borrower's beneficial interest in the Mexican trust;

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related agreement; and

- if applicable, the original contract and copies of documents and instruments related to each contract and, other than in the case of unsecured contracts, the security interest in the property securing the related contract.

7.      "Assignments of the loans, including contracts secured by liens on mortgaged property, will be recorded in the appropriate public recording office, except for mortgages registered with MERS(R) or in states where,

63

in the opinion of counsel acceptable to the trustee, the recording is not required to protect the trustee's interests in the loans against the claim of any subsequent transferee or any successor to or creditor of the depositor or the originator of the loans, or except as otherwise specified in the accompanying prospectus supplement." [30-31]

X.      **RASC 2006-KS3 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed March 28, 2006 for the RASC 2006-KS3 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

    1.      **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)     "Prior to assignment to the depositor, Residential Funding Corporation reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Corporation's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-52]

        (b)     "Residential Funding Corporation has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Corporation on the basis of criteria set forth in Residential Funding Corporation's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding Corporation purchased from sellers in this program, each mortgage loan determined by Residential Funding Corporation to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-57]

    2.      **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)     "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property

taxes, utility costs, standard hazard insurance and other fixed
obligations other than housing expenses.  The originator's
guidelines for mortgage loans generally specify that scheduled
payments on a mortgage loan during the first year of its term plus
taxes and insurance and all scheduled payments on obligations
that extend beyond ten months, including those mentioned above
and other fixed obligations, equal no more than specified
percentages of the prospective mortgagor's gross income.  The
originator may also have considered the amount of liquid assets
available to the mortgagor after origination." [s-53]

3.   **Untrue or misleading statements concerning information evaluated in
the loan application**

(a)   "Residential Funding Corporation's underwriting of the mortgage
loans generally consisted of analyzing the following as standards
applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family
income relative to the mortgage payment and to other fixed
obligations, including in certain instances rental income
from investment property, and

- the adequacy of the mortgaged property expressed in terms
of LTV ratio, to serve as the collateral for a mortgage loan.

(b)   "Generally, each mortgagor would have been required to complete
an application designed to provide to the original lender pertinent
credit information concerning the mortgagor.  As part of the
description of the mortgagor's financial condition, each
mortgagor would have been required to furnish information with
respect to the mortgagor's assets, liabilities, income, credit
history, employment history and personal information, and
furnished an authorization to apply for a credit report which
summarized the borrower's credit history with local merchants
and lenders and any record of bankruptcy.  The information may
have been supplied solely in the loan application.  The mortgagor
may also have been required to authorize verifications of deposits
at financial institutions where the mortgagor had demand or
savings accounts.  In the case of investment properties, income
derived from the mortgaged property may have been considered
for underwriting purposes.  With respect to mortgaged property
consisting of vacation homes, generally no income derived from
the property was considered for underwriting purposes." [s-52-53]

66

(c)    "In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, only income derived from the mortgaged property may have been considered for underwriting purposes, rather than the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes." [14]

(d)    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance.  The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [14]

4.    **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)    "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Corporation's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Corporation.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting

exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-53-54]

(b)   "As described above, the indicated underwriting standards applicable to the mortgage loans include the foregoing categories and characteristics as guidelines only.  The underwriting process may determine that the prospective mortgagor warrants a credit grade category upgrade based on compensating factors. Examples of compensating factors include strong residual income, strong prior mortgage history, 6 months or more of liquid reserves, LTV ratios below 65%, or a credit score above 600." [s-56]

**B.    Untrue or misleading statements about owner-occupancy status**

1.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,699 out of a total pool of 1,712 loans (99.24%). [*See* I-16]

**C.    Untrue or misleading statements about LTV ratios**

1.    "Approximately 39.8% and 38.4% of loan group I and loan group II, respectively, of the cut off date principal balance of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-19]

2.    "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 80.61%." [II-14]

3.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator."

4.    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis

based on the current cost of constructing or purchasing a similar property." [s-53]

**D.      Untrue or misleading statements about credit ratings**

1.      Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.      Additional untrue or misleading statements**

1.      "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-40]

2.      "Compliance with Local, State and Federal Laws

Residential Funding Corporation will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3.     "Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-38-39]

4.     "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities.

5.     "Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

6.     "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

7.     "In addition, except as described in the accompanying prospectus supplement, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

    •     the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [34-36]

XI.   **RALI 2006-QO4 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed April 28, 2006 for the RALI 2006-QO4 Securitization**

A.   **Untrue or misleading statements about underwriting guidelines**

  1.   **Untrue or misleading statements about conformity with underwriting guidelines**

(a)   "Program Underwriting Standards.  In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor." [s-54]

(b)   "The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.  All of the mortgage loans constituting the mortgage pool for a series of certificates will have been acquired either directly or indirectly by the depositor through the Expanded Criteria Program, which is described below under "--The Expanded Criteria Mortgage Program.

(c)   "In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes.  In the case of certain borrowers with

72

acceptable payment histories, no income will be required to be
stated, or verified, in connection with the loan application." [12]

**2.** **Untrue or misleading statements concerning borrower's ability to
repay the loan**

(a)    "Once all applicable employment, credit and property information
is received, a determination is made as to whether the prospective
borrower has sufficient monthly income available to meet the
borrower's monthly obligations on the proposed mortgage loan
and other expenses related to the home, including property taxes
and hazard insurance, and other financial obligations and monthly
living expenses." [15]

**3.** **Untrue or misleading statements concerning information evaluated in
the loan application**

(a)    "Program Underwriting Standards.  In accordance with the Seller
Guide, the Expanded Criteria Program Seller is required to review
an application designed to provide to the original lender pertinent
credit information concerning the mortgagor.  As part of the
description of the mortgagor's financial condition, each
mortgagor is required to furnish information, which may have
been supplied solely in the application, regarding its assets,
liabilities, income (except as described below), credit history and
employment history, and to furnish an authorization to apply for a
credit report which summarizes the borrower's credit history with
local merchants and lenders and any record of bankruptcy.  The
mortgagor may also be required to authorize verifications of
deposits at financial institutions where the mortgagor had demand
or savings accounts.   In the case of non-owner occupied
properties, income derived from the mortgaged property may be
considered for underwriting purposes.   For mortgaged property
consisting of a vacation or second home, generally no income
derived from the property is considered for underwriting
purposes."

(b)    "Based on the data provided in the application and certain
verifications, if required, a determination is made by the original
lender that the mortgagor's monthly income, if required to be
stated, will be sufficient to enable the mortgagor to meet its
monthly obligations on the mortgage loan and other expenses
related to the property, including property taxes, utility costs,
standard hazard insurance and other fixed obligations.   Generally,
scheduled payments on a mortgage loan during the first year of its
term plus taxes and insurance and all scheduled payments on
obligations that extend beyond ten months, including those

mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income.   The originator may also consider the amount of liquid assets available to the mortgagor after origination." [s-54-55]

(c)    "With respect to the depositor's underwriting standards, as well as any other underwriting standards that may be applicable to any mortgage loans, such underwriting standards typically include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a mortgage loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.  For example, a mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the mortgage loan is considered to be in substantial compliance with the underwriting standards.  In the case of a Designated Seller Transaction, the applicable underwriting standards will be those of the seller or of the originator of the mortgage loans and will be described in the accompanying prospectus supplement." [14]

4.    **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)    "In order to be approved for participation in the Expanded Criteria Program, mortgage collateral sellers are generally required to have a net worth of at least $500,000, although this amount can be reduced if certain compensating factors, including guarantees or pricing concessions, are present." [19]

B.    **Untrue or misleading statements about owner-occupancy status**

1.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group I was 1,332 out of a total pool of 1,683 loans (79.14%). [*See* I-5]

C.    **Untrue or misleading statements about LTV ratios**

1.    "The weighted average loan-to-value ratio at origination of the Group I Loans will be approximately 72.99%." [I-3]

2.    "The weighted average Loan-to-Value ratio at origination of the mortgage loans will be approximately 74.27%." [I-23]

74

3.      "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."

4.      "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [13]

**D.      Untrue or misleading statements about credit ratings**

1.      Defendants represented that Certificates in the IA1 tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

2.      Defendants represented that Certificates in the IA2 tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.      Additional untrue or misleading statements**

1.      "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-40-41]

2.      "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

•       Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws.

75

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994.  None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.  See "Certain Legal Aspects of the Mortgage Loans - The Mortgage Loans - Homeownership Act and Similar State Laws" in the prospectus.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the mortgage loans contain prepayment charges that extend beyond three years after the date of origination.

3.   "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificate insurer or of the certificateholders in that mortgage loan." [s-40]

4.   "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities.  Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement.  Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

5.   "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic

Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.    "In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements; and

- if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement.

7.    "The assignments may be blanket assignments covering mortgages secured by mortgaged properties located in the same county, if permitted by law. If so provided in the accompanying prospectus supplement, the depositor may not be required to deliver one or more of the related documents if any of the documents are missing from the files of the party from whom the mortgage loan was purchased." [26-27]

8.    "Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-41]

77

9.  "Except in the case of a Designated Seller Transaction, Residential Funding Corporation will provide with respect to each mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, all of the representations and warranties required by the rating agency or agencies rating a specific series of certificates.  In a Designated Seller Transaction, the Designated Seller would make substantially the same representations and warranties, which are not expected to vary in any material respect.  Residential Funding Corporation will generally represent and warrant that:

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Seller Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Corporation's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Corporation had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination;

- the mortgage loan or contract was not 30 or more days delinquent in payment of principal and interest as of the related cut-off date and was not so delinquent more than once during the twelve month period to the cut-off date; and

- there is no delinquent tax or assessment lien against the related mortgaged property.

10.    "In the event of a breach of a representation or warranty made by Residential Funding Corporation that materially adversely affects the interests of the certificateholders in the mortgage loan or contract, Residential Funding Corporation will be obligated to repurchase any mortgage loan or contract or substitute for the mortgage loan or contract as described below." [19-20]

**XII.   RALI 2006-Q05 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed May 26, 2006 for the RALI 2006-Q05 Securitization**

**A.   Untrue or misleading statements about underwriting guidelines**

    **1.   Untrue or misleading statements about conformity with underwriting guidelines**

        (a)   "Program Underwriting Standards.  In accordance with the Seller Guide, the Expanded Criteria Program Seller is required to review an application designed to provide to the original lender pertinent credit information concerning the mortgagor."

        (b)   "All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under "--The Program" in this prospectus supplement.  Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase as described under "The Trusts - Underwriting Policies - Automated Underwriting" in the prospectus."

        (c)   "The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.  For example, a mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." [s-63]

    **2.   Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)   "As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also be required to authorize verifications of

80

deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of non-owner occupied properties, income derived from the mortgaged property may be considered for underwriting purposes.  For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes." [s-35]

3. **Untrue or misleading statements concerning information evaluated in the loan application**

(a) "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [s-61-62]

4. **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a) "In order to be  approved  for participation in the Expanded Criteria Program,  mortgage collateral sellers are generally required  to have a net  worth of at least  $500,000,  although  this amount can be reduced if certain compensating  factors, including guarantees or pricing concessions,  are present." [19]

**B.** **Untrue or misleading statements about owner-occupancy status**

1. Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group I was 1,187 out of a total pool of 1,463 loans (81.13%).  [*See* I-5]

**C.** **Untrue or misleading statements about LTV ratios**

1. "The weighted average loan-to-value ratio at origination of the Group I Loans will be approximately 73.79%." [I-3]

2. "The weighted average Loan-to-Value ratio at origination of the mortgage loans will be approximately 74.67%." [I-30]

3.      "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide.  Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed.  The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-62]

**D.      Untrue or misleading statements about credit ratings**

1.      Defendants represented that Certificates in the IA1 tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.      Additional untrue or misleading statements**

1.      "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-45]

2.      "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the certificates, the following:

●       Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti predatory lending laws.

●       None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994.  None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.  See "Certain Legal Aspects of the Mortgage Loans - The

82

Mortgage Loans - Homeownership Act and Similar State Laws" in the prospectus.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the mortgage loans contain prepayment charges that extend beyond five years after the date of origination." [s-44]

3.      "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

4.      "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

5.      "In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, a set of legal documents relating to each mortgage loan that are in possession of the depositor, including:

- the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee;

- the  mortgage,  except for any mortgage not returned from the
  public recording office,  with evidence of recording indicated
  thereon or a copy of the mortgage  with evidence of recording
  indicated  thereon or,  in the case of a  Cooperative  Loan,  the
  respective  security agreements and any applicable financing
  statements;

- an assignment in recordable  form of the mortgage,  or evidence
  that the mortgage is held for the trustee through the MERS(R)
  System or a copy of such assignment with evidence of recording
  indicated thereon or, for a Cooperative Loan, an assignment of the
  respective security agreements,   any  applicable  financing
  statements,   recognition agreements, relevant stock certificates,
  related blank stock powers and the related proprietary leases or
  occupancy agreements; and

- if applicable,  any riders or modifications to the mortgage note and
  mortgage,  together  with  any  other  documents  at  such  times  as
  described in the related pooling and servicing agreement. "[26-27]

XIII.   **RASC 2006-EMX8 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed September 27, 2006 for the RASC 2006-EMX8 Securitization**

A.   **Untrue or misleading statements about underwriting guidelines**

1.   **Untrue or misleading statements about conformity with underwriting guidelines**

(a)   "Prior to assignment to the depositor, Residential Funding Corporation reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Corporation's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-54]

(b)   "Residential Funding Corporation has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Corporation on the basis of criteria set forth in Residential Funding Corporation's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding Corporation purchased from sellers in this program, each mortgage loan determined by Residential Funding Corporation to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-58]

(c)   "The specific underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Corporation's Client Guide, referred to as the Guide, as modified from time to time, including the provisions of the Guide applicable to the depositor's AlterNet Mortgage Program and the Credit Gap Program.  AlterNet loans and Credit Gap Loans are made to borrowers having a range of imperfect credit histories, ranging from minor delinquencies to borrower bankruptcies.  The applicable underwriting standards are revised based on changing conditions in the residential mortgage

85

market and the market for the depositor's mortgage pass-through certificates and may also be waived by Residential Funding Corporation from time to time.  The prospectus supplement for each series of certificates secured by AlterNet loans or Credit Gap loans will describe the general underwriting criteria applicable to such mortgage loans, as well as any material changes to the general standard described above." [13-14]

2.     **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a)     "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income, if required to be stated, would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property.  Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of junior mortgage loans, payments required to be made on any senior mortgage.  The originator's guidelines for mortgage loans will, in most cases, specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance, including primary mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [11]

(b)     "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified

86

percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-55]

3.    **Untrue or misleading statements concerning information evaluated in the loan application**

(a)    "Residential Funding Corporation's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan."

(b)    "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes."  [s-54-55]

4.    **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)    "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding

87

Corporation's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Corporation.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-55-56]

**B.      Untrue or misleading statements about owner-occupancy status**

1.      Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 2,036 out of a total pool of 2,036 loans (100%). [*See* II-17]

**C.      Untrue or misleading statements about LTV ratios**

1.      "Approximately 47.5% and 46.3% of the cut-off date principal balance of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-19]

2.      "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 84.64%." [II-15]

3.      "The weihted average loan-to-value ratio at origination of the mortgage loans will be approximately 85.03%." [II-26]

4.      "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator."

5.      "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis

based on the current cost of constructing or purchasing a similar property."

6. "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-55]

7. "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

8. "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [10]

**D.     Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.     Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-42]

2. "Residential Funding Corporation will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

89

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3. "Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s 40-41]

4. "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as

applicable, at origination or modification, without regard to any secondary financing.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6. "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such

times as described in the related pooling and servicing agreement." [26-27]

7.  "The depositor and Residential Funding Corporation will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates.  The depositor and Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan." [s-39]

8.  "The depositor and Residential Funding Corporation will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates.  In connection with the mortgage loan secured by a leasehold interest, Residential Funding Corporation shall have represented to the depositor that, among other things: the use of leasehold estates for residential properties is an accepted practice in the area where the related mortgaged property is located; residential property in such area consisting of leasehold estates is readily marketable; the lease is recorded and no party is in any way in breach of any provision of such lease; the leasehold is in full force and effect and is not subject to any prior lien or encumbrance by which the leasehold could be terminated or subject to any charge or penalty; and the remaining term of the lease does not terminate less than ten years after the maturity date of such mortgage loan.  The depositor and Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan." [s-37]

XIV.   <u>RASC 2006-EMX9 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed October 27, 2006 for the RASC 2006-EMX9 Securitization**

A.     **Untrue or misleading statements about underwriting guidelines**

    1.     **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)     "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-54]

        (b)     "Residential Funding Company, LLC has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Company, LLC on the basis of criteria set forth in Residential Funding Company, LLC's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding Company, LLC purchased from sellers in this program, each mortgage loan determined by Residential Funding Company, LLC to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-58]

    2.     **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)     "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan

93

and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-55]

3.     **Untrue or misleading statements concerning information evaluated in the loan application**

(a)     "Residential Funding Company, LLC's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan.

(b)     "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes.

94

(c)  "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination.

(d)  "Some of the mortgage loans have been originated under "stated income" programs (also referred to in this prospectus supplement as "reduced documentation" programs) that require less documentation and verification than do traditional "full documentation" programs.  Under a "stated income" program, some borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken." [s-54-55]

4.  **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)  "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Company, LLC's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Company, LLC.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-55-56]

**B.      Untrue or misleading statements about owner-occupancy status**

    1.      Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,557 out of a total pool of 1,557 loans (100%).  [*See* II-17]

**C.      Untrue or misleading statements about LTV ratios**

    1.      "Approximately 55.1% and 58.7% of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%."  [s-54]

    2.      "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 86.65%." [II-15]

    3.       "There are no Group II Loans with a current loan-to-value ratio in excess of 100.00%."  [II-15]

    4.      "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [10]

    5.      "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [s-55]

6. "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator." [s-55]

7. "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [10]

**D. Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E. Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-42]

2. "Residential Funding Corporation will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination."

3. "Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s 40-41]

4. "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6. "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or

its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [26-27]

7.  "The depositor and Residential Funding Company, LLC will make certain limited representations and warranties regarding the mortgage loans as of the date of issuance of the certificates.  The depositor and Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan as to which a breach of its representations and warranties with respect to such mortgage loan occurs, if such breach materially and adversely affects the interests of the certificateholders in any such mortgage loan.  See "The Trusts--Representations with Respect to Mortgage Collateral" in the prospectus." [s-39]

8.  "Residential Funding Company, LLC will generally represent and warrant that:

99

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Company, LLC's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Company, LLC had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination; and

- there is no delinquent tax or assessment lien against the related mortgaged property.

9.  "In the event of a breach of a representation or warranty made by Residential Funding Company, LLC that materially adversely affects the interests of the certificateholders in the mortgage loan or contract, Residential Funding Company, LLC will be obligated to repurchase any mortgage loan or contract or substitute for the mortgage loan or contract as described below." [17]

XV.   **RALI 2006-Q08 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed October 30, 2006 for the RALI 2006-Q08 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

    1.      **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)      "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-59]

        (b)      "All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under "--The Program" in this prospectus supplement.  Residential Funding will review each mortgage loan for compliance with its underwriting standards prior to purchase as described under "The Trusts--Underwriting  Policies--Automated Underwriting" in the prospectus." [s-61]

    2.      **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)      "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross

income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [s-60]

3. **Untrue or misleading statements concerning information evaluated in the loan application**

(a)  "As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of non-owner occupied properties, income derived from the mortgaged property may be considered for underwriting purposes.  For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes." [s-59]

(b)  "Certain of the mortgage loans have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs.  Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator.  Under a "no stated income" program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken.  Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator.  The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination." [s-60]

(c)  "Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide.  With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system.  Any

102

determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review. See "The Trusts--Underwriting Policies--Automated Underwriting" in the prospectus."

4. **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a) "In order to be approved for participation in the Expanded Criteria Program, mortgage collateral sellers are generally required to have a net worth of at least $500,000, although this amount can be reduced if certain compensating factors, including guarantees or pricing concessions, are present. An Expanded Criteria Program Seller may be an affiliate of the depositor, and the depositor presently anticipates that GMAC Mortgage, LLC and Homecomings Financial, LLC each an affiliate of the depositor, will be Expanded Criteria Program Sellers." [19]

(b) "There can be no assurance that any Expanded Criteria Program Seller presently meets any qualifications or will continue to meet any qualifications at the time of inclusion of mortgage collateral sold by it in the trust for a series of certificates, or thereafter. If an Expanded Criteria Program Seller becomes subject to the direct or indirect control of the FDIC, or if an Expanded Criteria Program Seller's net worth, financial performance or delinquency and foreclosure rates are adversely impacted, the institution may continue to be treated as an Expanded Criteria Program Seller. Any event may adversely affect the ability of any such Expanded Criteria Program Seller to repurchase mortgage collateral in the event of a breach of a representation or warranty which has not been cured. See "--Repurchases of Mortgage Collateral" below." [19]

B. **Untrue or misleading statements about owner-occupancy status**

1. Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,441 out of a total pool of 1,762 loans (81.78%). [*See* I-16]

C. **Untrue or misleading statements about LTV ratios**

1. "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 74.25%." [I-14]

2. "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 75.16%." [I-24]

103

3. "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-59]

## D.    Untrue or misleading statements about credit ratings

1. Defendants represented that Certificates in the IIA tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-8]

## E.    Untrue or misleading statements about compliance with law

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-50]

2. "Residential Funding Corporation will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or

104

additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination. None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3. "Residential Funding Corporation will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-49-50]

4. "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgage of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.    "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [26-27]

7.    "Representations with Respect to Mortgage Collateral."

8.    "Except in the case of a Designated Seller Transaction, Residential Funding Company, LLC will provide with respect to each mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, all of the representations and warranties required by the rating agency or agencies rating a specific series of certificates. In a Designated Seller Transaction, the Designated Seller would make substantially the same representations and warranties, which are not expected to vary in any material respect. Residential Funding Company, LLC will generally represent and warrant that:

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Seller Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Company, LLC's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Company, LLC had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination;

- the mortgage loan or contract was not 30 or more days delinquent in payment of principal and interest as of the related cut-off date and was not so delinquent more than once during the twelve month period to the cut-off date; and

- there is no delinquent tax or assessment lien against the related mortgaged property." [19]

## XVI. RASC 2006-KS9 Securitization

**Misrepresentations in the prospectus supplement and/or prospectus filed October 30, 2006 for the RASC 2006-KS9 Securitization**

### A. Untrue or misleading statements about underwriting guidelines

#### 1. Untrue or misleading statements about conformity with underwriting guidelines

(a) "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-55]

(b) "Residential Funding Company, LLC has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Company, LLC on the basis of criteria set forth in Residential Funding Company, LLC's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding Company, LLC purchased from sellers in this program, each mortgage loan determined by Residential Funding Company, LLC to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-61]

(c) "The AlterNet Mortgage Program and the Credit Gap Program

The specific underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Company, LLC's Client Guide, referred to as the Guide, as modified from time to time, including the provisions of the Guide applicable to the depositor's AlterNet Mortgage Program and the Credit Gap Program.  AlterNet loans and Credit Gap Loans are made to borrowers having a range of

imperfect credit histories, ranging from minor delinquencies to borrower bankruptcies. The applicable underwriting standards are revised based on changing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates and may also be waived by Residential Funding Company, LLC from time to time. The prospectus supplement for each series of certificates secured by AlterNet loans or Credit Gap loans will describe the general underwriting criteria applicable to such mortgage loans, as well as any material changes to the general standard described above." [13]

2. **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a) "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-56]

(b) "Based on the data provided in the application and certain verifications, if required, and the appraisal or other valuation of the mortgaged property, a determination will have been made by the original lender that the mortgagor's monthly income, if required to be stated, would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. Examples of other expenses include property taxes, utility costs, standard hazard and primary mortgage insurance, maintenance fees and other levies assessed by a Cooperative, if applicable, and other fixed obligations other than housing expenses including, in the case of junior mortgage loans, payments required to be made on any senior mortgage. The originator's guidelines for mortgage loans will, in most cases, specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance, including primary

109

mortgage insurance, and all scheduled payments on obligations that extend beyond one year, including those mentioned above and other fixed obligations, would equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [10-11]

3. **Untrue or misleading statements concerning information evaluated in the loan application**

(a) "Residential Funding Company, LLC's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan." [s-57]

(b) "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-57]

(c) "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a

determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-57]

4.     **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Company, LLC's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Company, LLC.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-57]

B.     **Untrue or misleading statements about owner-occupancy status**

1.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,124 out of a total pool of 1,173 loans (95.82%). [*See* II-17]

2.     "The mortgaged properties may be owner-occupied or non-owner-occupied and may include vacation homes, second homes and investment properties.  The percentage of mortgage loans that is owner-occupied will be disclosed in the accompanying prospectus supplement.  The basis for any statement that a given percentage of the mortgage loans is secured by mortgaged properties that are owner-occupied will be one or more of the following:

111

- the making of a representation by the mortgagor at origination of a mortgage loan that the mortgagor intends to use the mortgaged property as a primary residence;

- a representation by the originator of the mortgage loan, which may be based solely on the above clause; or

- the fact that the mailing address for the mortgagor is the same as the address of the mortgaged property.

3.   "Any representation and warranty in the related pooling and servicing agreement regarding owner-occupancy may be based solely on that information.  Mortgage loans secured by investment properties, including two- to four-unit dwellings, may also be secured by an assignment of leases and rents and operating or other cash flow guarantees relating to the mortgage loans." [ 8]

## C.   Untrue or misleading statements about LTV ratios

1.   "Approximately 42.8% and 54.8% of loan group I and loan group II, respectively, of the cut off  date principal balance of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-20]

2.   "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 83.54%." [II-15]

3.   "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [10]

112

4.  "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [10]

5.  "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."

6.  "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-57]

7.  "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator." [s-57]

**D.    Untrue or misleading statements about credit ratings**

1.  Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service, Standard & Poor's Ratings services, and Fitch, Inc., respectively: Aaa, AAA, and AAA. [*See* s-7]

**E.    Additional untrue or misleading statements**

1.  "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-43]

2.  "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

113

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3.    "Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-42-43]

4.    "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as

114

applicable, at origination or modification, without regard to any secondary financing.

5.  "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.  "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

115

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [27]

XVII.   <u>RALI 2006-Q09 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed November 28, 2006 for the RALI 2006-Q09 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

    1.      **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)      "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-64]

    2.      **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)      "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination." [s-63]

    3.      **Untrue or misleading statements concerning information evaluated in the loan application**

        (a)      "As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and

117

employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of non-owner occupied properties, income derived from the mortgaged property may be considered for underwriting purposes.  For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes." [s-63]

(b)     "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.  Generally, scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, must equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also consider the amount of liquid assets available to the mortgagor after origination."

4.     **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "In order to be approved for participation in the Expanded Criteria Program, mortgage collateral sellers are generally required to have a net worth of at least $500,000, although this amount can be reduced if certain compensating factors, including guarantees or pricing concessions, are present." [19]

**B.     Untrue or misleading statements about owner-occupancy status**

1.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,001 out of a total pool of 1,236 loans (80.99%). [*See* I-15]

**C.     Untrue or misleading statements about LTV ratios**

1.     "The weighted average loan-to-value ratio at origination of the Group II loans will be approximately 74.54%." [I-13]

118

2.      The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 75.15%." [s-23]

3.      "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide.  Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed.  The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-63]

**D.      Untrue or misleading statements about credit ratings**

1.      Defendants represented that Certificates in the IIA tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-8]

**E.      Additional untrue or misleading statements**

1.      "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-53]

2.      "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

•       None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

•       Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

119

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3.    "Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-53]

4.    "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

5.    "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity

120

on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.   "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [26-27]

7.   "Representations with Respect to Mortgage Collateral

Except in the case of a Designated Seller Transaction, Residential Funding Company, LLC will provide with respect to each mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, all of the representations and warranties required by the rating agency or agencies rating a specific series of certificates. In a Designated Seller Transaction, the Designated Seller would make substantially the same representations and warranties, which are not expected to vary in any material respect. Residential Funding Company, LLC will generally represent and warrant that:

121

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Seller Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Company, LLC's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Company, LLC had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination;

- the mortgage loan or contract was not 30 or more days delinquent in payment of principal and interest as of the related cut-off date and was not so delinquent more than once during the twelve month period to the cut-off date; and

- there is no delinquent tax or assessment lien against the related mortgaged property." [18]

8.    "Residential Funding will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan.  Any breach of any of these representations and warranties with respect to a Group II Loan and any breach of some other representations and warranties made by Residential Funding with respect to any Group II Loan will be deemed to materially and adversely affect the interests of the holders of the Class II-A Certificates.  Residential Funding maintains policies and procedures that are designed to ensure that it does not purchase mortgage loans subject to the Homeownership Act.  However, there can be no assurance that these

122

policies and procedures will assure that each and every mortgage loan complies with all applicable origination laws in all material respects. Residential Funding is opposed to predatory lending practices, as a matter of corporate policy.  In addition, Residential Funding's Servicer Guide requires that each subservicer accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-53]

**XVIII.** **RASC 2007-KS2 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed February 23, 2007 for the RASC 2007-KS2 Securitization**

**A.** **Untrue or misleading statements about underwriting guidelines**

    1. **Untrue or misleading statements about conformity with underwriting guidelines**

        (a) "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement. In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-57]

        (b) Residential Funding Company, LLC has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors. The mortgage collateral sellers that participate in this program have been selected by Residential Funding Company, LLC on the basis of criteria set forth in Residential Funding Company, LLC's Client Guide, referred to as the Guide. For those mortgage loans that Residential Funding Company, LLC purchased from sellers in this program, each mortgage loan determined by Residential Funding Company, LLC to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-62]

        (c) "The specific underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Company, LLC's Client Guide, referred to as the Guide, as modified from time to time, including the provisions of the Guide applicable to the depositor's AlterNet Mortgage Program and the Credit Gap Program. AlterNet loans and Credit Gap Loans are made to borrowers having a range of imperfect credit histories, ranging from minor delinquencies to borrower bankruptcies. The applicable underwriting standards are

revised based on changing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates and may also be waived by Residential Funding Company, LLC from time to time.  The prospectus supplement for each series of certificates secured by AlterNet loans or Credit Gap loans will describe the general underwriting criteria applicable to such mortgage loans, as well as any material changes to the general standard described above." [13]

2.  **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a)  "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-59]

3.  **Untrue or misleading statements concerning information evaluated in the loan application**

(a)  "Residential Funding Company, LLC's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan.

125

(b)     "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-59]

4.     **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)     "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Company, LLC's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Company, LLC.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-59]

B.     **Untrue or misleading statements about owner-occupancy status**

1.     Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,199 out of a total pool of 1,259 loans (95.23%). [*See* I-17]

C.     **Untrue or misleading statements about LTV ratios**

1.     "Approximately 47.2% and 55.3% of loan group I and loan group II, respectively, of the cut-off date principal balance of the mortgage loans in

126

loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-21]

2.   "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 82.35%." [II-15]

3.   "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "--Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

4.   "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [10]

5.   "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.

6.   "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis

based on the current cost of constructing or purchasing a similar property." [s-60]

7. "In certain instances, the LTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-60]

**D.     Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service, Standard & Poor's Ratings services, and Fitch, Inc., respectively: Aaa, AAA, and AAA. [*See* s-7]

**E.     Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-44]

2. "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

   - None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

   - Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

   - None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

   - None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

   - None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

128

3. "Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificateholders in that mortgage loan." [s-43-44]

4. "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

5. "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6. "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [27]

XIX.   <u>RASC 2007-KS3 Securitization</u>

**Misrepresentations in the prospectus supplement and/or prospectus filed March 9, 2007 for the RASC 2007-KS3 Securitization**

A.      **Untrue or misleading statements about underwriting guidelines**

     1.      **Untrue or misleading statements about conformity with underwriting guidelines**

       (a)      "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-55]

       (b)      "THE ALTERNET PROGRAM

Residential Funding Company, LLC has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Company, LLC on the basis of criteria set forth in Residential Funding Company, LLC's Client Guide, referred to as the Guide. For those mortgage loans that Residential Funding Company, LLC purchased from sellers in this program, each mortgage loan determined by Residential Funding Company, LLC to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-59]

       (c)      "The specific underwriting standards with respect to AlterNet loans and Credit Gap loans will in most cases conform to those published in Residential Funding Company, LLC's Client Guide, referred to as the Guide, as modified from time to time, including the provisions of the Guide applicable to the depositor's AlterNet Mortgage Program and the Credit Gap Program.  AlterNet loans and Credit Gap Loans are made to borrowers having a range of

imperfect credit histories, ranging from minor delinquencies to borrower bankruptcies. The applicable underwriting standards are revised based on changing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates and may also be waived by Residential Funding Company, LLC from time to time. The prospectus supplement for each series of certificates secured by AlterNet loans or Credit Gap loans will describe the general underwriting criteria applicable to such mortgage loans, as well as any material changes to the general standard described above." [13-14]

2.    **Untrue or misleading statements concerning borrower's ability to repay the loan**

(a)    "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses. The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income. The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-60]

3.    **Untrue or misleading statements concerning information evaluated in the loan application**

(a)    "Residential Funding Company, LLC's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

•      the creditworthiness of a mortgagor,

•      the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

132

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan."

(b)   "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-60]

(c)   "In most cases, under a traditional ''full documentation'' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, only income derived from the mortgaged property may have been considered for underwriting purposes, rather than the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes." [10-11]

4.   **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

    (a)   "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Company, LLC's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Company, LLC.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-61]

**B.**    **Untrue or misleading statements about owner-occupancy status**

1.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 1,204 out of a total pool of 1,260 loans (95.56%).  [*See* I-18]

**C.**    **Untrue or misleading statements about LTV ratios**

1.    "Approximately 50.3% and 57.0% of loan group I and loan group II, respectively, of the cut-off date principal balance of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-21]

2.    "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 82.89%." [II-16]

3.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan generally has been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  Appraisers were either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by the originator.

4.    "The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal would have considered a market data analysis of recent sales of

comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property." [s-60]

**D.    Untrue or misleading statements about credit ratings**

1.    Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-7]

**E.    Additional untrue or misleading statements**

1.    "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-45]

2.    "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

- None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

- Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

135

3.　　"Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificate insurer or the certificateholders in that mortgage loan." [s-41-42]

4.　　"At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

5.　　"If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS (Registered Trademark) System. For mortgage loans registered through the MERS (Registered Trademark) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.　　"The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

136

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS (Registered Trademark) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [27]

**XX.**   **RASC 2007-EMX1 Securitization**

**Misrepresentations in the prospectus supplement and/or prospectus filed March 9, 2007 for the RASC 2007-EMX1 Securitization**

**A.**      **Untrue or misleading statements about underwriting guidelines**

   **1.**     **Untrue or misleading statements about conformity with underwriting guidelines**

        (a)     "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-56]

        (b)     "Residential Funding Company, LLC has established the AlterNet program primarily for the purchase of mortgage loans that are made to borrowers that may have imperfect credit histories, higher debt to income ratios or mortgage loans that present certain other risks to investors.  The mortgage collateral sellers that participate in this program have been selected by Residential Funding Company, LLC on the basis of criteria set forth in Residential Funding Company, LLC's Client Guide, referred to as the Guide.  For those mortgage loans that Residential Funding Company, LLC purchased from sellers in this program, each mortgage loan determined by Residential Funding Company, LLC to be acceptable for purchase would have been originated in accordance with or would have been determined to be generally consistent with the provisions of the Guide." [s-60]

   **2.**     **Untrue or misleading statements concerning borrower's ability to repay the loan**

        (a)     "Based on the data provided in the application, certain verifications, if required by the originator of the mortgage loan, and the appraisal or other valuation of the mortgaged property, a determination was made by the original lender that the mortgagor's monthly income would be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan

138

and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses.  The originator's guidelines for mortgage loans generally specify that scheduled payments on a mortgage loan during the first year of its term plus taxes and insurance and all scheduled payments on obligations that extend beyond ten months, including those mentioned above and other fixed obligations, equal no more than specified percentages of the prospective mortgagor's gross income.  The originator may also have considered the amount of liquid assets available to the mortgagor after origination." [s-57]

3.  **Untrue or misleading statements concerning information evaluated in the loan application**

(a)  "Residential Funding Company, LLC's underwriting of the mortgage loans generally consisted of analyzing the following as standards applicable to the mortgage loans:

- the creditworthiness of a mortgagor,

- the income sufficiency of a mortgagor's projected family income relative to the mortgage payment and to other fixed obligations, including in certain instances rental income from investment property, and

- the adequacy of the mortgaged property expressed in terms of LTV ratio, to serve as the collateral for a mortgage loan.

(b)  "Generally, each mortgagor would have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, each mortgagor would have been required to furnish information with respect to the mortgagor's assets, liabilities, income, credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarized the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The information may have been supplied solely in the loan application.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, income derived from the mortgaged property may have been considered for underwriting purposes.  With respect to mortgaged property consisting of vacation homes, generally no income derived from the property was considered for underwriting purposes." [s-57]

139

(c)    "Some of the mortgage loans have been originated under "stated income" programs (also referred to in this prospectus supplement as "reduced documentation" programs) that require less documentation and verification than do traditional "full documentation" programs.  Under a "stated income" program, some borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken." [s-57]

(d)    "In most cases, under a traditional ''full documentation'' program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income, credit history and employment history, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of investment properties, only income derived from the mortgaged property may have been considered for underwriting purposes, rather than the income of the mortgagor from other sources.  With respect to mortgaged property consisting of vacation or second homes, no income derived from the property will have been considered for underwriting purposes." [10]

4.    **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a)    "In most cases, the mortgage loans were either originated and underwritten in accordance with Residential Funding Company, LLC's AlterNet Program, as discussed below, or otherwise acquired from a mortgage collateral seller based on standards consistent with the following discussion on credit grades classification or substantially similar standards acceptable to Residential Funding Company, LLC.  Exceptions to these standards are made, however, on a case by case basis if it is determined, generally based on compensating factors, that an underwriting exception is warranted.  Compensating factors may include, but are not limited to, a low LTV ratio, stable employment, a relatively long period of time in the same residence, a mortgagor's cash reserves and savings and monthly residual income." [s-57-58]

**B.      Untrue or misleading statements about owner-occupancy status**

    1.    Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 3,732 out of a total pool of 4,051 loans (92.13%). [*See* II-31]

**C.      Untrue or misleading statements about LTV ratios**

    1.    "Approximately 45.1% and 47.9% of the cut-off date principal balance of the mortgage loans in loan group I and loan group II, respectively, have a loan-to-value ratio, or combined loan-to-value ratio with respect to mortgage loans that are secured by junior liens, at origination in excess of 80%." [s-20]

    2.    "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 83.82%." [II-16]

    3.    "The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under ''—Loan-to-Value Ratio.'' Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator.  The appraisal procedure guidelines in most cases will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal will have considered a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio or CLTV ratio may have been based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [11]

    4.    "The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance." [11]

    5.    "In the case of some mortgage loans seasoned for over twelve months, the LTV ratio may be determined at the time of purchase from the related seller based on the ratio of the current loan amount to the current value of the mortgaged property.  Appraised values may be determined by either:

        •    a statistical analysis;

- a broker's price opinion; or

- an automated valuation, drive-by appraisal or other certification of value."  [10]

**D.** **Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-7]

**E.** **Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-43]

2. "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

   - None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

   - Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

   - None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

   - None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

   - None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3.  "Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificate insurer or the certificateholders in that mortgage loan." [s 42-43]

4.  "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the last day of the month of the cut-off date, other than principal and interest due on or before such date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior mortgage ratio, as applicable, at origination or modification, without regard to any secondary financing.

5.  "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS® System. For mortgage loans registered through the MERS® System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.  "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee, or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

143

- the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

- an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS® System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed reassignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

- if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement." [27]

7. "Residential Funding Company, LLC will generally represent and warrant that:

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Company, LLC's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Company, LLC had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under

the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination; and

- there is no delinquent tax or assessment lien against the related mortgaged property.

8.   "In the event of a breach of a representation or warranty made by Residential Funding Company, LLC that materially adversely affects the interests of the certificateholders in the mortgage loan or contract, Residential Funding Company, LLC will be obligated to repurchase any mortgage loan or contract or substitute for the mortgage loan or contract as described below." [18]

## XXI.  RALI 2007-QH5 Securitization

**Misrepresentations in the prospectus supplement and/or prospectus filed May 29, 2007 for the RALI 2007-QH5 Securitization**

A.   **Untrue or misleading statements about underwriting guidelines of Residential Funding Company, LLC**

   1.   **Untrue or misleading statements about conformity with underwriting guidelines**

      (a)   "Prior to assignment to the depositor, Residential Funding Company, LLC reviewed the underwriting standards for the mortgage loans and all of the mortgage loans were in substantial conformity with the standards set forth in Residential Funding Company, LLC's AlterNet Program or are otherwise in conformity with the standards set forth in the description of credit grades set forth in this prospectus supplement.  In addition, reference is made to "The Trusts--Underwriting Policies" in the prospectus for important information in addition to that set forth in this prospectus supplement regarding the underwriting standards for the mortgage loans, including automated underwriting." [s-52]

   2.   **Untrue or misleading statements concerning borrower's ability to repay the loan**

      (a)   "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations." [s-54]

   3.   **Untrue or misleading statements concerning information evaluated in the loan application**

      (a)   "As part of the description of the mortgagor's financial condition, each mortgagor is required to furnish information, which may have been supplied solely in the application, regarding its assets, liabilities, income (except as described below), credit history and employment history, and to furnish an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  The mortgagor may also be required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts.  In the case of non-owner occupied

properties, income derived from the mortgaged property may be considered for underwriting purposes. For mortgaged property consisting of a vacation or second home, generally no income derived from the property is considered for underwriting purposes." [s-54]

(b) "Prior to assigning the mortgage loans to the depositor, Residential Funding Company, LLC will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding Company, LLC was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review. See "The Trusts--Underwriting Policies--Automated Underwriting" in the prospectus." [s-54]

4. **Untrue or misleading statements concerning evaluation of exceptions and compensating factors**

(a) "In order to be approved for participation in the Expanded Criteria Program, mortgage collateral sellers are generally required to have a net worth of at least $500,000, although this amount can be reduced if certain compensating factors, including guarantees or pricing concessions, are present. Statements concerning appraisal of the subject property Other statements concerning quality control procedures The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral." [16-17]

B. **Untrue or misleading statements about owner-occupancy status**

1. Defendants represented that the number of mortgage loans secured by properties used as primary residences in Supporting Loan Group II was 458 out of a total pool of 592 loans (77.36%). [*See* I-15]

C. **Untrue or misleading statements about LTV ratios**

1. "The weighted average loan-to-value ratio at origination of the Group II Loans will be approximately 73.47%." [I-13]

147

2. "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 73.79%." [I-23]

3. "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide. Appraisers may be staff appraisers employed by the originator. The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed. The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property. In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator." [s-54]

**D.    Untrue or misleading statements about credit ratings**

1. Defendants represented that Certificates in the AII tranche would be assigned a rating of not lower than the following by Moody's Investors Service and Standard & Poor's Ratings services, respectively: Aaa and AAA. [*See* s-6]

**E.    Additional untrue or misleading statements**

1. "Residential Funding is opposed to predatory lending practices, as a matter of corporate policy. In addition, Residential Funding's Servicer Guide requires each subservicer to accurately and fully report its borrower credit files to credit repositories in a timely manner." [s-43]

2. "Residential Funding Company, LLC will sell the mortgage loans to the depositor and will represent and warrant, as of the date of issuance of the certificates, the following:

•    None of the mortgage loans were subject to the Home Ownership and Equity Protection Act of 1994, referred to as the Homeownership Act.

•    Each mortgage loan at the time it was made complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws.

- None of the mortgage loans are loans that, under applicable state or local law in effect at the time of origination of the loan, are referred to as (1) "high cost" or "covered" loans or (2) any other similar designation if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

- None of the proceeds for the mortgage loans were used to finance the purchase of single premium credit insurance policies.

- None of the Group I Loans contain prepayment penalties that extend beyond five years after the date of origination.  None of the Group II Loans contain prepayment penalties that extend beyond three years after the date of origination.

3.     "Residential Funding Company, LLC will be required to repurchase or substitute for any mortgage loan that violates any of these representations and warranties, if that violation materially and adversely affects the interests of the certificate insurer or the certificateholders in that mortgage loan." [s 42-43]

4.     "At the time of issuance of a series of certificates, the depositor will cause the mortgage loans or mortgage securities and any other assets being included in the related trust to be assigned to the trustee or its nominee, which may be the custodian, together with, if specified in the accompanying prospectus supplement, all principal and interest received on the mortgage loans or mortgage securities after the cut-off date, other than principal and interest due on or before the cut-off date and any Spread. The trustee will, concurrently with that assignment, deliver a series of certificates to the depositor in exchange for the mortgage loans or mortgage securities. Each mortgage loan or mortgage security will be identified in a schedule appearing as an exhibit to the related pooling and servicing agreement. Each schedule of mortgage loans will include, among other things, information as to the principal balance of each mortgage loan as of the cut-off date, as well as information respecting the mortgage rate, the currently scheduled monthly payment of principal and interest, the maturity of the mortgage note and the LTV ratio, at origination or modification, without regard to any secondary financing.

5.     2.     "If stated in the accompanying prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. or, MERS, assignments of the mortgages for the mortgage loans in the related trust will be registered electronically through Mortgage Electronic Registration Systems, Inc., or MERS(R) System. For mortgage loans registered through the MERS(R) System, MERS shall serve as mortgage

of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans.

6.  "The depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the trustee or to the custodian, the mortgage note and any modification or amendment thereto endorsed without recourse either in blank or to the order of the trustee or its nominee. In addition, the depositor will, as to each mortgage loan other than mortgage loans underlying any mortgage securities, deliver to the sponsor, the servicer, the master servicer, the trustee, or the custodian, as elected by the depositor, a set of the remaining legal documents relating to each mortgage loan that are in possession of the depositor, which may include the following:

   • the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan, the respective security agreements and any applicable financing statements;

   • an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements; and

   • if applicable, any riders or modifications to the mortgage note and mortgage or a copy of any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement.." [41-42]

7.  "Except in the case of a Designated Seller Transaction, Residential Funding Company, LLC will provide with respect to each mortgage loan, including Expanded Criteria Program loans, or contracts constituting a part of the trust, all of the representations and warranties required by the rating agency or agencies rating a specific series of certificates. In a Designated Seller Transaction, the Designated Seller would make substantially the same representations and warranties, which are not expected to vary in any material respect. Residential Funding Company, LLC will generally represent and warrant that:

150

- as of the cut-off date, the information described in a listing of the related mortgage loan or contract was true and correct in all material respects;

- except in the case of Cooperative Loans, a policy of title insurance in the form and amount required by the Seller Guide or an equivalent protection was effective or an attorney's certificate was received at origination, and each policy remained in full force and effect on the date of sale of the related mortgage loan or contract to the depositor;

- to the best of Residential Funding Company, LLC's knowledge, if required by applicable underwriting standards, the mortgage loan or contract is the subject of a primary insurance policy;

- Residential Funding Company, LLC had good title to the mortgage loan or contract and the mortgage loan or contract is not subject to offsets, defenses or counterclaims except as may be provided under the Servicemembers Civil Relief Act, as amended, or Relief Act, and except with respect to any buy-down agreement for a Buy-Down Mortgage Loan;

- each mortgaged property is free of material damage and is in good repair;

- each mortgage loan complied in all material respects with all applicable local, state and federal laws at the time of origination;

- the mortgage loan or contract was not 30 or more days delinquent in payment of principal and interest as of the related cut-off date and was not so delinquent more than once during the twelve month period to the cut-off date; and

- there is no delinquent tax or assessment lien against the related mortgaged property." [26-27]

# Exhibit B
# to Notice of Removal

### *Stipulation*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

**FEDERAL HOUSING FINANCE**
**AGENCY, AS CONSERVATOR FOR THE**
**FEDERAL HOME LOAN MORTGAGE**
**CORPORATION,**

          **Plaintiff,**

       **-against-**

**ALLY FINANCIAL INC. f/k/a GMAC,**
**LLC,  et al.,**

          **Defendants.**

---

**Index No. 652441/2011**


**STIPULATION EXTENDING TIME**

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that:

    (a)     Defendants' time to move to dismiss, answer or otherwise respond to the Complaint in this action is extended until December 2, 2011;

    (b)     Plaintiff's time to oppose a motion to dismiss or otherwise respond is extended until March 2, 2012;

    (c)     Defendants' time to reply, as applicable, is extended until April 16, 2012;

    (d)     neither Plaintiff nor Defendants waive any rights to seek from each other or the Court adjournments or extensions of these deadlines or any other deadlines; and

    (e)     the entry into this stipulation shall not waive any rights, claims or defenses, including, without limitation, all defenses relating to jurisdiction and venue, all of which are expressly preserved.

-1-

Dated:       New York, New York
             September 26, 2011

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP

By: _____
Marc E. Kasowitz
(mkasowitz@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Michael S. Shuster
(mshuster@kasowitz.com)
Christopher P. Johnson
(cjohnson@kasowitz.com)
Michael Hanin (mhanin@kasowitz.com)
Kanchana Wangkeo Leung
(kleung@kasowitz.com)
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff Federal Housing
Finance Agency*

CRAVATH, SWAINE & MOORE LLP

By: _____
Richard W. Clary (rclary@cravath.com)
Michael Reynolds (mreynolds@cravath.com)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: 212-474-1000
Facsimile: 212-474-3700

*Attorneys for Credit Suisse Securities (USA)
LLC*

SIMPSON THACHER & BARTLETT LLP

By:_____
Thomas C. Rice (trice@stblaw.com)
Alan C. Turner (aturner@stblaw.com)
David J. Woll (dwoll@stblaw.com)
425 Lexington Avenue
New York, NY 10017-3954
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Attorneys for RBS Securities, Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:_____
Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Attorneys for Citigroup Global Markets Inc.*

-2-

Dated:        New York, New York
              September 26, 2011

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP

By: _____
Marc E. Kasowitz
(mkasowitz@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Michael S. Shuster
(mshuster@kasowitz.com)
Christopher P. Johnson
(cjohnson@kasowitz.com)
Michael Hanin (mhanin@kasowitz.com)
Kanchana Wangkeo Leung
(kleung@kasowitz.com)
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff Federal Housing
Finance Agency*

SIMPSON THACHER & BARTLETT LLP

By: _____
Thomas C. Rice (trice@stblaw.com)
Alan C. Turner (aturner@stblaw.com)
David J. Woll (dwoll@stblaw.com)
425 Lexington Avenue
New York, NY 10017-3954
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Attorneys for RBS Securities, Inc.*

CRAVATH, SWAINE & MOORE LLP

By: _____
Richard W. Clary (rclary@cravath.com)
Michael Reynolds (mreynolds@cravath.com)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: 212-474-1000
Facsimile: 212-474-3700

*Attorneys for Credit Suisse Securities (USA)
LLC*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _____
Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Attorneys for Citigroup Global Markets Inc.*

Dated:        New York, New York
              September 26, 2011

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP

By: _____
Marc E. Kasowitz
(mkasowitz@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Michael S. Shuster
(mshuster@kasowitz.com)
Christopher P. Johnson
(cjohnson@kasowitz.com)
Michael Hanin (mhanin@kasowitz.com)
Kanchana Wangkeo Leung
(kleung@kasowitz.com)
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Plaintiff Federal Housing
Finance Agency*

CRAVATH, SWAINE & MOORE LLP

By: _____
Richard W. Clary (rclary@cravath.com)
Michael Reynolds (mreynolds@cravath.com)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: 212-474-1000
Facsimile: 212-474-3700

*Attorneys for Credit Suisse Securities (USA)
LLC*

SIMPSON THACHER & BARTLETT LLP

By: _____
Thomas C. Rice (trice@stblaw.com)
Alan C. Turner (aturner@stblaw.com)
David J. Woll (dwoll@stblaw.com)
425 Lexington Avenue
New York, NY 10017-3954
Telephone: 212-455-2000
Facsimile: 212-455-2502

*Attorneys for RBS Securities, Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: _____
Brad S. Karp (bkarp@paulweiss.com)
Susanna M. Buergel
(sbuergel@paulweiss.com)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-373-3000
Facsimile: 212-757-3990

*Attorneys for Citigroup Global Markets Inc.*

-2-

MAYER BROWN LLP

By:_____
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
Christopher Provenzano
(cprovenzano@mayerbrown.com
1675 Broadway
New York, Ny 10019-5820
Telephone: 212-506-2500
Facsimile: 212-262-1910

*Attorneys for Ally Financial Inc., GMAC
Mortgage Group, Inc., Residential Capital
LLC, GMAC-RFC Holding Company, LLC,
Residential Funding Company, LLC, Ally
Securities, LLC, Residential Asset Mortgage
Products, Inc., Residential Asset Securities
Corporation, Residential Accredit Loans, Inc.*

SULLIVAN & CROMWELL LLP

By:_____
David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua J. Fritsch (fritschj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Barclays Capital Inc.*

SULLIVAN & CROMWELL LLP

By:_____
Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Jordan T. Razza (razzaj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Goldman, Sachs & Co.*

MAYER BROWN LLP

By:_____
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
Christopher Provenzano
(cprovenzano@mayerbrown.com
1675 Broadway
New York, Ny 10019-5820
Telephone: 212-506-2500
Facsimile: 212-262-1910

*Attorneys for Ally Financial Inc., GMAC
Mortgage Group, Inc., Residential Capital
LLC, GMAC-RFC Holding Company, LLC,
Residential Funding Company, LLC, Ally
Securities, LLC, Residential Asset Mortgage
Products, Inc., Residential Asset Securities
Corporation, Residential Accredit Loans, Inc.*

SULLIVAN & CROMWELL LLP

By:_____
David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua J. Fritsch (fritschj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Barclays Capital Inc.*

SULLIVAN & CROMWELL LLP

By: *Richard H. Klapper*
Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Jordan T. Razza (razzaj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Goldman, Sachs & Co.*

-3-

MAYER BROWN LLP

By:_____
Richard A. Spehr (rspehr@mayerbrown.com)
Michael O. Ware (mware@mayerbrown.com)
Christopher Provenzano
(cprovenzano@mayerbrown.com
1675 Broadway
New York, Ny 10019-5820
Telephone: 212-506-2500
Facsimile: 212-262-1910

*Attorneys for Ally Financial Inc., GMAC
Mortgage Group, Inc., Residential Capital
LLC, GMAC-RFC Holding Company, LLC,
Residential Funding Company, LLC, Ally
Securities, LLC, Residential Asset Mortgage
Products, Inc., Residential Asset Securities
Corporation, Residential Accredit Loans, Inc.*

SULLIVAN & CROMWELL LLP

By:_____
David H. Braff (braffd@sullcrom.com)
Brian T. Frawley (frawleyb@sullcrom.com)
Jeffrey T. Scott (scottj@sullcrom.com)
Joshua J. Fritsch (fritschj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Barclays Capital Inc.*

SULLIVAN & CROMWELL LLP

By:_____
Richard H. Klapper (klapperr@sullcrom.com)
Theodore Edelman (edelmant@sullcrom.com)
Michael T. Tomaino, Jr.
(tomainom@sullcrom.com)
Jordan T. Razza (razzaj@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for Goldman, Sachs & Co.*

SULLIVAN & CROMWELL LLP

By: _____
Penny Shane (shanep@sullcrom.com)
Sharon L. Nelles (nelless@sullcrom.com)
Jonathan M. Sedlak (sedlakj@sullcrom.com)
David A. Castleman
(castlemand@sullcrom.com)
125 Broad Street
New York, NY 10004
Telephone: 212-558-4000

*Attorneys for J.P. Morgan Securities, LLC*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____
Jay B. Kasner (jay.kasner@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton.skadden.com)
Four Times Square
New York, NY 10036
Telephone: 212-735-3000
Facsimile: 212-735-2000/1

*Attorneys for UBS Securities LLC*

-4-

SULLIVAN & CROMWELL LLP

By:_____
Penny Shane (shanep@sullcrom.com)
Sharon L. Nelles (nelless@sullcrom.com)
Jonathan M. Sedlak (sedlakj@sullcrom.com)
David A. Castleman
(castlemand@sullcrom.com)
125 Broad Street
New York, NY  10004
Telephone:  212-558-4000

*Attorneys for J.P. Morgan Securities, LLC*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP

By:_____
Jay B. Kasner (jay.kasner@skadden.com)
Scott Musoff (scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton.skadden.com)
Four Times Square
New York, NY  10036
Telephone:  212-735-3000
Facsimile:  212-735-2000/1

*Attorneys for UBS Securities LLC*

-4-