April 5, 2013

Hon. Denise L. Cote,
    United States District Judge,
        Daniel Patrick Moynihan
            United States Courthouse,
                500 Pearl St.,
                    New York, New York 10007-1312

            Re:     FHFA Actions, No. 11-cv-5201 (DLC), et al.

Your Honor:

        Defendants in the above-referenced actions write in response to the Court's March 22 Order that "[t]he parties shall confer and design a process for selecting deponents."  ECF No. 481.  Having made significant efforts to reach agreement on a selection process that would protect the rights of all of them, Defendants unanimously agree that the *only* process adequate to protect each Defendant's rights to select and examine deponents whose testimony is critical to that Defendant's case, within the strictures the Court has placed on depositions by the Defendants, is one where a deposition may count against the limit of 20 across all actions *only if* all Defendants have agreed on the selection of that individual.  Other depositions in which a Defendant chooses to examine a witness would count only against a separate, individually customized limit applicable to that Defendant, based on factors such as size of the case, types and varieties of claims, and other indicia of potential need.[1]  Recognizing that FHFA has rejected similar proposals in the past, Defendants reached out to FHFA for its consent and did not receive a response.

        As described in prior submissions, Defendants are so differently situated relative to claims and defenses in each action that no single set of 20 deponents across all 16 actions would satisfy each Defendant's need for certain deposition testimony, much less each Defendant's particular assessment of the priorities among potential areas of inquiry in that Defendant's case.  For example, FHFA has asserted fraud claims against only a subset of Defendants, and has advised the Court that it intends to prove the reliance element of those claims through the testimony of the traders at the GSEs.  Based on review of Plaintiff's ongoing production, there were at least 10 such traders at the GSEs, each of whom is likely to have unique knowledge relevant to purchases of some but not all of the securities at issue in the various fraud cases.  The non-fraud defendants, however, have no reason to use half the permitted depositions on traders, where FHFA itself has identified *more than 100* other people who may have at least equally important information.  *See* Non-UBS Def. 3/22/13 Ltr at 2 n.2.  Another example: FHFA asserts claims against the Ally defendants based only on purchases of securities by Freddie Mac, not Fannie Mae.  The Ally defendants cannot reasonably consent to Defendants using any of their 20 depositions on employees of Fannie Mae.  A further example: some Defendants would push to depose GSE employees who made favorable statements about those Defendants' due diligence practices, but other Defendants would not choose to spend limited deposition resources on those

---

[1] The 20-deposition limit (and other limits on discovery) imposed by the Court, to which Defendants have consistently objected and continue to object, is now before the Second Circuit as part of Defendants' Joint Petition for a Writ of Mandamus, filed on March 26, 2013.  13-1122-cv (2d Cir.).  Defendants are submitting this letter without prejudice to their longstanding objection that these limits violate the Federal Rules of Civil Procedure and Defendants' due process rights.

Hon. Denise L. Cote                                                                                                           -2-

deponents.  No single subset of potential deponents would address important interests of every Defendant.

To address the important interests of each Defendant necessarily requires testimony from far more than 20 witnesses.  As one would expect for two highly sophisticated, sprawling organizations with multi-trillion dollar stakes in the mortgage markets, the GSEs divided responsibilities in areas directly relevant to the claims and defenses in these actions among a large number of individuals within a wide range of committees and departments.[2]  Defendants reasonably differ about which areas and personnel matter most to the defense of the claims against each of them.

Defendants also have distinct interests and judgments about the *timing* of depositions.  Because UBS uniquely faces expert deadlines in June and a fact discovery cut-off at the end of August, it has had no reasonable alternative but to begin fact depositions immediately even though FHFA continues to produce significant quantities of documents (including approximately 2 million pages this past weekend) and will not provide a date by which its production will be complete.  The remaining defendants seek to avoid the substantial prejudice UBS faces from conducting depositions in advance of complete document production.

In coordinated actions such as these, each defendant necessarily retains the "due process right to prosecute his own separate and distinct claims or defenses without having them so merged into the claims or defenses of others that irreparable injury will result." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 842 F. Supp. 2d 587, 592 (S.D.N.Y. Feb. 6, 2012) (quoting *Garber v. Randell*, 477 F.2d 711, 716 (2d Cir. 1973)).  This bedrock due process right explains why the Manual for Complex Litigation (§ 11.4) at most contemplates the *deferral* of deposition questions on individualized issues until after depositions on common issues, but in no way countenances the preclusion of discovery tailored to each individual case.  Defendants' proposed process would at least give each Defendant some opportunity to pursue discovery tailored to its case, provide efficiencies for truly common witnesses, and account for the distinct scheduling and other differences among defendants.  Pursuant to this Court's March 22 Order, Defendants respectfully request a conference to address these issues.

---

[2]  Based on our current understanding and subject to the caveat that certain departments and functions may have changed over the course of the relevant time period, we believe that PLS trading at Fannie Mae was done within the Capital Markets Mortgage Assets group, made up of multiple vice presidents, directors, traders and support staff.  Risk management and credit review responsibility at Fannie Mae included individuals in the Capital Markets Strategy group which, in turn, housed the PLS Analytics and PLS Surveillance units.  Counterparty reviews and risk assessment responsibilities at Fannie Mae were conducted by the Single Family Counterparty Risk Management group, which was frequently involved in assessing individual PLS purchases.  Risk oversight functions at Fannie Mae were performed by Credit Risk Oversight, Office of the Chief Risk Officer, the Private Label Advisory Team and numerous other risk committees.  At Freddie Mac, responsibility for purchasing PLS was within the Mortgage Investment & Structuring group, which, like Fannie Mae, included a number of executives, directors, traders and support staff.  Freddie also had a Portfolio Management and Pricing group responsible for, among other things, credit reviews and risk management of PLS.  Portfolio Management and Pricing was part of the Credit Policy and Portfolio Management Division, which was run by numerous individuals with different responsibilities.  Freddie Mac also maintained a number of different counterparty review groups, including the Counterparty Credit Risk Management group, Alternative Market Operations group, and the External Operations Risk Management group.  All of these groups, in one way or another, were responsible for reviewing and evaluating relevant originators.  Additional risk management functions were performed at Freddie Mac by the Enterprise Risk Management Committee and each of the Credit, Market, Model, Operations, Capital and Regulatory Subcommittees, as well as committees and departments responsible for overall Enterprise Risk Policy, Enterprise Credit Risk, Enterprise Market Risk, Enterprise Operational Risk and Enterprise Methodologies and Technologies.

Hon. Denise L. Cote                                                          -3-

 

                                      Respectfully,

                                      /s/ Penny Shane

                                      Penny Shane